UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIENVENIDO PILAO ONG,

                                   Plaintiffs,                    Case No. 12-CV-974 (KMK)

        -v-                                                       <u>OPINION AND ORDER</u>

PARK MANOR (MIDDLETOWN PARK)
REHABILITATION AND HEALTHCARE
CENTER et al.,

                                   Defendants.

<u>Appearances:</u>

Bienvenido Pilao Ong
Middletown, NY
*Pro Se Plaintiff*

Katherine J. Zellinger, Esq.
Law Offices of Alan I. Lamer
Elmsford, NY
*Counsel for Defendants Park Manor (Middletown Park) Rehabilitation and Healthcare Center,
Darla Conklin, Eileen Masterson, Jennifer Small, Wendy Brewster, Jenna Green, Suzanne
Forman, and Lisa M. Reyes*

Victor Carmine Piacentile, Esq.
Kopff, Nardelli & Dopf, LLP
New York, NY
*Counsel for Defendant Park Manor (Middletown Park) Rehabilitation and Healthcare Center*

James A. Randazzo, Esq.
Caitlin Grace Scheir, Esq.
Gaines, Gruner, Ponzini & Novick, LLP
White Plains, NY
*Counsel for Defendants Town of Wallkill Police Department, Police Officer Jason Farmingham,
Robert Hertman, Sergeant Mr. R. Procak, TOW-P.O. Jefferey Gulick, TOW-P.O. Adam Solan,
Deputy Chief Anthony Spano, Sgt. Robert McLymore, Sgt. Robert Kammarada, and P.O. A.
Dewey*

Carol C. Pierce, Esq.
Orange County Attorney
Goshen, NY
*Counsel for Defendants County of Orange, Tim Murphy, Candice H. Crain, Dina M. Lacatena*

Michael Francis Albanese, Esq.
State of New York, Attorney General's Office
New York, NY
*Counsel for Defendant Timothy Mannix*

Kenneth Andrew McLellan, Esq.
Keith Robert Roussel, Esq.
Winget Spadafora & Schwartzberg, LLP
New York, NY
*Counsel for Defendant Sholes & Miller, LLP*

KENNETH M. KARAS, District Judge:

Plaintiff Bienvenido Pilao Ong brings this Action against multiple defendants, alleging various claims under federal and state law arising out of five incidents that took place in 2010 and 2011.  Before the Court are five motions to dismiss filed by certain groups of Defendants. For the following reasons, the Court grants those motions in part and denies them in part.

## I.  BACKGROUND

### A.  Factual Background

The following facts are taken from Plaintiff's Second Amended Complaint and the exhibits attached thereto.  (*See* Second Am. Compl. (Dkt. No. 32).)[1]  Plaintiff is an Asian-American naturalized U.S. citizen over the age of 65 who, at all relevant times, was a resident of

---

[1] This document consists of a total of 322 pages, the first 32 of which contain Plaintiff's Complaint (set out in six sections of 120 individually numbered paragraphs), and the remaining 290 of which contain a number of indexed exhibits.  When referring to the Complaint, the Court will use the relevant paragraph number or page number, where appropriate.  When referring to an exhibit, the Court will use the index number Plaintiff assigned to that exhibit.  The Court notes that, in addition to labelling each exhibit with an index number, Plaintiff included tables of contents explaining the nature and intended use of each indexed exhibit.  Those tables can be found at pages 33–35, 82–85, 140–46, 224–25, and 241–44 of the combined, 322-page document.

Middletown, NY.  (*See id.* ¶¶ 28, 78.)  Defendants include four entities and a number of

individuals employed by those entities, which Plaintiff classifies into five categories:  (1)

Middletown Park Rehabilitation and Health Care Center (formerly known as "Park Manor")

("MPRHCC"), a long-term-care facility primarily serving elderly individuals; Vincent

Maniscalco ("Maniscalco"), an administrator; Darla Conklin ("Conklin"), an assistant

administrator; Eileen Masterson ("Masterson"), a director of nursing; Suzzane Forman

("Forman"), a director of social services; Jenna Green ("Green"), a case manager; Jennifer Small

("Small"), a nursing manager; Wendy Brewster ("Brewster"), another nursing manager; Lisa

Reyes ("Reyes"), a physical therapist; "Ms. Dawn" ("Dawn"), a duty nurse; "Ms. Tiffany"

("Tiffany"), a nursing aid; and "Ms. Yvette" ("Yvette"), another nursing aid, (collectively,

"MPRHCC Defendants"); (2) Town of Wallkill Police Department ("Wallkill"); Chief of Police

Robert Hertman ("Hertman"); Deputy Chief Antonio Spano ("Spano"); Sergeant Robert

Kammarada ("Kammarada"); Sergeant Robert McLymore ("McLymore"); Sergeant Richard

Procak ("Procak"); Officer Jason Farmingham ("Framingham"); Officer "A. Dewey"

("Dewey"); Officer Thomas Kleveno ("Kleveno"); Officer "S. Belgiovene" ("Belgiovene");

Officer Jeffrey Gulick ("Gulick"); Officer Adam Solan ("Solan"); Sergeant "A. Moskowitz"

("Moskowitz"); and Angelina Guzman ("Guzman"), a police dispatcher (collectively, "Wallkill

Defendants"); (3) "New York State Police—Troop F" ("New York State") and Timothy Mannix

("Mannix"), a New York State police officer; (4) County of Orange ("Orange County"); Tim

Murphy ("Murphy"), the head supervisor of Orange County's Adult Protective Services

department ("APS"); and APS case workers Candice Crain ("Crain"), Kate Labuda ("Labuda"),

Dina Lacatena ("Lacatena"), and Andrea Leo ("Leo") (collectively, "Orange County

Defendants"); and (5) Sholes & Miller, LLP ("Sholes & Miller"), a New York law firm.  (*See id.*

at 1–3.)

The Complaint divides its allegations and exhibits into five sections corresponding to the

five days on which the events giving rise to Plaintiff's Complaint allegedly occurred.  The

Court's summary follows Plaintiff's chronological organization.

### 1.  March 30, 2010

On March 30, 2010, Plaintiff got into an argument with his daughter, who was a minor.

(*Id.* ¶¶ 63, 109.)  The police were called, and Defendant Farmingham, along with other unnamed

police officers, arrived at Plaintiff's home.  (*Id.* ¶ 109.)  Plaintiff attempted to explain the

situation, but "Farmingham did not listen to [his] explanation," and instead "just hand cuff[ed]"

Plaintiff and "dragg[ed] [him] down stair[s] going to . . . [a] driveway."  (*Id.*)  Farmingham then

"unlawfully arrested" Plaintiff, using "substantial force . . . without provocation" while doing so

(*Id.*)

Farmingham "never created or made [an] arrest/incident[] report," (*id.* ¶ 51.1), but

Plaintiff was nevertheless charged with one count of second-degree menacing, N.Y. Penal Law

§ 120.14, and one count of endangering the welfare of a child, N.Y. Penal Law § 260.10, both

Class A misdemeanors under New York law, (*see id.* ¶ 56; *see also id.* Ex. 1.2 (Securing Order,

dated Mar. 30, 2010)).  Bail was set at $1,000 cash or $2,000 bond, but Plaintiff was remanded

and remained in jail until he was released on April 4, 2010.  (*See id.* ¶ 59; *see also id.* Ex. 1.2.)

Plaintiff was ultimately convicted of one count of endangering the welfare of a child, as charged,

and one count of disorderly conduct, N.Y. Penal Law § 240.20 (the latter of which is a

"violation," as opposed to a Class A misdemeanor) on May 6, 2010.  (*See id.* Ex. 1.4 (Seal

Order, dated Mar. 21, 2013, indicating that Plaintiff's case was adjudicated on May 6, 2010, and

that it "was terminated with a conviction for a noncriminal offense"); *see also id.* (Certificate of Disposition, dated Jan. 15, 2013, indicating same).)

While Plaintiff was in jail, authorities took two actions related to Plaintiff's charges. First, on March 30, the day of Plaintiff's arrest, a town court justice issued a temporary Order of Protection against Plaintiff, prohibiting him from certain types of contact with his daughter and two other individuals.  (*See id.* ¶ 60; *see also id.* Ex. 1.1 (Order of Protection, dated Mar. 30, 2010).)  That order expired on April 15, 2010.  (*See id.* ¶ 63; *see also id.* Ex. 1.1.)  Nevertheless, perhaps due in part to the Order, Plaintiff stayed in a hotel from April 4, 2010 (the day he was released) until May 20, 2010, and thereby incurred $3,306.94 in charges.  (*See id.* ¶ 59; *see also id.* Ex. 1.6 (Microtel Folio).)  Second, on March 31, the day after Plaintiff's arrest, while he was still in jail, Wallkill police officers—one of whom was Defendant Dewey—went to Plaintiff's home and seized a firearm and a pistol permit, the former of which police later secured in an armory, and the latter of which they forwarded to the Orange County Pistol Permit Office.  (*See id.* ¶¶ 39, 56, 59, 110; *see also id.* Exs. 1.5-1, 1.5-2 (Firearms Surrender Report, dated Mar. 31, 2010).)  It is unclear whether police returned these items to Plaintiff when he was released, but on April 7, three days later, a county court judge issued an Order of Suspension, ordering that Plaintiff's pistol permit be suspended, that Plaintiff "immediately surrender all weapons and license [sic] to the Orange County Sheriff's Department," and that, if Plaintiff did not comply, the Orange County Sheriff's Department would be "directed to send a representative to take custody of said weapons."  (*Id.* Ex. 1.5A (Order of Suspension, dated Apr. 7, 2010); *see also id.* ¶ 63.2.)

     2.  August 20, 2010

On August 20, 2010, Plaintiff lived with his mother in an apartment in Middletown.  (*Id.* ¶ 111.)  That afternoon, Defendant Guzman, a 911 operator, received a call from Plaintiff's neighbor, who reported that "Plaintiff's mother was yelling that she was being sexually assaulted and/or otherwise physically abused by Plaintiff."  (*Id.*)  Guzman then dispatched Defendants Farmingham and Kleveno to Plaintiff's apartment.  (*Id.*)  After they arrived at the apartment and knocked on the door, Plaintiff answered and asked them why they were there.  (*Id.*; *see also id.* ¶ 75.)  Initially, Farmingham asked Plaintiff if Plaintiff knew him; Plaintiff responded that he remembered Farmingham as the officer who arrested him on March 30, 2010.  (*Id.* ¶¶ 75, 111.)  Farmingham then told Plaintiff that he was there to arrest Plaintiff again, and when Plaintiff asked him why, Farmingham responded that the police had received a call from Plaintiff's neighbor reporting that Plaintiff's mother was "'yelling for help'" and that "it sounded as though someone [was] being raped."  (*Id.* ¶¶ 64, 111; *see also id.* ¶ 75 (alleging that Farmingham told Plaintiff that he was "going to arrest [him] again because somebody heard . . . [his] mom yelling [that] she was getting or being rape[d] and [that] [someone] [was] biting [his] mother").)  When Plaintiff asked about the neighbor's identity, the officers refused to tell him.  (*Id.* ¶¶ 75, 111.) [2]

     Farmingham and Kleveno then "immediately" entered the apartment and "closed the door," at which point Farmingham "push[ed] [Plaintiff] near [a] door," told him to "put [his] hand[s] up," and then told him to "start strip[ping] from head to foot."  (*Id.* ¶ 111.)  The officers, aware that Plaintiff previously possessed a handgun and a pistol license, were specifically looking for a "weapon or gun."  (*Id.*)  Farmingham then "put hand cuffs on [Plaintiff] [and] then

---

    [2] This is perhaps why Plaintiff multiple times refers to the neighbor's communication with the police as an "anonymous call."  (*See* Second Am. Compl. ¶¶ 64, 67, 75, 111.)

start[ed] biting Plaintiff"; Kleveno saw this occur, but did not try to intervene.  (*Id.*; *see also id.*
¶¶ 64, 71.)

At some point while in Plaintiff's apartment, Farmingham stated that he detected a "'very
strong odor of something rotting.'"  (*Id.* ¶ 65.)  He then "went to [Plaintiff's] refrigerator,"
"open[ed]" it, commented that it "smell[ed] [of] rotten food,'" and asked Plaintiff whether he
was "'feeding [his] mother'" rotten food.  (*Id.* ¶ 67.)  Plaintiff responded that the officers should
"not [be] searching and opening [his] refrigerator" because they were there for the "'purpose'" of
responding to the "'anonymous call,'" and that they were "'violating [his] privacy and at the
same time harassing'" and "'intimidating'" him.  (*Id.*)  In a similar incident, while Plaintiff was
in handcuffs, he asked Farmingham to "close[] [his] laptop" before the officers brought him to
the police station, but Farmingham refused.  (*Id.* ¶ 73.)  Plaintiff alleges that he was later told by
a friend who went to Plaintiff's apartment after Plaintiff was taken to jail that Farmingham
searched Plaintiff's laptop and made a comment to Plaintiff's friend about Plaintiff's finances
based on information he obtained in the search.  (*Id.* ¶¶ 73, 111.)

While the officers were at the scene, an ambulance arrived, as well as Defendant Crain,
who appeared on behalf of APS.  (*See id.* ¶ 77.1; *see also id.* Ex. 2.0 (Incident Report, dated
Aug. 20, 2010, indicating that Crain and a non-party nurse were at the scene); *id.* Ex. 2.1 (Arrest
Report, dated Aug. 20, 2010, indicating same).)  All of those parties entered Plaintiff's mother's
bedroom and, after examining her at the scene, decided to send her to Orange Regional Medical
Center for a full evaluation.  (*See id.* Ex. 2.0.)  Although the examining doctor found "[n]o
information regarding sexual or psychiatric abuse" and that there were "no fracture[s]" or "signs
of infection," he did determine that Plaintiff's mother suffered from "[d]ementia," "severe
dehydration," and "[p]hysical abuse" in the form of "ecchymosis on the skin of upper and lower

extremities and blisters." (*Id.* ¶ 77.1.; *id.* Ex. 2.14 (History and Physical, dated Aug. 20, 2010).)[3]

The doctor also noted that he would consider a "gynecological exam," possibly based on the rape

allegations. (*Id.* ¶ 77.1; *id.* Ex. 2.14.)

    The police filed an Incident Report that day, which included an officer's account of the

arrest:

> On August 20, 2010, [Farmingham] was dispatched to [Plaintiff's apartment] to
> check the welfare of an elderly female. Upon arrival[, Plaintiff] answered the door,
> [Farmingham] informed [Plaintiff] that [he] and officer Kleveno were there to
> check the welfare of his mother. Upon [Plaintiff] answering the door there was a
> very strong odor of something rotting. [Plaintiff] immediately became defensive
> and stated to [the officers] that he had just put his mother to sleep and the he did
> not want us to wake her. [The officers] then informed [Plaintiff] that [they] would
> need to speak to his mother before leaving. [Plaintiff] agreed to let [the officers]
> speak to his mother. While walking in [Plaintiff] began to appear very nervous.
> Upon entering [the mother's] bedroom, [the officers] immediately observed several
> bruises on [the mother's] legs [and] arms and also that [the mother] had a black eye.
> [Farmingham] also observed bed sheets next to [the mother's] bed that were
> covered in urine. [Plaintiff] was asked to leave the room so [Farmingham] could
> speak to [the mother]. [Farmingham] then interviewed [the mother,] who was
> visibly shaking and appeared confused. [Farmingham] attempted to interview [the
> mother,] but due [to] a language barrier [Farmingham] was unable to obtain
> information from [the mother]. [The mother] also appeared to [be] frightened and
> afraid to speak to [the officers]. [An ambulance] was dispatched and [Farmingham]
> contacted [APS]. [Farmingham] spoke with Candice Crain of APS[,] who stated
> that she would respond to [the] location. Upon arrival of [the ambulance,]
> [Plaintiff] stated to [the officers] and in front of the [ambulance crew], "I tie [sic]
> her legs up." [The officers] then took [Plaintiff] into custody, [and Plaintiff] was
> then transported to [the] station for processing. Upon arrival of [Crain], [Crain]
> spoke with [the mother] and discovered that her legs[,] which were covered under
> the blankets[,] were still tied with a twisted plastic bag. [Crain] immediately
> removed [the mother's] legs from the restraint and informed [Farmingham]. [The
> mother] was transported to [the hospital] for evaluation . . . . [Crain] went to the
> hospital with [the mother]. Upon arrival to the hospital[, Crain] discovered with
> hospital staff further bruising on [the mother's] breast and upper thighs. [The

---

[3] Although it is unclear from the report exactly what the examining doctor meant by his diagnosis of "ecchymosis," the Court notes that that term, in medical usage, commonly refers to "the escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot or area"—in other words, a bruise. *Webster's Third New Int'l Dictionary* 718 (2002).

doctor] stated that the bruising was consistent with [the mother] being physically abused.

(*Id.* Ex. 2.0.)  The police also provided Plaintiff with an official notice, required by N.Y. C.P.L. § 710.30, of the county's intent later to offer Plaintiff's statement, "I tie [sic] her legs down," into evidence.  (*Id.* Ex. 2.0-2 (710.30 Notice, dated Aug. 20, 2010).)

Plaintiff was charged that day with second-degree endangering the welfare of a vulnerable elderly person (a Class E felony), N.Y. Penal Law § 260.32, third-degree assault (a Class A misdemeanor), N.Y. Penal Law § 120.00, and second-degree unlawful imprisonment (a Class A misdemeanor), N.Y. Penal Law § 135.05.  (*Id.* ¶ 65; *see also id.* Ex. 2.1 (Arrest Report, dated Aug. 20, 2010).)  In a misdemeanor information and felony complaint filed the same day, Farmingham offered an account of the incident that appears to be consistent with the account he gave in the Incident Report:

> [Plaintiff] . . . [,] on Aug[ust] 20, 2010 at approximately [3:25 p.m.,] being the caregiver for 92 year old victim (Felicidad P[.] Rana)[,] did physically tie [the] victim's feet together and then to the bed using a plastic bag, in order to prevent said victim from being able to get out of bed.  Furthermore[,] the victim was unable to stand on her own and walk to the bathroom due to the tightness in her ankles from being restrained[,] causing said victim to urinate on the floor.

(*Id.* Ex. 2.2 (Misdemeanor Information, filed Aug. 20, 2010).)

> [Plaintiff] . . . [,] on Aug[ust] 20, 2010 at approximately [3:25 p.m.,] being the caregiver for 92 year old victim (Felicidad P[.] Rana)[,] did physically tie [the] victim's feet to the bed using a plastic bag.  [Plaintiff's] actions did cause swelling and severe bruising to [the] victim's ankles and feet.

(*Id.* Ex. 2.3 (Felony Complaint, filed Aug. 20, 2010).)[4]

Plaintiff was kept in jail overnight, but the next morning he was released on bail with the assistance of his friend.  (*Id.* ¶ 64.)  That same day, Plaintiff saw a doctor, who completed a

---

[4] According to a "Seal Order" filed on March 21, 2013, the case was "adjudicated" on November 16, 2010, and it "was terminated in favor of [Plaintiff]."  (Second Am. Compl. Ex. 2.5 (Seal Order).)

9

medical examination, which included taking numerous x-rays, and concluded that Plaintiff had

bruises on his stomach and left arm.  (*See id.* ¶ 71; *id.* Ex. H (prescription slip, noting that

Plaintiff complained of being "bitten by police" and had "bruise[s]" on his chest and abdomen);

*id.* Exs. I, J, K (x-ray images); *id.* Exs. L, M, N (photos of Plaintiff appearing to indicate

bruises).)

### 3.  June 10, 2011

On June 10, 2011, Plaintiff's mother was a resident at MPRHCC, where she lived on the

third floor, fifth unit, in Room #511.  (*Id.* ¶¶ 102, 112.)  While visiting his mother in her room,

Plaintiff observed that his mother had been "neglected," in that she was not wearing any pants or

socks, but was "covered [only] by [three] bed sheet[s]," and was therefore "chilling because [the

air conditioner] was so high."  (*Id.* ¶ 90; *see also id.* ¶ 102.)  He also observed that her pants,

which had been "'thrown in the garbage,'" were "full of feces and soak[ed] with urine."  (*Id.*

¶¶ 90, 102.)  Plaintiff was concerned, not only because of his mother's present situation, but also

because he knew that multiple times his mother had repeatedly pushed a "'red button'" in her

room to summon help, "but no one came[] in."  (*Id.* ¶ 90.)  Plaintiff asked two nurses,

Defendants Tiffany and Yvette, to watch his mother while he asked a third nurse, Defendant

Dawn, who was alone at a nearby nursing station, to bring his mother some socks.  (*Id.*

¶¶ 90, 102.)

At some point, Dawn "reported Plaintiff to [the] Director of Nursing."  (*Id.* ¶ 90.)  Then,

Defendant Brewster, a nursing manager, and Defendant Reyes, a physical therapist, "allegedly

called the [Wallkill] police to inform the[m] that she [sic] had heard Plaintiff yelling [at his]

mother and [making] verbal threat[s] regarding the use of [a] firearm."  (*Id.* ¶ 112.)  Two police

officers responded to the scene: Defendant Gulick, from Wallkill, and Defendant Mannix, a state

trooper.  (*See id.* ¶¶ 88, 102–03.)  They did not find a firearm at the scene, (*id.* ¶ 112), but Gulick did arrest Plaintiff and charge him with third-degree attempted assault (a Class B misdemeanor), N.Y. Penal Law §§ 110.00, 120.00, and first-degree endangering the welfare of an incompetent or physically disabled person (a Class A misdemeanor), N.Y. Penal Law § 260.25, (s*ee id.* ¶¶ 88, 102; *see also id.* Ex. 3.18 (Arrest Report, dated June 10, 2011).)  Plaintiff alleges that, throughout the course of the incident, only seven people were present: Gulick, Mannix, Tiffany, Yvette, Plaintiff, his mother, and Defendant Masterson.  (*Id.* ¶ 102.)  Conversely, he alleges that a number of Defendants—specifically, Conklin, Small, Brewster, Green, Forman, Reyes, and Maniscalco—were not present.  (*Id.* ¶¶ 86, 87, 89, 90, 102.)

A temporary Order of Protection issued that same day, ordering Plaintiff to surrender any firearms he owned or possessed, and prohibiting Plaintiff from certain types of contact with his mother.  (*Id.* Ex. 3.15 (Order of Protection, dated June 10, 2011).)  Another temporary Order of Protection was then issued on July 12, 2011, restricting Plaintiff generally from any form of communication or contact with his mother, but allowing Plaintiff to visit his mother "only . . . under the supervision of [Plaintiff's friend] Brent Borgmann."  (*Id.* Ex. 3.21 (Order of Protection, dated July 12, 2011).)  A final temporary Order of Protection was entered on August 2, 2011, retaining the supervised-visit condition of the previous order while also ordering Plaintiff to refrain from committing "any criminal offense or interference with" his mother.  (*Id.* Ex. 3.23 (Order of Protection, dated Aug. 2, 2011).)  The Order, which expired on August 2, 2012, also entered an "adjournment in contemplation of dismissal" of Plaintiff's case, meaning that if Plaintiff complied with the Order for one year, he could expect the charges to be dismissed.  (*Id.*; *see also id.* Ex. 3.26 (Letter from Plaintiff's attorney, Craig Stephen Brown, Esq., to Plaintiff, dated Aug. 5, 2011, informing Plaintiff that he "[was] given a one . . . year

Adjournment in Contemplation of Dismissal with a limited Order of Protection," and that "[i]f [he] [did] not get arrested within this one . . . year time period, the charge [would] be dismissed").)

The Complaint is somewhat unclear as to the details of the incident that prompted Plaintiff's arrest, but documents attached to the Complaint—including a Domestic Incident Report and an Incident Report—contain Defendant Gulick's account:

> While [Plaintiff] was visiting [his mother] at a rehabilitation/nursing facility, [Plaintiff] became verbally abusive towards [his mother] and also struck and pushed [her] several times. [Plaintiff] was placed in custody by [Gulick]. [Plaintiff's mother] did not suffer any injuries. [Her] [s]tatement was taken from [a] staff member who witnessed [the] incident.

(*Id.* Ex. 3.17 (Domestic Incident Report, dated June 11, 2011).)

> [Gulick] responded to a 911 [call]. Upon arrival [Gulick] located [Plaintiff] inside a private residential room with [his mother] and several staff members from [MPRHCC]. [Gulick] advised [Plaintiff] to exit the room and stand in the hallway. [Plaintiff] was uncooperative but eventually left the room. [Gulick] and [Defendant Belgiovene] searched [Plaintiff] because it was reported [that] he made a verbal threat regarding the use of a firearm. No firearm [was] located. [Gulick] spoke with [a witness, who was a physical-therapist assistant,] who advised [that] at approx[imately] [5:00 p.m.,] she [was] walking down the hallway and heard yelling, cursing[,] and what sounded like approx[imately] [three] slaps coming from [Plaintiff's mother's] room . . . . [The witness] observed [Plaintiff's] arm in the air in a striking position and [Plaintiff] then started forcibly pushing [his mother's] knees and legs while yelling[,] "Fucking diaper!!" [The witness] stated [that] she is familiar with [Plaintiff] because he visits [his mother] everyday [sic] and she is aware of numerous complaints against [Plaintiff] by staff members. [The witness] stated [that] after observing the incident, she advised [a nurse manager named Wendy,] who called 911. [Gulick] placed [Plaintiff] into custody and transported [him] to [the Wallkill police station]. [Gulick] processed [Plaintiff] who was then [transferred] to [officer] Renwick for arraignment . . . . [Gulick] . . . contacted [APS] and spoke with [Defendant] Andrea Leo[,] who took the case. Judge Owen issued a stay away order of protection against [Plaintiff] protecting [his mother]. [Defendant Maniscalco,] Director of Administration [at MPRHCC] was advised. Case closed.

(*Id.* Exs. 3.19, 3.19-1 (Incident Report and Additional Narrative, dated June 10, 2011).) The Complaint also contains, as an attached exhibit, a deposition from Defendant Reyes, taken by

Defendant Gulick the day of the incident, which was submitted in support of the Misdemeanor

Information filed against Plaintiff and provides Reyes's account of the incident:

> I was walking down the hallway on the 5th floor when I heard yelling, cursing[,]
> and what sounded like approx[imately] [three] slaps coming from one of the private
> residential rooms.  I had passed the room so I turned back and was able to look
> inside the room because the door was wide open.  I observed a male subject,
> [Plaintiff], who I am familiar with from being at the facility every day visiting his
> mother . . . who resides in the room.  [Plaintiff's] arm was in the air in a striking
> position and he then started forcibly pushing [his mother's] knees and legs while
> cursing[,] "Fucking diaper!!"  [His mother] had no pants on during the physical
> altercation.  I never entered the room and viewed everything from the hallway.
> After witnessing [Plaintiff's] actions I walked away and immediately advised [a
> nursing manager named Wendy] and she then called 911.  I am aware of numerous
> complaints against [Plaintiff] from the nursing staff and he's also made direct
> comments to me threatening physical harm to members of his family and staff
> members.

(*Id.* Ex. 3.16.1 (Supporting Deposition of Lisa M. Reyes, dated June 10, 2011).)

### 4.  September 13, 2011

Plaintiff was arrested again on September 13, 2011.  (*Id.* ¶ 113.)  The Complaint does not

appear to allege the facts underlying this arrest, however the Court can glean a number of details

from exhibits attached to the Complaint.  On August 9, 2011, three Defendants employed by

MPRHCC—Masterson, Brewster, and Small—gave statements to Defendant Solan regarding

allegations of harassment against Plaintiff.  First, Masterson stated that, "[i]n the past week, [her]

staff ha[d] been receiving numerous phone calls from [Plaintiff].  [Plaintiff] call[ed] at all hours

of the day[,] t[y]ing up [her] staff just to vent his frustrations with [her] and [Brewster] for

having him arrested."  (*Id.* Ex. 4.5 (Masterson Statement, dated Aug. 9, 2011).)  She also alleged

that these phone calls "serve[d] no legitimate purpose in that all [Plaintiff] want[ed] to do [was]

vent."  (*Id.*)  She further alleged that when Plaintiff was "allowed at the facility, he would harass

other visitors[,] causing a hazardous environment."  (*Id.*)  Finally, she alleged that Plaintiff's

"action[s] ha[d] left [her] and other staff in fear of their safety."  (*Id.*)

Second, Brewster stated that, "on [June 10, 2010], [she] was one of the nursing staff involved in an incident between [Plaintiff] and his mother." (*Id.* Ex. 4.6 (Brewster Statement, dated Aug. 9, 2011).)  She acknowledged that, "[s]ince the incident, [she] ha[d] not spoken with [Plaintiff]." (*Id.*)  However, she alleged that "numerous threats were made at [her] when other nursing staff ha[d] spoken with him," and she further alleged that, "[a]lthough the threats were not made directly to [her], [she] still [was] in fear for [her] safety and well[-]being." (*Id.*)

Third, Small stated that she had received a call from Plaintiff on August 8, 2011 (the previous day) "while working at [MPRHCC]." (*Id.* Ex. 4.7 (Small Statement, dated Aug. 9, 2011).)  According to Small, Plaintiff "seemed very irate and rambeling [sic]" on the call. (*Id.*)  In this context, he told Small, "'I know it was [Brewster] that called 911 the day I was taken into police custody.  I have rights to my mother.  [Brewster] and [Masterson] will pay the ultimate consequence and I can see it in my mind what I will do to you.'" (*Id.*)  Small then "reported the incident to [Maniscalco] . . . that day." (*Id.*)

Approximately two weeks later, on August 23, Maniscalco provided to Farmingham a handwritten log of phone calls MPRHCC had received from Plaintiff since July 12, 2011, reflecting that Plaintiff had made 11 such calls. (*Id.* Ex. 4.3 (note from Maniscalco to Farmingham, dated Aug. 23, 2011).)  Maniscalco also gave a statement:

> Since July of [2011] I have been receiving numerous phone calls from [Plaintiff].  [Plaintiff] is currently no longer allowed on the property due to an incident that occurred in June at my facility.  [Plaintiff] calls me on a daily basis numerous times serving no legitimate purpose other th[a]n to vent his frustration against me banning him from the property.  [Plaintiff] not only contacts me via the telephone but [he] has sent numerous fax messages to me which serves no legitimate purpose.  [Plaintiff] has been advised by me numerous time[s] to stop all communication, phone and fax, and that all communications should be sent to the facilities attorney or his attorney regarding any matter that he may have.  [Plaintiff] has failed to comply with my request and the constant phone calls I [b]elieve is causing annoyance and alarm for my safety.  I wish to pursue charges against [Plaintiff].

(*Id.* Ex. 4.4 (Supporting Deposition of Vincent Maniscalco, dated Aug. 23, 2011).)

On September 13, 2011, Wallkill police arrested Plaintiff and charged him with second-degree aggravated harassment, N.Y. Penal Law § 240.30 (a Class A misdemeanor).  (*Id.* Ex. 4.0 (Arrest Report, dated Sept. 13, 2011).)  According to the Arrest Report, Defendant Solan was the arresting officer.  (*Id.*)  Ultimately, the charge was later dismissed, for reasons that are not clear based on the Complaint and accompanying exhibits.  (*See id.* Ex. 4.9 (Certificate of Disposition, dated Oct. 18, 2011).)

### 5.  November 10, 2011

The fifth incident discussed in Plaintiff's Complaint involves a petition for guardianship filed on August 24, 2011, and litigated at a November 10, 2011 Surrogate's Court hearing.  On August 24, 2011, Defendant Sholes & Miller, on behalf of Defendant MPRHCC, filed a petition in Orange County Surrogate's Court to determine whether Plaintiff's mother should be appointed a legal guardian.  (*Id.* ¶¶ 24, 108.)  The petition claimed that Plaintiff's sister, Victoria Chang ("Chang"), sought to become her mother's legal guardian:

> Petitioner is aware that [Plaintiff's mother] had designated her son, [Plaintiff], as her health care proxy.  However, due to [Plaintiff's] refusal to take our calls, respond to our letters, and discuss his mother's care, and due to his assaults on his mother and orders of protection discussed below, we contacted [Plaintiff's mother's] alternate health care proxy, [Plaintiff's sister] Yolando Co.  When our social worker spoke with Ms. Co by telephone on June 30, 2011, Ms. Co advised that she could not make health care decisions for her mother and wanted to be removed as her mother's alternate health care proxy.  Ms. Co requested that all calls and decision making regarding her mother be directed to her sister, Victoria Chang, the eldest daughter of [Plaintiff's mother].   We then spoke with Ms. Chang regarding acting as a surrogate health care proxy pursuant to the Family Health Care Decision Act. . . .
>
> Although [Plaintiff] claims to be his mother's power of attorney, we have not seen such a document.
>
> Ms. Chang attended an initial care plan meeting at our facility on July 15, 2011.  Ms. Chang indicated that she wanted to be in charge of her mother's health care decision making process, and also wanted her mother to reside in a nursing home closer to her own home, which is located in New Jersey.

(*Id.* Ex. 18 (apparent excerpt from guardianship petition).)  Along with the petition, Sholes &
Miller filed a number of supporting documents, including (1) a "Family Health Care Decision
Information" form signed by Defendant Green and dated June 29, 2011, noting that Plaintiff's
mother had an existing Health Care Proxy, that she did not have a guardian, but that she did have
two daughters (Victoria Chang and Eloisa Kern), (*see id.* Ex. 12); (2) a "Consent by Surrogate to
DNR Order" form signed by Plaintiff (as his mother's surrogate), witnessed by Defendant Green,
and dated March 31, 2011, indicating Plaintiff's consent for a physician to issue a do-not-
resuscitate order ("DNR"), (*see id.* Ex. 14); (3) supporting documentation regarding the DNR
consent form, (*see id.* Exs. 15–17); and (4) a New Jersey police report memorializing a domestic
dispute in November 2007 involving Plaintiff's mother (as the offender), Chang (as the
complainant), and a third-party witness, (*see id.* Ex. 19).

A judge issued an Order To Show Cause the same day the petition was filed.  (*See id.*
Exs. 5.0, 5.0-1 (Order To Show Cause, dated Aug. 24, 2011).)  Moreover, at some point,
Plaintiff's mother was appointed a temporary guardian from the Orange County Department of
Social Services, a "court evaluator," and an attorney from Mental Hygiene Legal Services, Inc.
to represent her in connection with the guardianship petition.  (*See id.* Ex. Index No. 2011-08338
("Guardianship Order") (Order & J. Appointing Guardian of the Person and Property, dated Dec.
12, 2011).)  A hearing was originally scheduled to take place in October, but it was rescheduled
to November 10.  (*See id.* Ex. 13 (Letter from Sarah E. Sholes, Esq., to Plaintiff and others (Oct.
14, 2011).)

At the hearing, Sarah Sholes ("Sholes"), an attorney from Defendant Sholes & Miller,
appeared on behalf of petitioner; the court evaluator appeared on behalf of the court; Plaintiff's
mother's attorney appeared on behalf of Plaintiff's mother; and David Medford of the Orange

16

County Attorney's Office appeared on behalf of the Orange County Department of Social Services.  (*See id.* Ex. 5.1 ("Hr'g Tr.") (Hr'g Tr., dated Nov. 10, 2011).)  In support of the petition, Sholes called a number of witness, including the court evaluator, and Defendants Masterson, Forman, Smalls, Farmingham, and Crain.  (*See id.* (Index page).)  Plaintiff's mother's attorney also called a number of witnesses, including Plaintiff's mother, Chang, and Plaintiff. (*See id.*)  The Court was also presented with a number of exhibits, including the court evaluator's report, Plaintiff's mother's medical records, and exhibits from the Wallkill Police Department. (*See* Guardianship Order 2.)

Plaintiff identifies a number of excerpts from the Hearing Transcript that are relevant to his Complaint.  First, the court evaluator (who is not a party to this Action) testified regarding Plaintiff's status as Power of Attorney.  After being shown a copy of a document dated November 20, 2007, wherein Plaintiff's mother appears to have granted Plaintiff power of attorney, Sholes asked the court evaluator whether he had seen that document:

> A.  The first I saw the power of attorney was a few minutes ago in chambers produced by the assistant county attorney.
>
> Q.  Does that power of attorney indicate that [Plaintiff] is [his mother's] power of attorney?
>
> A.  Yes.  And if I was aware of this, and I had seen a copy of it, I would have requested in my report that the power of attorney be revoked immediately.
>
> Q.  And on what basis?
>
> A.  Based upon the maltreatment—the alleged maltreatment of [Plaintiff] relating to his mother, clearly identified by the several police reports that are attached to your petition. . . .

(Hr'g Tr. 9.)

Second, Defendant Masterson testified on direct examination regarding Plaintiff's treatment of his mother at MPRHCC:

Q.  Are you familiar with [Plaintiff]?

A.  I am.

Q.  Can you tell us what your experience has been with him in terms of he and his mother since she has been at [MPRHCC]?

A.   My experiences have been that he has displayed volatile actions on many occasions towards his mother, towards the staff.

Q.  Can you give us some examples?

A.  I can give an example as to times that he would start yelling, start cursing.

Q.  At staff?

A.  At staff, and also yelling about her diapers, things like that.

Q.  And what would the comment about the diapers entail?

A.  F'g diapers.  F'g diapers.

Q.  And was [Plaintiff] asked by the staff not to raise his voice and not to curse?

A.  Yes.  On more than one occasion.

Q.  Did he heed any of those requests?

A.  No.

Q.   Now, did there come a time in June of this year when a physical incident occurred between [Plaintiff] and his mother at the facility?

A.  Yes.

Q.  And how did you come to learn about that?

A.  It was brought to my attention by the then assistant director of nursing, and the nursing supervisor that I needed to go to the unit where [Plaintiff's mother] was, that something was going on with her son.

Q.  Did you go to the unit?

A.  I did.

Q.  When you got there, what did you learn?

A.  I asked the staff what was the matter and they said there was a report that [Plaintiff] had been cursing at his mother and was seen slapping his mother on the leg.

Q.  Were the police called?

A.  They were.

Q.  Was [Plaintiff] arrested as a result?

A.  He was.

Q.  Now was it your understanding that a protective order was issued by a local judge as a result of that incident?

A.  Yes.

Q.  And eventually was that protective order revised to permit [Plaintiff] to visit his mother in the company of someone else?

A.  Yes.

Q.  When [Plaintiff's mother] was admitted to the facility . . . , was she on any type of special diet?

A.  She was.  She had some swallowing difficulties so she was on a special type of diet.

Q.  And did there come a time when you learned that [Plaintiff] had brought different food in for her and was feeding her different food?

A.  Yes.

Q.  And what, if any, medical issues were there with that scenario?

A.  There was the risk for aspiration for her because at that time she wasn't taking a regular texture diet with regular thin liquids.

Q.  Did the staff explain the risk of aspiration to [Plaintiff]?

A.  Correct.  They had before and during the incident.

Q.  So is it correct that even after he had been asked not to bring in that food, he continued to do so?

A.  Yes.

Q.  And was he observed feeding that food that he brought in to his mother?

A.  Yes.

. . . .

Q.  Have you noticed any changes in [Plaintiff's mother's] mood and her demeanor since [Plaintiff] stopped visiting her?

. . . .

A.  I have observed that [Plaintiff's mother] is more open with the nursing staff in that she will speak to them more.  She doesn't just use clipped one word answers.  And that she also has gained 11 points since [Plaintiff] stopped visiting her.

Q.  And was that weight gain a good thing for her?

A.  A very good thing.

(*Id.* 14–18.)  Plaintiff's mother's attorney then asked Masterson a number of questions on cross-

examination:

Q.  Miss Masterson, you mentioned that at some point there was a stipulation that [Plaintiff] could visit with [his mother] with supervision?

A.  Right.

Q.  Is that plan still in effect?

A.  No, it is not.

Q.  Why was it changed?

A.  It was changed because [Plaintiff] was not abiding by the stipulations even.  He was being adversarial.

Q.  With whom?

A.  With the staff.  Even with another visitor in the lobby.

Q.  Did the nursing home take any legal action to prevent [any] further supervised visits?

. . . .

A.  We had consulted with counsel and also with the police about the order of protection.

Q.  And was the order of protection changed or extended at any point?

A.  Yes.

Q.  And what is his current order of protection, if you know?

A.  That he cannot come to the facility.

Q.  Is he permitted supervised visits on any level?

A.  No.

Q.  Outside of the nursing facility?

A.  No.

Q.  And are you aware of the current expiration date of that order of protection?

A.  I believe that I am.  I'm not sure if it is correct.  I thought it was in December of this year.

(*Id.* 19–21.)

Third, Forman testified on direct examination regarding her position at MPRHCC, her qualifications, and her presence at the scene of the July 20, 2011 incident:

Q.  Miss Forman, where are you currently employed?

A.  [MPRHCC].

Q.  In what capacity?

A.  Director of social services.

Q.  Are you a social worker?

A.  I am.

Q.  Are you licensed in New York State?

A.  Not licensed.  Master's in social work.

21

Q.  Okay.  Where did you obtain your master's?

A.  Rutgers University.

. . . .

Q.  Did you become aware in June of [2011] of an incident involving [Plaintiff] and his mother?

A.  Yes.

Q.  How did you learn about that?

A.  I was at the facility at the time. . . .  And I was informed the same time Mrs. Masterson was.

Q.  Did you go to [Plaintiff's mother's] room?

A.  I did.

Q.  Tell us what you observed and heard?

A.  When I entered the room, [Plaintiff] was in there with his mother and another nurse's aide.  And when asked to leave, he refused to leave, and he started yelling and screaming.

Q.  And can you tell us what types of things he was yelling and screaming?

A.  "I'm not going anywhere.  I didn't do anything.  What are you talking about?  What are you talking about?"  And then the police came.  They came very quickly.

Q.  Was [Plaintiff] arrested?

A.  Yes he was.

Q.  What was your understanding as to what had happened with him and his mother?

A.  Another staff member apparently witnessed [Plaintiff] slapping his mother and yelling at her while in the room with her.

Q.  And did you speak to that staff member?

A.  No, I didn't.

(*Id.* 22, 24–25.)

Fourth, Smalls testified on direct examination about her prior conversations with

Plaintiff:

Q.  Now, have you had any conversations with [Plaintiff] over the time his mother has resided at [MPRHCC]?

A.  Yes.

Q.  Can you tell us about those conversations, what his tone and demeanor was?

A.  I remember one time I had to go out on a doctor's appointment with [Plaintiff's mother].  And he was telling me about his brother who smoked and did a lot of drinking.  And he wished that his brother would die.  And the brother ended up with lung cancer.  And the brother, I guess, wanted to make amends with him, and he refused.  He said, I hope you die.  And then the brother died.

I have spoken to [Plaintiff] several times on the phone.  One time in August.  He said he knew that it was Wendy Brewster that called 911 that day he was taken into police custody.  And that Wendy and Eileen Masterson would pay the ultimate consequence for keeping him from his mother.

Q.  What did you interpret paying the ultimate consequence to mean?

A.  It could mean anything. I thought, you know, physical retaliation.

Q.  Did you notify Miss Masterson that he made that remark?

A.  Yes.

Q.  Did [Plaintiff] ever raise his voice to you or within ear s[h]ot of you?

A.  Yes.

Q.  And can you explain what his tone was when those things happened, what the reason for it was, if any?

A.  The day we approached him about him feeding his mother the unsafe diet texture, I believe it was soup with pieces of carrots and celery and rice in it.  And she was on a pureed diet at the time.  And he says, "Don't tell me how to feed my mother.  I know how to feed my mother.  I read about it on the internet how to feed my mother."  And he was very angry.

Q.  Were there further examples of him feeding his mother food that was not on her pureed diet?

A. Just that one time that I witnessed.

Q. Did any of your staff ever tell you that there were other incidents where he had been seen trying to feed his mother food that was not on her diet?

A. Yes.

Q. And did you counsel him about that?

A. Yes.

Q. More than once?

A. Yes.

Q. Did there come a time when he told you that he had been up in a tree?

A. Yes.

Q. Can you tell us about that?

A. It was one of the social workers and myself. He was talking about his sister Victoria [Chang] and how he wanted to kill her. And he was sitting up in a tree with a gun. And that God came to him in the tree and said that you do not want to do this. So he climbed down from the tree.

(*Id.* at 33–35.)

Fifth, Farmingham testified about his interactions with Plaintiff:

Q. Did there ever come a time [on August 20, 2010] when you were called to the Senior Horizons facility in the Town of Wallkill?

A. Yes, sir.

Q. Why were you called there?

A. For a check the welfare call. An anonymous caller called to complain about the neighbor in the close proximity of their apartment and continuously hearing slapping noises, and it sounded like somebody moaning in pain.

Q. What did you do after you received that call?

A. I responded to the Senior Horizons complex. Went to the apartment number that was issued to me over the radio in the car. Knocked on the door, and which was answered by [Plaintiff].

24

Q.  Have you ever met [Plaintiff] before that time?

A.  I have.

Q.  When you first encountered him, did you recognize him?

A.  I did.

Q.  Once you saw [Plaintiff], what did you do then?

A.  I informed him that I received a call about the welfare of his mother.  I told him—I informed him that I needed to speak to him.  And while standing at the doorway I smelled a very strong odor of something which seemed to be rotting.  It was a very foul odor, almost as if it were more rotting flesh, or something that may have been partially had food, or possibly somebody deceased in the residence.

Q.  What did you do after that?

A.  He immediately was very hesitant to let me in.  And I informed him that I wasn't going to go anywhere until I was able to speak to his mother.  He agreed to let me in.  And we walked into the apartment.

Q.  Would you describe the apartment?

A.  Very disheveled.  Messy.  Unorganized.  Very foul odor.  Very stale air.  As if no windows had been opened for several weeks.  It was just a mess.  A complete mess.

There was pads that were near the mother's bed that were covered in urine.  There was a towel on the bed that was covered in urine and brown stains, which I would have assumed that would be fecal matter.

Q.  Did you find [Plaintiff's] mother in the apartment that day?

A.  Yes, I did.

Q.  Where was she located?

A.  She was in the bedroom when you open the door, the living room.  If you're looking in, the living room is on the left, the bedroom is kind of straight ahead on the right.

Q.  When you found her in the apartment, was she laying down on the bed or was she sitting up?

A.  She was laying down on the bed with the blankets over her legs.

Q.  What happened after you noticed where [Plaintiff's mother] was?

A.  I went in to speak with her.  She appeared very disheveled.  Very kind of out of it.  [Plaintiff] began to speak very loudly.  Very aggravated and agitated.  I told him that I needed to speak to his mother and I asked him to leave the room.  He refused.  I told him, listen, I need to speak to your mom.  She wouldn't talk to me.  She was very—she seemed to be very fearful.  And the fact that he was so agitated and screaming seemed to make her very more uneasy of my presence to speak to me.

Q.  Did there ever come a time when you called for any assistance?

A.  I did.  I called for an ambulance to, at the bare minimum, come and evaluate her.  I contacted my sergeant, and I also notified—I got the number for [APS] and I got the calls started to [APS].

Q.  While you were at the scene, did any of the people you called arrive at the apartment?

A.  They did. . . .  Town of Wallkill Volunteer Ambulance Corps.[] arrived and also [APS].  I believe her name is Candace.  And she is in the room.

. . . .

Q.  Now once the case worker from [APS] arrived, what happened then?

A.  [Plaintiff] already had been taken into custody and brought back to the station by [Kleveno] in a marked patrol unit.  When the ambulance arrived, I believe Miss Crain arrived shortly thereafter or right before.  She spoke with her.  She went to the hospital with her.

When she went into the room and came back out after speaking with her, she had informed me that she had found [Plaintiff's mother's] leg tied to the bed, which was covered by the blankets.

Q.  Did you go back into the room at that point?

A.  I did not.  The ambulance had put her on the stretcher and so forth.  She had, Miss Crain had removed the leg before I had seen it.

Q.  What did you do then?

A.  I—they were taken—I had another Officer come in with a camera to take pictures of the scene.

. . . .

26

Q.  Now, sir, I'm gonna ask you to take a look at [certain photographs] for identification purposes. . . .

. . . .

Q.  [What is] picture number 6?

A.  It is a picture . . . of the plastic bag used to tie [Plaintiff's mother's] legs.  Again of her bed in the apartment.

. . . .

Q.  Picture number 7?

A.  Again, another picture of the rope, just a different angle, that was used to tie her legs.

. . . .

Q.  . . . .  Do you recognize Exhibit 19A?

. . . .

A.  The paper bag which I placed the rope in for evidence.

Q.  How do you know it's the paper bag that you placed the rope into?

A.  Because I filled everything out and I signed it that I was the one that sealed it and placed it on the evidence.

. . . .

Q.  What is Exhibit 19B[?]

A.  It is a plastic bag that is spun around to use to tie her legs down.

(*Id.* at 39–48.)

Finally, Crain testified as to her recollection of the events of August 20, 2010:

Q. . . .  What were the circumstance[s] why you were called into the field [on August 20, 2010]?

A.  Officer Far[m]ingham had made a referral for [Plaintiff's mother], so I went out to the apartment.  And when I got there Officer Far[m]ingham was there and the paramedics were there.  And [Plaintiff's mother] was there.

27

Q.  And once you got there, what did you find?

A.  I found [Plaintiff's mother] in her bedroom lying on the bed.  She was in a night gown.  And she appeared to have some bruising on her face, on her arms.  And the paramedic had pointed out that one of her ankles was very bruised.

So while I was there I decided to move the blanket and that is when I noticed that her other leg was still tied to the bed.

Q.  What kind of bed was it?

A.  It was a twin bed.  I believe it had the hospital bars on the side.

Q.  And how was her leg tied?

A.  It was with a long, like a plastic bag that appeared to be tied a couple times.  And it was wrapped around her ankle and then tied to the hospital bed bar.

Q.  Once you noticed that this was on her leg, what did you do?

A.  Tried to remove it.

Q.  Were you able to remove it?

A.  Actually it was tied so tight that the paramedic had to remove it.  I tried.

. . . .

Q.  Ma'am, do you recognize [Exhibit] 19B?

A.  Yes.  . . . . [It is] [t]he rope that bound [Plaintiff's mother's] leg to the bed.

(*Id.* at 51–53.)  Crain also examined and testified to a number of photographs taken at the hospital on August 20, 2010, purportedly depicting bruises on various parts of Plaintiff's mother's body.  (*See id.* at 53–56.)

On December 12, 2011, the Surrogate's Court issued an order finding that Plaintiff's mother was sufficiently "incapacitated" that she would "likely suffer harm because of her functional limitations" and that "the appointment of a Guardian [was] necessary to prevent such harm."  (Guardianship Order 2–3.)  Accordingly, the court appointed Chang guardian.  (*Id.* at 3.)

The order also decreed that "all health care proxies and power of attorney documents previously executed by [Plaintiff's mother] [were] [t]hereby revoked and vacated and any appointments made thereunder [were] [t]hereby terminated." (*Id.* at 7.)  And it issued a permanent Order of Protection against Plaintiff, ordering that he "remain at least 500 feet from [his mother] [at] all times" and "refrain from any and all telephone and other contact" with her. (*Id.* at 7–8; *see also* Second Am. Compl. Ex. Index No. 2011-008338 (Order of Protection, dated Dec. 12, 2011).) Plaintiff's mother passed away approximately one month later, on January 10, 2012. (Second Am. Compl. ¶ 81.)

    B.  Procedural History

        1.  Initial Complaints

Plaintiff filed the instant Action on February 6, 2012.  At that time, the Complaint was 12 pages long (not including approximately 56 pages of exhibits); contained allegations involving the August 2010, June 2011, and September 2011 incidents; and named only the Town of Wallkill Police Department and MPRHCC as defendants—although it did include references to, inter alia, Farmingham, Reyes, Tiffany, Yvette, Dawn, Maniscalco, and Gulick. (*See* Dkt. No. 2.) On March 27, 2012, the Court issued an Order noting that the Complaint contained numerous allegations against Farmingham "throughout the Complaint," and therefore "direct[ing] [the Clerk of Court] to amend the caption of th[e] action to add [Farmingham] as a defendant." (Dkt. No. 7 at 3–4.)  The Court also directed the Clerk "to substitute as a defendant the Town of Wallkill for the Town of Wallkill Police Department." (*Id.* at 4.)

The Court held an initial conference on November 30, 2012, at which Plaintiff and counsel for Wallkill, Farmingham, and MPRHCC appeared. (*See* Dkt. (minute entry for Nov. 30, 2012).)  At that conference, the Court granted Plaintiff leave to file an amended complaint.

29

(*See id.*)  After successfully seeking numerous extensions of the original January 15, 2013

deadline, Plaintiff ultimately filed his Amended Complaint on May 7, 2013.  (*See* Dkt. No. 23.)[5]

The Amended Complaint, now consisting of 34 pages and a number of exhibits, named

MPRHCC, Wallkill, and Farmingham as Defendants, but also added a number of new Parties,

including Maniscalco, Conklin, Masterson, Small, Brewster, Green, Dawn, Forman, Reyes,

Tiffany, Yvette, Hertman, Procak, Kleveno, Gulick, Solan, Orange County Department of Social

Services, Murphy, Crain, Labuda, Lacatena, Mannix, Sholes & Miller, and Sholes.  (*See id.*)[6]

On July 11, 2013, the Court issued, sua sponte, an Order directing Plaintiff to submit a

second Amended Complaint.  After reminding Plaintiff that, in granting him leave to file his

Amended Complaint, the Court "specifically directed [him] to be clearer as to the entities and/or

persons he intend[ed] to sue, the actionable conduct those entities or persons allegedly engaged

in, and the federal statutory or constitutional basis for his claims," the Court noted that the

Amended Complaint was "extremely difficult to follow," and that "it [was] in many respects less

clear than [the] original Complaint."  (Order ("July 2013 Order") 1–2 (Dkt. No. 25).)  The Court

was able to "discern that Plaintiff intends to pursue malicious prosecution, excessive force,

failure to intervene, and false imprisonment claims against the law enforcement Defendants,"

and it could "construe some of the allegations in the Amended Complaint to support a claim

against the law enforcement Defendants for violating Plaintiff's right to familial association with

---

[5] The Amended Complaint is listed as the twenty-third entry on the Docket, but many of the exhibits can be found in the twenty-second entry, which is the May 4, 2013 letter from Plaintiff to the Court wherein Plaintiff submitted his Amended Complaint and accompanying exhibits.  (*See* Dkt. No. 22.)

[6] Of the presently named Defendants, the Amended Complaint did not name Spano, Kammarada, McLymore, Dewey, Belgiovene, Moskowitz, or Guzman (from Wallkill) or Leo (from Orange County).

his mother." (*Id.* at 6.)  However, the Court noted that "by presenting a great amount of

disjointed and nonsequential information to the Court about the various events giving rise to

Plaintiff's arrests, Plaintiff ha[d] rendered it impossible to comprehend what actually happened

to him." (*Id.*)  It therefore held that "[Plaintiff's] claims against the law enforcement Defendants

. . . [did] not satisfy the pleading requirements of Rule 8." (*Id.*)  It also held that, with regard to

the other Defendants, "Plaintiff [did] not clearly or specifically allege how they were personally

involved in any alleged wrongdoing or any basis for their liability under federal law," and it

therefore held that "[t]he balance of the Amended Complaint . . . also [did] not satisfy the

pleading requirements established by Rule 8." (*Id.*)

The Court then granted Plaintiff "one more opportunity to file an Amended Complaint

. . . in order [to] correct the above deficiencies and to allege clearly and concisely facts to support

his claims." (*Id.* at 7.)  The Court specifically instructed Plaintiff to "provide a short plain

statement of the relevant facts, in separate numbered paragraphs in chronological order,

supporting each claim against each Defendant." (*Id.*)  It also instructed Plaintiff to allege, in the

Second Amended Complaint, "who violated Plaintiff's federally protected rights; what facts

show that his federally protected rights were violated; when such violation(s) occurred; where

such violation(s) occurred; and why Plaintiff is entitled to relief." (*Id.* at 8.)  Finally, the Court

instructed Plaintiff to "allege, in separate numbered paragraphs, for each named Defendant, what

that Defendant did to be personally involved in the violation of Plaintiff's constitutional rights,"

and it warned Plaintiff that "[i]f [he] [did] not comply with this instruction, his pleading may be

dismissed as against any Defendant whose personal involvement [could not] be discerned from

reading the pleading." (*Id.*)  It also twice told Plaintiff that "this may be his final opportunity to

amend." (*Id.* at 7; *see also id.* at 8 ("[T]he Court may not grant Plaintiff another chance to amend.").)

### 2. Second Amended Complaint

Plaintiff ultimately submitted his Second Amended Complaint on September 24, 2013. (*See* Dkt. No. 32.) On December 18, 2013, the Court issued an Order directing Plaintiff to serve the 36 Defendants named in the Second Amended Complaint, and advising Plaintiff that, "[i]f within 120 days of issuance of [a] summons, Plaintiff ha[d] not made service or requested an extension of time in which to do so, under Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure, the Court may dismiss this action for failure to prosecute." (*See* Dkt. No. 36 at 2.)[7] Plaintiff had previously served Defendants MPRHCC, Wallkill, and Farmingham in 2012, when he originally filed his Complaint. (*See* Dkt. (entry for Apr. 5, 2012, indicating issuance of summons); Dkt. No. 8 (Motion To Dismiss filed by MPRHCC, dated May 2, 2012); Dkt. No. 13 (notice of appearance filed on behalf of Defendants Farmingham and Wallkill, dated June 29, 2012).) Plaintiff therefore filed USM-285 forms for the remaining Defendants, which forms

---

[7] In addition to the 35 Defendants that are listed in both the caption of the Second Amended Complaint and on the Docket (one of which is Sholes & Miller), it appears that Plaintiff meant to include Sholes, individually, as a Defendant in both his Amended Complaint and Second Amended Complaint, but she is currently not listed as a Defendant on the Docket. It does not appear that Plaintiff sought to correct the Docket or otherwise serve Sholes when he submitted service forms for the other Defendants. Moreover, when she accepted service on behalf of Defendant Sholes & Miller, Sholes noted that she "[did not] know whether [she had] been named as an individual defendant, or whether plaintiff pro se [was] suing just Sholes & Miller, LLP." (Dkt. No. 44 (Process Receipt & Return for Sholes & Miller, dated Mar. 5, 2014).) Plaintiff still made no attempt to add Sholes as a Defendant or to serve her. The Court therefore construes Plaintiff's Second Amended Complaint not to name Sholes as an individual Defendant.

were received on January 13, 2014, resulting in the issuance of summons on February 14, 2014.

(*See* Dkt. (entries for Jan. 13, 2014 and Feb. 14, 2014).)

Most of the unserved Defendants were served at various points from March to June of

2014. However, the Docket reflects that 11 Defendants are currently not represented by counsel,

and that at least seven of them have not been served.[8] Of those, it appears that Plaintiff failed to

file a USM-285 form for or otherwise serve New York State. Of the remaining five unserved

Defendants, Plaintiff has failed to serve two of them (Yvette and Tiffany) because he was not

able to provide their full names, and subsequent court-directed efforts by Defendants to identify

these individuals were unsuccessful.[9] He has also failed to serve one of them (Guzman), despite

---

[8] Defendants Dawn and Maniscalco were served on April 1, 2014, apparently along with other MPRHCC Defendants. (*See* Dkt. No. 85 (Process Receipt & Return for Dawn, filed Apr. 11, 2014); Dkt. No. 81 (Process Receipt & Return for Maniscalco, filed Apr. 11, 2014); *see also* Dkt. Nos. 80, 82-84 (Process Receipts & Returns for other MPRHCC Defendants, all of whom were served on the same date and at the same address as Dawn, filed Apr. 11, 2014).) The Court notes that, because all of the other MPRHCC Defendants are represented by the same attorney, Dawn and Maniscalco's current lack of representation, as reflected on the Docket, may be a technical oversight.

Likewise, Defendants Kleveno and Leo were served on August 20, 2014 and September 4, 2014, respectively. (*See* Dkt. No. 140 (Process Receipt & Return for Kleveno, filed Sept. 10, 2014); Dkt. No. 137 (Process Receipt & Return for Leo, filed Sept. 10, 2014).) The Court notes that, because all of the other Wallkill Defendants are represented by one attorney, and all of the other Orange County Defendants are also represented by one attorney, Kleveno and Leo's current lack of representation, as reflected on the Docket, may also be a technical oversight.

After Plaintiff unsuccessfully attempted to serve Defendant Labuda at APS (where she apparently no longer worked at the time Plaintiff attempted to serve her), (*see* Dkt. No. 90 (unexecuted Process Receipt, filed Apr. 22, 2012)), counsel for Orange County Defendants, at the Court's direction, provided an updated address for Labuda, and it further informed Plaintiff that it had been "authorized to accept service on [her] behalf," (Dkt. No. 98 (Letter from Carol C. Pierce, Esq. to Plaintiff (May 27, 2014))). It does not appear that Plaintiff has served Labuda since he received this information.

[9] The U.S. Marshals returned unexecuted Process Receipts on April 22, 2014, for Defendants Yvette and Tiffany. (*See* Dkt. Nos. 86, 89.) At a conference held on May 21, 2014, the Court directed counsel representing MPRHCC Defendants to ascertain the identities of Yvette and Tiffany, but counsel informed Plaintiff on June 5, 2014, that she was "unable to

providing her full name, because he attempted to serve her at the Wallkill Police Department, but Wallkill has no record of her being an employee there, (*see* Dkt. No. 66 (unexecuted Process Receipt, filed Mar. 21, 2014)), and Wallkill's counsel has represented to the Court, after complying with its order to help Plaintiff serve her, that Guzman "is not, nor has she ever been, a dispatcher for the police department or employed by [Wallkill] in any other capacity," but was instead "the private individual who had placed a call to the police department concerning the incident referenced in the reports," (Dkt. No. 99 (Letter from James A. Randazzo, Esq., to Plaintiff, May 28, 2014)). Counsel for Wallkill was, however, able to provide contact information for four of the Wallkill Defendants whom, because they had all left their positions at the Wallkill Police Department, Plaintiff was originally unable to serve. (*See id.*) Accordingly, on June 26, 2014, summonses were issued as to those four Defendants, whom for some reason Plaintiff had previously not attempted to serve. (*See* Dkt. (entry for June 26, 2014).) Of those four Defendants, Plaintiff has only yet to serve Belgiovene. (*See* Dkt. No. 139 (unexecuted Process Receipt, filed Sept. 10, 2012). The final remaining unserved Defendant is Moskowitz, whom Plaintiff apparently did not realize was already a Defendant when, on July 11, 2014, he requested that the Court allow him to add Moskowitz as a Defendant. (*See* Dkt. No. 117 (Letter from Plaintiff to Court (July 11, 2014)).) The Court notified Plaintiff on July 16 that he "may seek leave to amend his Complaint to include [Moskowitz] as a defendant," but that he must "includ[e] the specific grounds upon which [Moskowitz] [could] be held liable." (*Id.*) But

---

identify" those Defendants. (*See* Dkt. No. 116 (letter from Plaintiff to Court (July 15, 2014), attaching a letter from Katherine J. Zellinger, Esq., to Plaintiff (June 5, 2014)).) Plaintiff informed the Court of this development on July 17, 2014, but he has not made any further requests related to these Defendants. (*See id.*)

Plaintiff has since not sought such leave and he has not otherwise attempted to effect service on Moskowitz.

Therefore, in light of this discussion, and before turning to Defendants' Motions, the Court will take this opportunity to address the status of the seven unserved Defendants.  With regard to four of those Defendants, Plaintiff has failed to attempt to serve one (New York State) and has failed to request an extension or other relief from the Court for three (Yvette, Tiffany, and Guzman) whom neither Plaintiff nor existing counsel have been able to locate.  Accordingly, pursuant to the Court's December 19, 2013 Order, the Court dismisses the Complaint against those Defendants without prejudice for failure to serve.  (*See* Order (Dkt. No. 36).)[10]

### 3.  Defendants' Motions

The Court has held two premotion conferences in this case.  The first was held on December 17, 2013, at the request of counsel for Defendants Wallkill and Farmingham, each of whom was named in the original Complaint.  (*See* Dkt. (minute entry for Dec. 17, 2013).)[11]  The

---

[10] Plaintiff also has yet to serve, but may be attempting to serve, Defendants Belgiovene and Moskowitz.  However, because the Court separately dismisses Plaintiff's claims against those Defendants for failure to comply with Rule 8 (but grants Plaintiff leave to amend), Plaintiff's failure to serve the Second Amended Complaint on those Defendants will be moot as a result of this Order.  If Plaintiff chooses to submit a Third Amended Complaint against these Defendants, the Court will issue a separate Order regarding service at that time.
  Additionally, Plaintiff has yet to serve, but may be attempting to serve, Defendant Labuda.  However, because the Court separately dismisses Plaintiff's claims against Labuda for failure to comply with Rule 8 without leave to amend, Plaintiff's failure to serve the Second Amended complaint on Labuda will be moot as a result of this Order.

[11] Defendant MPRHCC was also named in the original Complaint, but it did not initially request a premotion conference and it did not appear at the December 2013 premotion conference.  In this context, the Court notes that MPRHCC filed a motion to dismiss in May 2012 (presumably shortly after Plaintiff served the original Complaint at some point after April 5, 2012), but the Court summarily denied it "without prejudice for failure to comply with the Court's Individual Practices" requiring parties to request a premotion conference before filing a dispositive motion.  (*See* Dkt. No. 11.)

Court set a briefing schedule for Wallkill's and Farmingham's Motion To Dismiss at that conference, (*see* Dkt. No. 35), pursuant to which those Defendants filed their Motion on January 17, 2014, (*see* Dkt. Nos. 39–41), and Plaintiff filed his Memorandum of Law in opposition to the Motion on February 26, 2014, (*see* Dkt. No. 43).[12]

The second premotion conference was held on May 21, 2014, at which counsel for all Defendants appeared.  (*See* Dkt. No. 76 (Order); Dkt. (minute entry for May 21, 2014).) Pursuant to a scheduling order adopted at that conference, the remaining Defendants filed Motions To Dismiss on June 20, 2014, (*see* Dkt. Nos. 105–07 (Defendant Mannix); Dkt. Nos. 108–11 (Orange County Defendants); Dkt. Nos. 112–14 (Defendant Sholes & Miller); 119–25 (MPRHCC Defendants), Plaintiff filed his Memorandum of Law in opposition on July 18, 2014, (*see* Dkt. No. 118), and Defendants filed Reply Memoranda on or before August 8, 2014, (*see* Dkt. No. 126 (Orange County Defendants); Dkt. No. 128 (Defendant Mannix); Dkt. No. 131 (Defendant Sholes & Miller); Dkt. No. 133 (MPRHCC Defendants)).[13]

## II.  DISCUSSION

Wallkill Defendants, MPRHCC Defendants, Mannix, and Sholes & Miller move to dismiss Plaintiff's Second Amended Complaint for failure to comply with Rule 8 of the Federal

---

[12] Counsel for these Defendants later informed the Court that he did not intend to file a reply memorandum in support of the Motion.  (*See* Dkt. No. 50 (Letter from James A. Randazzo, Esq. to Court (Mar. 13, 2014)).)

[13] On June 5, 2014, counsel for Wallkill and Farmingham requested that the Court amend their existing Motion "to include [Defendants Hertman, Spano, Kammarada, McLymore, Procak, and Solan] as movants to avoid filing another motion on their behalf." (*See* Dkt. No. 100 (Letter from James A. Randazzo to Court (June 5, 2014)).)  The Court granted that request on June 6, 2014, (*see* Dkt. No. 101), and it therefore deems the Motion filed on January 17, 2014 to apply to all Wallkill Defendants who have been served, (*see* Dkt. Nos. 39–41).

Rules of Civil Procedure.[14]  Among those Defendants, only Mannix moves to dismiss the Second

Amended Complaint for the additional reason that, substantively, it fails to state a claim.

Finally, Orange County Defendants move to dismiss the Second Amended Complaint only on

the ground that, substantively, it fails to state a substantive claim.  After a brief discussion of the

standard of review applicable to pro se complaints, the Court will first address the Movants' Rule

8 argument, and it will then turn to Mannix's and Orange County Defendants' remaining Rule

12(b)(6) arguments.

### A.  Submissions by Pro Se Litigants

"A document filed pro se is to be liberally construed, and a pro se complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers."  *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012) (internal quotation marks

omitted) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)); *see also James v.*

*Westchester Cnty.*, No. 13-CV-19, 2014 WL 4097635, at *2 (S.D.N.Y. Aug. 19, 2014) ("Pro se

complaints are held to less stringent standards than those drafted by lawyers, even following

*Twombly* and *Iqbal*." (internal quotation marks omitted)).  "This policy of liberally construing

pro se submissions is driven by the understanding that implicit in the right of self-representation

is an obligation on the part of the court to make reasonable allowances to protect pro se litigants

from inadvertent forfeiture of important rights because of their lack of legal training."  *Triestman*

*v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (alterations internal quotation marks

omitted); *see also Quadir v. N.Y. State Dep't of Labor*, — F. Supp. 2d —, 2014 WL 4086296, at

---

[14] The Court notes that Mannix did not move separately to dismiss pursuant to Rule 8, but instead "join[ed] in the motion pursuant to Rule 8 filed by [Wallkill Defendants] on January 17, 2014."  (*See* Def.'s Mem. of Law in Supp. of His Mot. To Dismiss the Second Am. Compl. or in the Alternative for Summ. J. ("Mannix Mem.") 6 (Dkt. No. 106).)

*3 (S.D.N.Y. Aug. 19, 2014) (same).  "Nonetheless, a pro se complaint must state a plausible

claim for relief."  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks

omitted).  Moreover, in doing so, a pro se party is "not exempt . . . from compliance with

relevant rules of procedural and substantive law."  *Triestman*, 470 F.3d at 477 (internal quotation

marks omitted); *see also Jordan v. Chase Manhattan Bank*, No. 13-CV-9015, 2014 WL

3767010, at *4 (S.D.N.Y. July 31, 2014) (same).

    B.  Rule 8

       Most of the Parties—all except Mannix and Orange County Defendants—move to

dismiss the Second Amended Complaint on the sole ground that it fails to comply with Rule 8.

As relevant here, that rule provides that "[a] pleading that states a claim for relief must contain

. . . a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.

Civ. P. 8(a)(2), and that "[e]ach allegation must be simple, concise, and direct," *id.* at 8(d)(1); *see

also* Fed. R. Civ. P. 10(b) ("A party must state its claims . . . in numbered paragraphs, each

limited as far as practicable to a single set of circumstances.").  Nonetheless, Rule 8 also

provides that "[n]o technical form is required" to comply with the rules, Fed. R. Civ. P. 8(d)(1),

and that "[p]leadings must be construed so as to do justice," *id.* at 8(e).

       From these Rules emerge two legal standards relevant to Defendants' Motions.  First, the

latter part of Rule 8(a)(2) contains what the Supreme Court in *Twombly* called the "Rule 8

entitlement requirement," which is that "the 'plain statement' possess enough heft to 'sho[w] that

the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)

(alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)); *see also id.* at 555 (noting "a plaintiff's

obligation to provide the 'grounds' of his 'entitle[ment] to relief'" (alteration in original)); *id.* at

555 n.3 (noting that "Rule 8(a)(2) . . . requires a 'showing,' rather than a blanket assertion, of

entitlement to relief"); *id.* at 557 (noting "the line between possibility and plausibility of 'entitle[ment] to relief'" (alteration in original)).  This part of Rule 8(a)(2) is echoed in *Iqbal*, which applied *Twombly*'s "plausibility standard" outside of the context of antitrust litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (concluding that, "where the well-pleaded facts do not merit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief'" (alterations in original) (quoting Fed. R. Civ. P. 8(a)(2))).  Second, the first part of Rule 8(a)(2) contains what may be termed the "short-and-plain-statement requirement," which has been independently interpreted, perhaps along with Rule 8(d)(1)'s requirement that allegations be "simple, concise, and direct," to protect interests separate from the entitlement requirement.  *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (discussing the interests underlying the short-and-plain-statement requirement); *cf. Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (noting the "critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted").  The first requirement asks, "how short is too short?"  The second requirement asks, "how long is not short enough?" *Cf. Shomo v. State of New York*, 374 F. App'x 180, 182 (2d Cir. 2010) ("The jurisprudence involving Rule 8, traced from our decision in *Salahuddin* through the Supreme Court's . . . *Iqbal* decision, is difficult to apply to the dismissal of a complaint containing *too much* detail, especially where the complaint is filed by a pro se litigant.").

In their Motions To Dismiss pursuant to Rule 8, Defendants ask only the second question.[15]  In particular, Defendants' Motions make at least five common arguments.  First, they

_____

[15] The Memoranda filed by Wallkill Defendants and MPRHCC Defendants also contain a single sentence arguing that, "to the extent there are any 'factual allegations' [in the Second

all quote the Second Circuit's opinion in *Salahuddin v. Cuomo*, 861 F.2d 40 (2d Cir. 1988),

wherein the court identified the reasoning underlying the short-and-plain-statement requirement:

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.

*Id.* at 42 (citations omitted). (*See* Mem. of Law in Supp. of Def. Town of Wallkill & Police

Officer Jason Farmingham's Mot. To Dismiss Pl.'s Second Am. Compl. ("Wallkill Defs.'

Mem.") 3 (Dkt. No. 41); Mem. of Law in Supp. of Defs. Sholes & Miller, LLP's & Sarah Sholes,

Esq.'s Mot. To Dismiss Pl.'s Second Am. Compl. ("Sholes Mem.") 3 (Dkt. No. 113); Mem. of

Law in Supp. of Defs. Park Manor Rehabilitation & Healthcare Center, Darla Conklin, Eileen

Masterson, Suzanna Forman, Jennifer Small, Jenna Green & Wendy Brewster's Mot. To Dismiss

Pl.'s Second Am. Compl. ("MPRHCC Defs.' Mem.") 2–3 (Dkt. No. 120).) Second, they all

reference the Second Amended Complaint's difficult-to-follow formatting. (*See* Wallkill Defs.'

Mem. 4 (noting that the Second Amended Complaint "is single-spaced and typed in a font of

Arial 8 pts., which . . . makes it difficult to read"); MPRHCC Defs.' Mem. 3 (same); Sholes

Mem. 4 (noting that "[t]he format of the Second Amended Complaint makes it difficult to

read").) Third, they all reference the Second Amended Complaint's length and the prevalence of

arguably irrelevant content within the document. (*See* Wallkill Defs.' Mem. 4 (noting that the

Second Amended Complaint "consist[s] of over 30 pages and over 200 pages of attachments"

---

Amended Complaint], they are conclusory and violate the plausibility pleading standard."
(Wallkill Defs.' Mem. 4 (citing *Iqbal*, 556 U.S. at 678); MPRHCC Defs.' Mem. 4 (same).)
However, this argument itself is conclusory, and the Court declines to dismiss any claims based
on a one-sentence argument that, itself, does not give Plaintiff fair notice of the claims he must
defend. The Court's denial of Defendants' Motion on this ground, however, is without prejudice
to Defendants, who may later seek to file a motion to dismiss the Second Amended Complaint
for failure to state a claim.

and contains "120 separately numbered paragraphs, many with subparts, with the vast majority of the paragraphs exceeding 10 lines of text" and with "many paragraphs" that "are irrelevant . . . and do not even address any purported conduct of the defendants"); MPRHCC Defs.' Mem. 3 (same); Sholes Mem. 4 (noting that "[m]any of the paragraphs of the Second Amended Complaint do not address alleged conduct of the defendants").)  Fourth, they all argue that the Second Amended Complaint is confusing.  (*See* Wallkill Defs.' Mem. 3–4 ("Plaintiff's [Second Amended Complaint] is confusing, unclear and at times unintelligible, thus preventing defendants from again being able to ascertain what the specific allegations and claims are against them."); MPRHCC Defs.' Mem. 3 (same); Sholes Mem. 5 ("It is unclear in the Second Amended Complaint which counts are being asserted against which defendant[.]").)  Finally, they all explicitly invoke Rules 8(a)(2) and 8(d)(1) and argue that the Second Amended Complaint fails to satisfy Rule 8.  (*See* Wallkill Defs.' Mem. 4 ("Simply, the [Second Amended Complaint] does not contain a short and plain statement of the claim and is anything but simple, concise and direct, and as such, must again be dismissed."); MPRHCC Defs.' Mem. 4 (same); Sholes Mem. 4–5 (citing Rules 8(a)(2) and 8(d)(1), and arguing that "[t]he Second Amended Complaint does not contain short and plain statements of the claim").)[16]

"The fundamental command of the Federal Rules of Civil Procedure is never to exalt form over substance."  *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (internal quotation marks omitted).  When enforcing technical requirements on litigants,

---

[16] The Court notes that much of the language in the "Argument" section of MPRHCC Defendants' Memorandum is nearly identical to the language in that section of Wallkill Defendants' earlier-filed Memorandum, although the former does not contain any apparent attribution to the latter.  (*Compare* MPRHCC Defs.' Mem. 2–4, *with* Wallkill Defs.' Mem. 3–4.) Thus, the parentheticals following the citations to MPRHCC Defendants' Memorandum in this paragraph are meant literally.

courts are always mindful of the "jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities." *Salahuddin*, 861 F.2d at 42; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleadings system, which was adopted to focus litigation on the merits of a claim."); *cf. Wynder*, 360 F.3d at 80 (noting that "form matters in our system of adjudication," but holding that the complaint "[was] not so lacking in form as to warrant dismissal" (internal quotation marks omitted)). In this context, "dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases," *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008), and it "'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised,'" *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (quoting *Salahuddin*, 861 F.2d at 42).

Instead of focusing on whether a complaint's allegations are "short and plain" or "simple, concise, and direct," the Court asks whether the complaint gives "fair notice" to the defendants. *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("The function of pleadings under the Federal Rules is to give fair notice of the claims asserted." (internal quotation marks omitted)); *see also Amron*, 464 F.3d at 343 ("A complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Swierkiewicz*, 534 U.S. at 513)); *Wynder*, 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given."). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." *Simmons*, 49 F.3d at 86 (internal quotation marks omitted). Thus, courts will not dismiss a complaint that is arguably prolix or unintelligible unless the

complaint's form or substance prevents the defendant from forming a "fair understanding" of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint. *See Amron*, 464 F.3d at 343 ("Dismissal is improper on technical pleading irregularities, which are excusable as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party." (internal quotation marks omitted)); *see also Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("Although [the plaintiff's] allegations were not neatly parsed and included a great deal of irrelevant detail, that is not unusual from a pro se litigant.  As long as his mistakes do not prejudice his opponent, a plaintiff is entitled to trial on even a tenuous legal theory, supported by the thinnest of evidence." (citation omitted)); *Kittay*, 230 F.3d at 542 (finding that a complaint satisfied Rule 8 where the "allegations [were] sufficiently clear to have provided [the defendant] with a fair understanding of what the plaintiff [was] complaining about and to have allowed [the defendant] to know whether there is a legal basis for recovery" (internal quotation marks omitted)).

Here, the Second Amended Complaint satisfies Rule 8's short-and-plain-statement requirement with respect to some Defendants, but it fails to satisfy that requirement with respect to others.  With respect to the former, even when the Court previously found that the Complaint violated Rule 8 and ordered Plaintiff to submit his Second Amended Complaint, it recognized that "Plaintiff intends to pursue malicious prosecution, excessive force, failure to intervene, and false imprisonment claims against the [Wallkill] Defendants."  (July 2013 Order 6.)  The Court ultimately found noncompliance with Rule 8 because the Amended Complaint "present[ed] a great amount of disjointed and nonsequential information . . . about the various events giving rise to Plaintiff's arrests, . . . render[ing] it impossible to comprehend what actually happened to [Plaintiff]."  (*Id.*)  However, in his Second Amended Complaint, Plaintiff cured some of the

deficiencies of the Amended Complaint when he organized his allegations chronologically and grouped them into five sections corresponding with the five incidents that form the basis of his claims.  Plaintiff also added clarity to his exhibits, which he indexed and grouped into five categories corresponding with the five incidents described in the body of the Complaint. Although it is true that certain parts of the Second Amended Complaint are arguably incomprehensible, and that the Complaint still contains a number of arguably confusing or irrelevant paragraphs, the Court cannot say that the Second Amended Complaint fails to put certain Defendants on fair notice of Plaintiff's claims.  *See Wynder*, 360 F.3d at 79 ("[The] plaintiff's submission is a model of neither clarity nor brevity, and we can sympathize with the district court's displeasure with it, but it is sufficient to put the defendants on fair notice."); *Salahuddin*, 861 F.2d at 43 (vacating a district court's dismissal for failure to comply with Rule 8 where the complaint included "a surfeit of detail," but where, "[d]espite its length," the complaint "[was] neither vague nor incomprehensible," and where, by "err[ing] on the side of detail rather than vagueness," the complaint "[met] the notice requirement of the [Federal] Rules [of Civil Procedure]").

Specifically, from the Second Amended Complaint, the Court can discern a number of claims, which, in an attempt to add clarity to Plaintiff's allegations, the Court will group into two categories.  First, Plaintiff alleges a number of federal and state law claims against Wallkill Defendants.  The federal law claims, most of which arise under § 1983, include false-arrest and false-imprisonment claims for all four of the arrests; Fourth Amendment claims related to the March 30, August 20, and June 10 arrests; excessive-force claims for the March 30 and August 20 arrests; and Second Amendment claims for the March 30 and June 10 arrests.  They also include conspiracy and failure-to-intervene claims, under §§ 1985 and 1986, respectively, for all

four arrests.  The state law claims arise either under New York constitutional law or tort law, and they include malicious-prosecution, negligence, intentional-infliction-of-emotional-distress, failure-to-supervise, and failure-to-train claims for all four arrests; assault and battery claims for the March 30 and August 20 arrests; and constitutional claims equivalent to Plaintiff's Second and Fourth Amendment claims for the March 30, August 20, and June 10 arrests.  Plaintiff also appears to allege state law conspiracy claims with regard to all four arrests.[17]

Second, Plaintiff alleges a state law abuse-of-process claim with regard to the September 13 arrest and the guardianship petition filed on August 24 and argued on November 10.  With regard to these incidents, the Court notes that "[c]onspiracy to commit a tort is not an independent cause of action" under New York law.  *See Aprea v. N.Y. State Bd. of Elections*, 960 N.Y.S.2d 255, 257 (App. Div. 2013).  "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort," *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986), but "[t]he agreement itself is not actionable," *Danahy v. Meese*, 446 N.Y.S.2d 611, 614 (App. Div. 1981).  Moreover, although the Second Amended Complaint contains numerous allegations that various Defendants made false statements or submitted falsified documents, these allegations alone do not support a cognizable claim.  *Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 301 (E.D.N.Y. 2013) ("[T]he Plaintiff's causes of action for perjury and subornation of perjury fail because in the absence of statute [sic], no action lies to recover damages caused by perjury or subornation of perjury, whether committed in the course of, or in connection with, a civil action or suit, a

---

[17] As further proof that the Second Amended Complaint gives Defendants fair notice of certain claims, Defendant Mannix interprets the Complaint to allege false-arrest, malicious-prosecution, excessive-force, and failure-to-intervene claims.  (*See* Mannix Mem. 7.)  The Court's interpretation is perhaps more liberal than Mannix's, but it is nonetheless consistent.

criminal prosecution, or other proceeding, and whether the perjurer was a party to or a witness in the action or proceeding." (internal quotation marks omitted)); *Retina Assocs. of Long Island, P.C. v. Rosberger*, 751 N.Y.S.2d 50, 52 (App. Div. 2002) ("No action lies to recover damages for alleged subornation of perjury in a prior action or proceeding, except where the perjury is part of a larger fraudulent scheme greater in scope than the issues determined in the prior proceeding." (internal quotation marks omitted)); *Yalkowsky v. Shedler*, 463 N.Y.S.2d 8, 9 (App. Div. 1983) ("The factual gravamen of th[e] 70 page 336 paragraph complaint appears to consist largely, if not entirely, of allegations of perjury and subornation of perjury in prior or still pending judicial proceedings.  Such allegations do not form the basis of a civil action for damages."); *Alexander v. City of Peekskill*, 436 N.Y.S.2d 327, 328 (App. Div. 1981) ("It is . . . fundamental that at common law actions to recover damages in tort for perjury committed in a prior action or proceeding do not lie.").  However, New York courts appear to recognize an exception to the bar on civil actions for perjury "where the perjury is merely a means to the accomplishment of a larger fraudulent scheme."  *See Newin Corp. v. Hartford Accident & Indem. Co.*, 333 N.E.2d 163, 166 (N.Y. 1975) (noting "the ancient rule that [New York] courts . . . will not entertain civil actions for damages arising from alleged subornation of perjury in a prior civil proceeding," but also noting the "exception" that "[a] cause of action for fraud and deceit will lie, even though perjury is present, where the perjury is merely a means to the accomplishment of a larger fraudulent scheme"); *see also Alexander*, 436 N.Y.S.2d at 329 (same).[18]  The Court

---

[18] The Court notes that its refusal to construe the Second Amended Complaint to state claims for civil conspiracy and perjury is based on the ground that those claims are not cognizable under New York law, not that the Complaint fails to state a claim that is otherwise cognizable.

therefore finds that the Second Amended Complaint gives certain Defendants fair notice that

Plaintiff is alleging an abuse-of-process claim, and that the Complaint's allegations of conspiracy

and perjury are part of that claim but do not allege independent claims.[19]

In construing the Second Amended Complaint to allege these claims, the Court takes no

position whatsoever on whether the Complaint meets other pleading requirements, such as Rule

8's entitlement requirement and Rule 12(b)(6)'s requirement that a complaint state a claim for

relief.  *See* Fed. R. Civ. P. 8(a)(2), 12(b)(6).  Indeed, in the context of Defendants' narrow Rule 8

---

[19] At various points in his Second Amended Complaint, Plaintiff makes passing references to §§ 1981, 1983, 1985, and 1986, asserting only that his "rights [were] violated." (*See, e.g.*, Second Am. Compl. ¶¶ 36–37, 70; *id.* at unnumbered 82 (first index page for the second section of exhibits, containing description of the attached August 20, 2010 arrest report).) In some of these references, the Court can infer the specific right that Plaintiff alleges Defendants violated.  (*See, e.g., id.* ¶ 64 (alleging that his "rights [were] violated" under §§ 1981, 1983, 1985, and 1986 in the specific context of alleging that Farmingham used excessive force during the August 20 arrest and that he was falsely arrested).)  However, in many other references, the Second Amended Complaint is not clear as to which underlying constitutional or statutory right Defendants supposedly violated, and the Court therefore cannot infer the nature of Plaintiff's claim.  To the extent Plaintiff asserts §§ 1981, 1983, 1985, or 1986 violations without referring to facts that indicate what specific constitutional or statutory right may have been violated, the Court finds that Defendants do not have fair notice of those claims.

Moreover, primarily in the context of alleging that multiple Defendants submitted false statements, committed perjury, or falsified documents, Plaintiff makes a number of references to a provision of the New York Penal Code that criminalizes, as a Class A misdemeanor, any making of a "false statement."  (*See, e.g., id.* at unnumbered 82–84, 224–25 (index pages for the second and fourth sections of exhibits) (citing N.Y. Penal Law § 210.45).)  However, that provision cannot form the basis of a civil claim, nor can it form the basis of a § 1983 or related claim given that those statutes apply only to violations of federal constitutional rights.  *See Peterec v. Hillard*, No. 12-CV-3944, 2013 WL 5178328, at *8 (S.D.N.Y. Sept. 16, 2013) (dismissing a false-statement claim based on New York Penal Law "because private citizens do not have a private cause of action for criminal violations" (internal quotation marks omitted)); *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 611 (S.D.N.Y. 2013) (dismissing forgery claims under New York Penal Law because "[n]o private right of action exists to enforce [such] provisions"); *cf. Hammer v. Am. Kennel Club*, 803 N.E.2d 766, 768 (N.Y. 2003) ("Where a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute may be had only if a private right of action may be fairly implied.").

Motion, it would be inappropriate for the Court to do so given that the short-and-plain-statement requirement is "extremely permissive" and is part of a rule that is meant "to lower the entry barriers for federal plaintiffs." *Wynder*, 360 F.3d at 77–78.  The Court merely holds that, because it can understand the Second Amended Complaint to allege certain claims, Defendants have fair notice of those claims and the Complaint thereby satisfies the short-and-plain-statement requirement.[20]  *See Kittay*, 230 F.3d at 541 ("[I]f the court underst[ands] the allegations sufficiently to determine that they could state a claim for relief, the complaint has satisfied Rule 8."); *see also Wynder*, 360 F.3d at 80 ("While we have insisted that complaints be concise because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it . . . , [the] plaintiff's long submission does not overwhelm the defendants' ability to understand or to mount a defense." (internal quotation marks omitted)).[21]

---

[20] In its Memorandum of Law, Sholes & Miller argues that "the Court does not have the duty to re-write the Complaint for the Plaintiff," even when it construes Plaintiff's pro se submission.  (Sholes & Miller Mem. 2.)  In this Opinion, the Court does not re-write, but merely interprets, the Second Amended Complaint to test whether the Court understands the Complaint to allege certain claims such that Defendants have fair notice of those claims.  Moreover, the case Sholes & Miller cites to support its argument is inapposite, as it spoke to the lack of a "duty to re-write" a pro se plaintiff's complaint in the context of a Rule 12(b)(6) motion arguing that a complaint "lacks an allegation regarding an element necessary to obtain relief."  *See Pierce v. Marano*, No. 01-CV-3410, 2002 WL 1858772, at *4 (S.D.N.Y. Aug. 13, 2002) (internal quotation marks omitted).

[21] In contrast to the aforementioned claims, the Court notes that the Second Amended Complaint references a number of other potential claims arising under state and federal law, including "witness tampering," retaliation against a witness, violation of the Nursing Home Reform Act of 1987, racial discrimination, and a First Amendment claim.  (*See* Second Am. Compl. ¶¶ 7–12, 15–17, 26, 34, 82, 116.)  The Court finds that, with regard to these claims and others not specifically identified by the Court, the Second Amended Complaint fails to meet Rule 8's fair notice requirement because it does not allege facts that specifically support these claims.  For example, the Complaint does not identify a witness against whom Defendants retaliated or with whom Defendants tampered, it does not explain how Defendants violated the Nursing Home Reform Act or cite a provision of that Act that could serve as the basis for a claim, it does not specify how Defendants discriminated against Plaintiff based on his race, and it

But identifying the claims does not end the matter, because to satisfy Rule 8, each Defendant must have fair notice of the claim or claims alleged against it.  With regard to the claims against Wallkill Defendants, the Second Amended Complaint includes allegations regarding Farmingham's role in the March 30 and August 20 arrests, Dewey's role in the March 30 arrest, Kleveno's role in the August 20 arrest, Gulick's, Procak's, and Mannix's role in the June 10 arrest, and Solan's role in the September 13 arrest.[22]  It also alleges that Hertman, as Chief of Police, and Spano, as Deputy Chief of Police, are liable for their roles in failing to supervise, monitor, or investigate those individuals.  Finally, it alleges that Wallkill itself is liable for the actions of these individuals.

With regard to the other claims, it alleges that Brewster and Reyes gave false statements to police, resulting in Plaintiff's arrest on June 10; that Masterson, Brewster, Small, and Maniscalco gave false statements to police, resulting in Plaintiff's arrest on September 13; that

---

does not explain how Defendants violated Plaintiff's First Amendment rights.  The Court thus dismisses these claims without leave to amend given Plaintiff's previous opportunities to raise these claims in his Complaint and his Amended Complaint.  *See Salahuddin*, 861 F.2d at 42 ("We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible, or where the substance of the claim pleaded is frivolous on its face." (citations omitted)).

[22] Some of the Second Amended Complaint's allegations against these individuals are more specific than others.  For example, with regard to Solan, Plaintiff appears to allege only that he was the officer who falsely arrested him on September 13, 2011.  However, with regard to Gulick, Dewey, Kleveno, and Farmingham, he alleges not only that they falsely arrested and falsely imprisoned him, but that they violated his Fourth Amendment rights to be free from unreasonable searches and seizures—by, for example, illegally searching his laptop, his refrigerator, and his person (via strip searches)—and, with regard to Dewey and Gulick, his Second Amendment right to possess a firearm.  Moreover, Plaintiff specifically alleges that Farmingham used excessive force against him during the March 30 and August 20 arrests, and that Dewey and Kleveno failed to intervene during those incidents.

Masterson, Forman, Small, Farmingham, and Crain gave false statements under oath at the November 10 hearing, resulting in Plaintiff losing certain rights related to his mother; that Murphy coached Crain to give the false statements; that Sholes & Miller submitted falsified documents and filed a malicious claim involving Plaintiff on August 24 and November 10; and that all of these individual Defendants conspired against Plaintiff throughout the course of the June 10, September 13, and November 10 incidents.[23]  These Defendants, therefore, have fair notice that the abuse-of-process and conspiracy claims are alleged against them.

With regard to other Defendants not yet named in the Court's analysis of the Second Amended Complaint, the Court finds that the Complaint does not give those Defendants fair notice of any claims alleged against them.  Defendants Dawn, Tiffany, and Yvette are mentioned multiple times in the Second Amended Complaint, but only as individuals who were present during the June 10 incident, and not as individuals who did anything to harm Plaintiff.  By contrast, Defendants Conklin, Labuda, Lacatena, Kammarada, McLymore, Belgiovene, Moskowitz, Leo, and Guzman are hardly mentioned at all—and, when they are mentioned, it is within the context of an assertion of liability without any explanation as to their role in harming Plaintiff.[24]  Given that many of these Defendants' names appear in the exhibits attached to the

---

[23] As with Plaintiff's other allegations, some of the allegations against the Defendants involved in these claims are more specific than others.  For example, the Complaint does not appear to speculate as to why Crain (from APS) and Farmingham (from Wallkill) were involved in the alleged conspiracy.  However, with regard to MPRHCC Defendants (and Sholes & Miller, acting on their behalf), Plaintiff speculates that they conspired against him in retaliation for his successful efforts to help his friend, Brent Borgmann, to win a case in small claims court against MPRHCC involving allegations of nursing-home abuse.  (*See* Second Am. Compl. ¶¶ 36, 84.)

[24] The Second Amended Complaint does allege that Guzman was the "dispatcher" who "called" Farmingham and Kleveno to Plaintiff's apartment on August 20, but this lone allegation is insufficient to give Guzman fair notice of any claims raised against her.  Moreover, the Court has already dismissed all claims against Guzman for failure to serve.

Second Amended Complaint or even in the allegations in the body of the Complaint, it is certainly possible that they are in some way involved with this case.  However, whether Plaintiff intends to depose these individuals or call these witnesses at trial, he may not pursue any claims against them given the lack of fair notice of those claims in his Second Amended Complaint.[25] The Court therefore dismisses the claims against these Defendants.[26]

### C.  Rule 12(b)(6)

In addition to moving to dismiss the Second Amended Complaint for failure to meet Rule 8's short-and-plain-statement requirement, Defendant Mannix moves to dismiss it for failure to

---

[25] The Court notes that, in his Amended Complaint, Plaintiff referred to certain Defendants as "potential witness[s] [as to] what happened," in contrast to others whom he alleged were "involved in [a] conspiracy."  (*See* Am. Compl. 1–4 (naming, as potential witnesses, Tiffany, Yvette, Lacatena, Gulick, and Mannix).)  At the May 21, 2014 conference, the Court informed Plaintiff that even if he does not name certain individuals as Defendants, he may be able to call them as witnesses as part of his case.

[26] Defendants Conklin, Labuda, and Lacatena were named in Plaintiff's Amended Complaint, which the Court dismissed with leave to amend.  (*See* Am. Compl.; July 2013 Order.) In that Order, the Court advised Plaintiff that he would have one final opportunity to amend his Complaint, (July 2013 Order 7), and that in doing so, he "should not name [an] individual as a Defendant" if he could not "clearly allege facts showing that [that] individual Defendant was personally involved in the wrongdoing," (*Id.* at 8.)  Because the Court has already granted Plaintiff an opportunity to amend as to these individuals but he has failed to comply with the Court's order, the Court dismisses the claims against these Defendants without leave to amend. *See Salahuddin*, 861 F.2d at 42.

By contrast, Defendants Kammarada, McLymore, Belgiovene, Moskowitz, and Leo were not named in the Amended Complaint, and therefore Plaintiff has not had an opportunity to submit an amended complaint alleging personal wrongdoing with regard to these Defendants. Therefore, the Court dismisses the claims against these Defendants, but grants Plaintiff leave to amend.  In doing so, however, Plaintiff should be mindful of the Court's order, in this Opinion, directing him to serve Defendants Belgiovene and Moskowitz within the required timeframe.

Finally, with regard to Guzman, the Court has dismissed the claims against her for failure to serve.  The dismissal under Rule 8, therefore, is in the alternative, and the Court need not address whether Plaintiff has leave to amend to correct the deficiencies with regard to his Rule 8 obligations.

state a claim under Rule 12(b)(6).  Orange County Defendants also move to dismiss pursuant to that Rule, although for different reasons.

In contrast to the other Defendants' Motions, Mannix's and Orange County Defendants' Motions implicate the part of Rule 8 containing "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions," and more than "a formulaic recitation of the elements of a cause of action[ ]."  *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)).  Indeed, "the pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alterations and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94; *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.,* 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alterations and internal quotation marks omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (some alterations, citation, and internal quotation marks omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

### 1.  Defendant Mannix

At the outset, Mannix argues that all of the claims against him should be dismissed for

failure to allege that he was personally involved in any deprivation of Plaintiff's rights or in any

actions resulting in harm to Plaintiff.  (*See* Def.'s Mem. of Law in Supp. of His Mot. To Dismiss

the Second Am. Compl. ("Mannix Mem.") 7 (Dkt. No. 106) ("The Second Amended Complaint,

and all of the paperwork attached thereto, do not allege that Defendant Mannix interacted with

Plaintiff in any way, much less committed a constitutional violation against him.").)  Having

reviewed the Second Amended Complaint, the Court agrees.  Aside from listing Mannix in the

caption and in certain headings, the Second Amended Complaint refers to Mannix a total of nine

times, at least three of which are duplicative of other references.  (*See* Second Am. Compl.

¶¶ 88, 102–03.)  More importantly, every single reference to Mannix alleges nothing more than

that he was "present," along with four other Defendants, at the scene of Plaintiff's arrest on June

10, or that he "accompanied" Gulick when Gulick made the arrest.  (*See id.*)  This is insufficient

to meet Plaintiff's burden of stating a plausible claim for relief, which requires that Plaintiff

allege that Mannix was personally involved in the deprivation of his rights, with respect to

Plaintiff's § 1983 claims, *see Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)

("It is well settled that, in order to establish a defendant's individual liability in a suit brought

under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged

constitutional deprivation."); *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *3

(S.D.N.Y. July 25, 2014) (dismissing § 1983 claims where the complaint contained "no

allegations whatsoever indicating that [the defendants] were personally involved in the purported

violations" of the plaintiff's constitutional rights); *cf. Iqbal*, 556 U.S. at 676 ("Because vicarious

liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."), and that Mannix caused Plaintiff's injury, with respect to Plaintiff's state claims, *see Mayzick v. Cnty. of Nassau*, — F. Supp. 2d —, 2014 WL 3673094, at *3 (E.D.N.Y. July 23, 2014) (noting that a state law malicious-prosecution claim has "substantially the same" elements as a similar claim brought under § 1983); *Frey v. City of New York*, No. 12-CV-2074, 2013 WL 706051, at *3 (S.D.N.Y. Feb. 27, 2013) (noting the requirement of pleading a "causal connection between the [defendant's] outrageous conduct and [the plaintiff's] injury" in the context of an intentional-infliction-of-emotional-distress claim); *Oskar v. IDS Property Cas. Ins. Co.*, No. 09-CV-4516, 2011 WL 1103905, at *6 (E.D.N.Y. Mar. 23, 2011) (noting a plaintiff's burden to plead that "the defendant breached [a] duty [of care]" in a negligence action).  The Court therefore dismisses these claims.

Similarly, with respect to Plaintiff's federal and state law conspiracy claims, his barebones allegations of Mannix's "presence" and "accompaniment" are insufficient to plead a plausible conspiracy claim.  *See Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) ("In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." (internal quotation marks omitted)); *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 429 (S.D.N.Y. 2013) (dismissing conspiracy claims where the complaint "fail[ed] to plead sufficient facts" because it "merely ma[de] conclusory allegations of a conspiratorial agreement and attempt[ed] to generate suspicion, without more"); *see also Betts v. Shearman*, 751 F.3d 78, 84 n.1 (2d Cir. 2014) (affirming a dismissal for "fail[ure] to sufficiently plead a conspiracy . . . because the pleading was conclusory").  Plaintiff therefore also fails to plead a failure-to-intervene claim under § 1986.  *See Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 341 (2d Cir.

1999) ("[A] § 1986 claim must be predicated on a valid § 1985 claim . . . ." (internal quotation marks omitted)); *Johnson v. City of New York*, 669 F. Supp. 2d 444, 452 (S.D.N.Y. 2009) (same).  The Court therefore dismisses these claims as well.

In its July 2013 Order dismissing the Amended Complaint, the Court granted Plaintiff "one more opportunity to file an Amended Complaint," and it informed Plaintiff that he "should be aware that this may be his final opportunity to amend."  (July 2013 Order 7.)  Moreover, it instructed him to "specifically allege, . . . for each named Defendant, what that Defendant did to be personally involved in the violation of Plaintiff's constitutional rights."  (*Id.* at 8.)  It further advised him that "[i]f [he] [did] not comply with [that] instruction, his pleading [might] be dismissed as against any Defendant whose personal involvement cannot be discerned from reading the pleading, and the Court [might] not grant [him] another chance to amend."  (*Id.*)  At the May 2014 premotion conference, the Court repeated this warning to Plaintiff and offered him a final opportunity to submit an amended complaint before Defendants submitted their motions, but Plaintiff indicated his intent to stand behind the Second Amended Complaint.  Therefore, because Plaintiff has failed to comply with the Court's instruction with regard to Defendant Mannix, the Court will not grant Plaintiff leave to amend with respect to that Defendant.  *See Rullan v. N.Y.C. Sanitation Dep't*, No. 13-CV-5154, 2014 WL 2011771, at *8 n.4 (S.D.N.Y. May 16, 2014) (denying pro se plaintiff leave to amend where the plaintiff "failed to provide the details ordered by the [c]ourt in permitting the plaintiff to file [an] [a]mended [c]omplaint" and where he "[had] not sought to file another amended complaint or proffered what he would state in another amended complaint"); *see also Coleman v. brokersXpress, LLC*, 375 F. App'x 136, 137 (2d Cir. 2010) (affirming dismissal without leave to amend for pro se plaintiff where "[t]he district court afforded [the plaintiff] one opportunity to amend the complaint" but the plaintiff

"made no specific showing as to how he would cure the defects that persisted if given a second opportunity to amend"); *Jendrzejczak v. Williams*, No. 13-CV-1239, 2014 WL 2533041, at *1 (N.D.N.Y. June 5, 2014) (noting that "affording . . . an opportunity to amend is not required where—as here—the pro se plaintiff has already been afforded the opportunity to amend his claims").

### 2.  Orange County Defendants

Orange County Defendants move to dismiss the Complaint on the grounds that certain claims are time barred, that the individual Orange County Defendants are immune from suit, and that the Second Amended Complaint fails to allege any Defendant's personal involvement.[27]  As a reminder, the Court has construed Plaintiff's Second Amended Complaint to allege claims against Crain and Murphy (and, by extension, Orange County) that relate only to those Defendants' participation in the November 10 guardianship petition hearing.[28]  Moreover, with

---

[27] Orange County Defendants move only on behalf of Orange County, Murphy, Crain, and Lacatena because, when the Motion was filed, Plaintiff had not yet served Leo and Labuda. Plaintiff served Leo on Sept. 4, 2014. (*See* Dkt. No. 137 (Process Receipt & Return, filed Sept. 10, 2014).)  Moreover, because the Court has already dismissed Plaintiff's claims against Lacatena for lack of fair notice under Rule 8, it considers Orange County Defendants' Motion only as it applies to Orange County, Murphy, and Crain.

[28] The Second Amended Complaint does allege that Crain was present at Plaintiff's August 20 arrest.  (*See* Second Am. Compl. ¶ 65.)  However, the Court has already found that this allegation is insufficient to give Crain fair notice of any claims alleged against her in connection with the August 20 arrest, and it has therefore dismissed any claims against Crain in connection with that incident on that ground.  For this reason, the Court does not address Orange County Defendants' statute-of-limitations argument, which applies only to any claims arising out of the March 30 and August 20 arrests.  (*See* Orange County Defs.' Mem. 6.)

The Court further notes that Plaintiff appears to allege that Crain kept Plaintiff's key to his home for 44 days, but he does not appear to allege any claims for relief based on this allegation.  (*See* Second Am. Compl. ¶ 65.)  And, in the alternative, the Court would dismiss any claims against Crain related to her role in the August 20 arrest (and any related claims against other Orange County Defendants) for the same reason it dismissed similar claims against

regard to that hearing, it has construed the Complaint to allege only an abuse-of-process claim under state law.

In the context of those claims, the Complaint alleges only that Crain "lied under oath" at the November 10 hearing.  (*See* Second Am. Compl. ¶ 106.)  It also alleges that Murphy was Crain's supervisor, that he "had a malicious [intent]" that was directed at Plaintiff at the time of the hearing, (*see id.*), and that he "coach[ed] . . . Crain [on] what to say [at the hearing] so they [could] get what they want[ed]" at the hearing, (*see id.* at unnumbered 241 (first index page of the fifth section of exhibits, heading)).  And it further alleges that Crain, Sholes, and other individuals who testified at the hearing "worked . . . together" to obtain a certain outcome.  (*See id.* at unnumbered 242 (second index page of the fifth section of exhibits, description of exhibit 5.1).)

With regard to what Crain actually said at the November 10 hearing, the relevant portion of the hearing transcript is attached as an exhibit to the Second Amended Complaint:

Q.  [O]nce you got [to Plaintiff's apartment], what did you find?

A.  I found [Plaintiff's mother] in her bedroom lying on the bed.  She was in a night gown.  And she appeared to have some bruising on her face, on her arms.  And the paramedic had pointed out that one of her ankles was very bruised.

So while I was there I decided to move the blanket and that is when I noticed that her other leg was still tied to the bed.

. . . .

Q.  And how was her leg tied?

A.  It was with a long, like a plastic bag that appeared to be tied a couple times.  And it was wrapped around her ankle and then tied to the hospital bed bar.

---

Mannix, all of which were based on his mere presence at the June 10 arrest—namely, that Plaintiff does not sufficiently allege Crain's personal involvement.

. . . .

Q.  What do you recognize [an exhibit] to be?

A.  The rope that bound [Plaintiff's mother's] leg to the bed.

(Hr'g Tr. 51–53.)  Plaintiff alleges that, in this part of her testimony—and, specifically, when she

stated that she "found [Plaintiff's mother] in her bedroom *lying on the bed*," that she noticed that

Plaintiff's mother's "leg was . . . *tied to the bed*," and that she recognized an exhibit as "[t]he

rope that bound [Plaintiff's mother's] leg *to the bed*," (*id.* (emphasis added))—Crain lied under

oath because these statements were inconsistent with the Incident Report for the August 20

incident, which quoted Plaintiff as telling the police, "I tie [sic] her legs up," (*id.* at unnumbered

84 (third index page for second section of exhibits, descriptions for exhibits 2.8-3–5 (quoting *id.*

Ex. 2.0))).

To plead a claim of abuse of process under New York law, Plaintiff "must plead . . . that

there was (1) regularly issued civil process, (2) an intent to do harm without excuse or

justification, (3) use of the process in a perverted manner to obtain a collateral objective, and (4)

actual or special damages."  *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, — F. Supp. 2d

—, 2014 WL 1612988, at *15 (S.D.N.Y. Mar. 30, 2014) (alterations and internal quotation

marks omitted); *see also D'Amico v. Corr. Med. Care, Inc.*, — N.Y.S.2d —, 2014 WL 3882627,

at *3 (App. Div. Aug. 8, 2014) (same).  Here, Plaintiff's allegation concerning Crain's testimony

does not satisfy the third element.  Although Plaintiff alleges that Crain "lied under oath," he

does not allege a collateral objective that her alleged lying served.  (Second Am. Compl. ¶ 106.)

Plaintiff also generally alleges that Murphy "had a malicious [intent]" and that he "coach[ed] . . .

Crain [on] what to say [at the hearing] so they [could] get what they want[ed]."  (*Id.* ¶ 106,

unnumbered 241).  However, "a malicious motive alone does not give rise to a cause of action

for abuse of process" under New York law.  *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir.

2003) (alterations and internal quotation marks omitted) (quoting *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984)); *see also Allen v. Antal*, No. 12-CV-8024, 2014 WL 2526977, at *16 (S.D.N.Y. Mar. 13, 2014) ("Neither retaliation nor a malicious motive . . . is a sufficient collateral objective to satisfy that element of a cognizable malicious abuse of process claim." (internal quotation marks omitted)); *Shakima O. v. Westchester Cnty.*, No. 12-CV-9468, 2014 WL 521608, at *3 (S.D.N.Y. Feb. 10, 2014) ("The allegation that defendants' actions arose out of personal animosity towards plaintiffs is not sufficient to state a claim for abuse of process, because personal animosity is a collateral motive, not a collateral purpose." (alterations and internal quotation marks omitted)).  Moreover, to the extent the Second Amended Complaint asserts that Crain had a collateral objective (i.e., that she was trying to "get what [she] want[ed]," (Second Am. Compl. at unnumbered 241), the allegations are conclusory and the Court need not consider them in evaluating Defendants' Motion.  *See Burroughs v. Dorn*, No. 13-CV-3609, 2013 WL 3820673, at *6 (E.D.N.Y. July 22, 2013) (dismissing an abuse-of-process claim where the plaintiff "offer[ed] nothing more than conclusory statements as to [the] allegation that [a defendant] intended to do harm without justification"); *Jovanovic v. City of New York*, No. 04-CV-8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (dismissing an abuse-of-process claim where the plaintiff "allege[d] a collateral objective only in the most conclusory fashion, failing to provide any basis for assessing [a defendant's] motive for the [use of process]"); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Twombly*, 550 U.S. at 555 ("[O]n a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation[.]" (internal quotation marks omitted)).  Therefore, the Court dismisses these claims.

### III.  CONCLUSION

In light of the foregoing, the Court holds:

(1) that all claims against Defendants New York State, Yvette, Tiffany, and Guzman are dismissed without prejudice for failure to serve;

(2) that all claims against Defendants Conklin, Labuda, and Lacatena are dismissed with prejudice and without leave to amend for failure to comply with Rule 8's short-and-plain-statement requirement;

(3) that all claims against Defendants Kammarada, McLymore, Belgiovene, Moskowitz, and Leo are dismissed without prejudice and with leave to amend for failure to comply with Rule 8's short-and-plain-statement requirement;

(4) that the Rule 8 Motions filed by Wallkill Defendants, MPRHCC Defendants, and Sholes & Miller are denied with respect to any other Defendant;

(5) that the Court's denial of the Rule 8 Motions is without prejudice to Defendants to file another Rule 12(b)(6) motion to dismiss for failure to state a claim;

(6) that all claims against Defendant Mannix are dismissed with prejudice and without leave to amend for failure to state a claim;

(7) that all claims against Defendants Orange County, Murphy, and Crain are dismissed without prejudice and with leave to amend for failure to state a claim; and

In deciding whether to file an amended complaint with respect to Defendants Kammarada, McLymore, Belgiovene, Moskowitz, Leo, Murphy, Crain, and Orange County, Plaintiff should be aware that this likely will be his final opportunity to submit an amended complaint.  Moreover, if Plaintiff does not comply with the Court's instruction that he allege a Defendants' personal involvement, the Court will dismiss his claims against that Defendant without leave to amend.

Finally, in the interest of clarity, the Court directs Plaintiff to submit an amended complaint that contains claims and allegations only against these Defendants.[29] If Plaintiff wishes to attach new exhibits to the Third Amended Complaint, he may do so, but those exhibits must be relevant to his allegations against the specific Defendants named in the Third Amended Complaint. Plaintiff has 30 days from the date of this Order to submit the Third Amended Complaint. The Clerk of the Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 39, 105, 108, 112, 119.)

SO ORDERED.

Dated:       September 29, 2014
             White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

---

[29] Plaintiff submitted a "Motion for Discovery" to the Court, dated August 19, 2014, requesting, inter alia, that he be permitted to add claims against two additional Defendants— David Jolly and Dr. Mrilini M. Yeddu—to his Complaint. (*See* Dkt. No. [TK].). This Opinion does not consider Plaintiff's claims against these individuals. If Plaintiff wishes to include claims and allegations against these individuals in his Third Amended Complaint, he may do so.