UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIENVENIDO PILAO ONG,

                                    Plaintiffs,

        -v-

PARK MANOR (MIDDLETOWN PARK)
REHABILITATION AND HEALTHCARE
CENTER et al.,

                                    Defendants.

---

Case No. 12-CV-974 (KMK)

OPINION AND ORDER

Appearances:

Bienvenido Pilao Ong
Middletown, NY
*Pro Se Plaintiff*

Katherine J. Zellinger, Esq.
Law Offices of Alan I. Lamer
Elmsford, NY
*Counsel for Defendants Park Manor (Middletown Park) Rehabilitation and Healthcare Center,
Vincent Maniscalco, Dara Conklin, Eileen Masterson, Jennifer Small, Wendy Brewster, Jenna
Green, Suzanne Forman, Lisa M. Reyes, Ms. Yvette, Ms. Dawn Du Bois, Ms. Tiffany, Lynn
Terwillinger, and Jennifer Brennan*

Victor Carmine Piacentile, Esq.
Kopff, Nardelli & Dopf, LLP
New York, NY
*Counsel for Defendant Park Manor (Middletown Park) Rehabilitation and Healthcare Center*

James A. Randazzo, Esq.
Caitlin Grace Scheir, Esq.
Gaines, Gruner, Ponzini & Novick, LLP
White Plains, NY
*Counsel for Defendants Town of Wallkill Police Department, Police Officer Jason Farmingham,
Robert Hertman, Sergeant Mr. R. Procak, TOW-P.O. Jefferey Gulick, TOW-P.O. Adam Solan,
Deputy Chief Anthony Spano, Sgt. Robert McLymore, Sgt. Robert Kammarada, Sgt. Ari
Moskowitz, Office Thomas Keleveno, Officer S. Belgiovene, and P.O. A. Dewey*

Carol C. Pierce, Esq.
Orange County Attorney
Goshen, NY
*Counsel for Defendants Orange County Department of Social Services, Candice H. Crain, David Jolly, Kate Labuda, Dina M. Lacatena, adnd Tim Murphy*

Michael Francis Albanese, Esq.
State of New York, Attorney General's Office
New York, NY
*Counsel for Defendant Timothy Mannix*

Kenneth Andrew McLellan, Esq.
Keith Robert Roussel, Esq.
Winget Spadafora & Schwartzberg, LLP
New York, NY
*Counsel for Defendants Sarah Sholes, Sholes & Miller, LLP*

KENNETH M. KARAS, District Judge:

Plaintiff Bienvenido Pilao Ong brings this Action against multiple defendants, alleging various claims under federal and state law arising out of six incidents that took place in 2010, 2011, and 2013.  Before the Court are five motions to dismiss filed by four groups of Defendants.  For the following reasons, the Court grants those Motions in part and denies them in part.

## I.  BACKGROUND

### A.  Factual Background

The following facts are taken from Plaintiff's Third Amended Complaint ("TAC") and Fourth Amended Complaint ("FAC"), the latter of which Plaintiff appears to have intended to supplement the TAC.  (*See* Third Amend. Compl. ("TAC") (Dkt. No. 162); Fourth Am. Compl. ("FAC") (Dkt. No. 172).)  Plaintiff is an Asian-American naturalized U.S. citizen over the age of

65 who, at all relevant times, was a resident of Middletown, NY.  (*See* FAC 1, 3.)[1]  Defendants

include four entities and a number of individuals employed by those entities, including a few

new Defendants not previously included in Plaintiff's pleadings.  (*See* TAC 1–4; FAC 3–4, 8–

10.)  Plaintiff groups these Defendants into five categories:  (1) Middletown Park Rehabilitation

and Health Care Center (formerly known as "Park Manor") ("MPRHCC"), a long-term-care

facility primarily serving elderly individuals; Vincent Maniscalco ("Maniscalco"), an

administrator; Darla Conklin ("Conklin"), an assistant administrator; Eileen Masterson

("Masterson"), a director of nursing; Suzanne Forman ("Forman"), a director of social services;

Jenna Green ("Green"), a case manager; Jennifer Small ("Small"), a nursing manager; Wendy

Brewster ("Brewster"), another nursing manager; Lisa Reyes ("Reyes"), a physical therapist;

"Ms. Dawn Du Bois" ("Du Bois"), a duty nurse; "Ms. Tiffany" ("Tiffany"), a nursing aid; "Ms.

Yvette" ("Yvette"), another nursing aid, new Defendant Lynn Terwillinger ("Terwillinger"), a

facility representative, new Defendant Mrilini M. Yeddu, MD ("Yeddu"), an internist, and new

Defendant Jennifer Brennan ("Brennan"), a finance manager (collectively, the "MPRHCC

Defendants"); (2) Town of Wallkill Police Department ("Wallkill"); Chief of Police Robert

Hertman ("Hertman"); Deputy Chief Antonio Spano ("Spano"); Sergeant Robert Kammarada

("Kammarada"); Sergeant Robert McLymore ("McLymore"); Sergeant Richard Procak

("Procak"); Officer Jason Farmingham ("Farmingham"); Officer "A. Dewey" ("Dewey");

Officer Thomas Kleveno ("Kleveno"); Officer "S. Belgiovene" ("Belgiovene"); Officer Jeffrey

---

[1] Because many of the paragraphs contained in Plaintiff's TAC and FAC are not clearly numbered, the Court cites page numbers rather than paragraph numbers.  Additionally, Plaintiff breaks his TAC and FAC into different sections, and he does not sequentially number across sections.  Nonetheless, in the interest of clarity, the Court will treat Plaintiff's TAC and FAC each as sequentially numbered, without indicating that individual pages are "unnumbered" in citation sentences.

Gulick ("Gulick"); Officer Adam Solan ("Solan"); Sergeant "A. Moskowitz" ("Moskowitz");

and Angelina Guzman ("Guzman"), a police dispatcher (collectively, the "Wallkill Defendants");

(3) "New York State Police—Troop F" ("New York State") and Timothy Mannix ("Mannix"), a

New York State police officer; (4) Orange County Department of Social Services ("OCDSS");

Tim Murphy ("Murphy"), the head supervisor of Orange County's Adult Protective Services

department ("APS"); APS case workers Candice Crain ("Crain"), Kate Labuda ("Labuda"), Dina

Lacatena ("Lacatena"), and Andrea Leo ("Leo"), and new Defendant David Jolly ("Jolly"),

Commissioner of the OCDSS (collectively, the "Orange County Defendants"); and (5) Sholes &

Miller, LLP ("Sholes & Miller"), a New York law firm, and new Defendant Sarah Sholes

("Sholes"), an attorney employed by Sholes & Miller (collectively, the "Sholes Defendants").

(*See* FAC 3–4; 8–10; *see also* TAC at 1–3.)[2]

Plaintiff's TAC and FAC divide Plaintiff's allegations and exhibits into sections

corresponding to separate incidents—five principle incidents and one additional incident that

Plaintiff references for the first time in his TAC—which collectively constitute the events giving

rise to Plaintiff's claims.  In his TAC and FAC, Plaintiff adopts and restates the Court's summary

of the facts of his case in its 2014 Opinion and Order, (Dkt. No. 144), characterizes those

summaries as accurate, (*see* TAC 10–27 (quoting the Court's summary of each incident

verbatim); *id.* at 28–42 (reproducing the remainder of the Court's 2014 Opinion and Order); *id.*

at 65, 72, 94, 107, 140 (describing Court's summary of each incident as "accurate"); FAC 14, 16,

18, 21, 25 (stating that the Court's summary of each incident was "ACCURATE"); *id.* 28–42

(reproducing the remainder of the Court's 2014 Opinion and Order)), and adds limited additional

---

[2] Plaintiff alleges that he originally intended to sue both Sholes & Miller and Sholes herself.  (TAC 19–20.)  The Court also notes that the Defendant referred to in this Opinion as "Du Bois" is the same as the Defendant referred to as "Dawn" in the 2014 Opinion and Order.

facts, clarifications, and explanations, (*see, e.g.,* TAC 65, 72, 94, 107, 140 (indicating that

Plaintiff "explain[ed] more detail" about the incidents in question)).  The Court accordingly

reproduces its summary of the facts from its 2014 Opinion and Order below, adding Plaintiff's

additional allegations and clarifications as relevant.[3]

### 1.  March 30 and 31, 2010[4]

On March 30, 2010, Plaintiff got into an argument with his daughter, who was a minor.

(Second Am. Compl. ("SAC") ¶¶ 63, 109 (Dkt. No. 23).)  The police were called, and

Farmingham and Dewey arrived at Plaintiff's home.  (*Id.* ¶ 109; TAC 11, 45.)  Plaintiff

attempted to explain the situation, but "Farmingham did not listen to [his] explanation," and

instead "just hand cuff[ed]" Plaintiff and "dragg[ed] [him] down stair[s] going . . . towards [a]

driveway," (SAC ¶ 109), at which time the temperature outside was "27F" (TAC 45).

Farmingham then "unlawfully arrested" Plaintiff, using "substantial force . . . without

provocation" while doing so.  (SAC ¶ 109.)

Farmingham "never created or made [an] arrest/incident[] report," (*id.* ¶ 51.1), though

Dewey did so, (TAC 11), and Plaintiff was charged with one count of second-degree menacing,

N.Y. Penal Law § 120.14, and one count of endangering the welfare of a child, N.Y. Penal Law

§ 260.10, both Class A misdemeanors under New York law, (*see id.* ¶ 56; *see also id.* Ex. 1.2

---

[3] The Court only includes allegations that pertain to non-parties insofar as they are relevant to claims that Plaintiff makes against named Defendants.  (*See, e.g.,* TAC 64 (referring to assistance from Orange County Sheriff Justin Butterfield).)

[4] While Plaintiff breaks the events of March 30 and March 31 into separate incidents in his TAC and FAC, (*see* TAC 10, 12, 45, 63; FAC 14), the Court groups them together because they refer to conduct surrounding the same arrest, (*see* TAC 64).

(Securing Order, dated Mar. 30, 2010)).[5]  Bail was set at $1,000 cash or $2,000 bond, but
Plaintiff was remanded and remained in jail until he was released on April 4, 2010.  (*See id.* ¶ 59;
*see also id.* Ex. 1.2.)  Plaintiff was ultimately convicted of one count of endangering the welfare
of a child, as charged, and one count of disorderly conduct, N.Y. Penal Law § 240.20 (the latter
of which is a "violation," as opposed to a Class A misdemeanor) on May 6, 2010.  (*See id.* Ex.
1.4 (Seal Order, dated Mar. 21, 2013, indicating that Plaintiff's case was adjudicated on May 6,
2010, and that it "was terminated with a conviction for a noncriminal offense"); *see also id.*
(Certificate of Disposition, dated Jan. 15, 2013, indicating same).)

While Plaintiff was in jail, authorities took two actions related to Plaintiff's charges.[6]
First, on March 30, the day of Plaintiff's arrest, a town court justice issued a temporary Order of
Protection against Plaintiff, prohibiting him from certain types of contact with his daughter and
two other individuals.  (*See* SAC ¶ 60; *see also id.* Ex. 1.1 (Order of Protection, dated Mar. 30,
2010).)  That Order expired on April 15, 2010.  (*See id.* ¶ 63; *see also id.* Ex. 1.1.)  Nevertheless,
perhaps due in part to the Order, Plaintiff stayed in a hotel from April 4, 2010 (the day he was
released) until May 20, 2010, and thereby incurred $3,306.94 in charges.  (*See id.* ¶ 59; *see also
id.* Ex. 1.6 (Microtel Folio).)  Second, on March 31, the day after Plaintiff's arrest, and while he
was still in jail, Dewey, together with Officer Justin Butterfield, went to Plaintiff's home and
seized a firearm and a pistol permit, the former of which police later secured in an armory, and

---

[5] Plaintiff alleges that the arrest report incorrectly indicated that Plaintiff's wife was
present.  (TAC 11.)

[6] Plaintiff also suggests in his TAC that he was denied a late dinner by Orange County
officials when he arrived in county jail early in the morning on March 31, 2010, (TAC 45), but
alleges in his FAC that he only arrived at county jail from "Wallkill Town Police Jail" after
"almost 8 hours," in time to eat breakfast, (FAC 51).

the latter of which was forwarded to the Orange County Pistol Permit Office.  (*See id.* ¶¶ 39, 56,

59, 110; *see also id.* Exs. 1.5-1, 1.5-2 (Firearms Surrender Report, dated Mar. 31, 2010); TAC

12, 63.)[7]  Plaintiff alleges that, despite his request, his pistol was not returned after his release,

noting that Hertman did "not like to listen to Plaintiff's request," and that on April 7, three days

later, a county court judge issued an Order of Suspension, ordering that Plaintiff's pistol permit

be suspended, that Plaintiff "immediately surrender all weapons and license [sic] to the Orange

County Sheriff's Department," and that, if Plaintiff did not comply, the Orange County Sheriff's

Department would be "directed to send a representative to take custody of said weapons."  (SAC

Ex. 1.5A (Order of Suspension, dated Apr. 7, 2010); TAC 12–13; *see also* SAC. ¶ 63.2.)[8]

### 2.  August 20, 2010[9]

On August 20, 2010, Plaintiff lived with his mother in an apartment in Middletown.  (*Id.*

¶ 111.)  That afternoon, Guzman, a 911 operator, received a call from Plaintiff's neighbor, who

reported that "Plaintiff's mother was yelling that she was being sexually assaulted and/or

otherwise physically abused by Plaintiff."  (*Id.*)  Guzman then dispatched Defendants

Farmingham and Kleveno to Plaintiff's apartment.  (*Id.*)  After they arrived at the apartment and

knocked on the door, Plaintiff answered and asked them why they were there.  (*Id.*; *see also id.*

¶ 75.)  Initially, Farmingham asked Plaintiff if Plaintiff knew him; Plaintiff responded that he

---

[7] The Wallkill Defendants contend that the weapon was seized when Plaintiff was arrested.  (*See* Mem. of Law in Supp. of Town of Wallkill Defs.' Mot. To Dismiss Pl.'s Fourth Amended Complaint 20–21 (Dkt. No. 190).)

[8] Plaintiff alleges that Hertman admitted "that several police officers violated . . . Plaintiff's right to be free" through their actions on March 31.  (FAC 15).

[9] In his TAC, but not in his FAC, Plaintiff represents that this incident actually occurred on August 10, 2010.  (*See, e.g.,* TAC 67; FAC 41.)  The Court assumes that the incident occurred on August 20, 2010, though it's exact date of is of little import.

remembered Farmingham as the officer who arrested him on March 30, 2010.  (*Id.* ¶¶ 75, 111.)

Farmingham then told Plaintiff that he was there to arrest Plaintiff again, and when Plaintiff

asked him why, Farmingham responded that the police had received a call from Plaintiff's

neighbor reporting that Plaintiff's mother was "'yelling for help'" and that "it sounded as though

someone [was] being raped."  (*Id.* ¶¶ 64, 111; *see also id.* ¶ 75 (alleging that Farmingham told

Plaintiff that he was "going to arrest [him] again because somebody heard . . . [his] mom yelling

[that] she was getting or being rape[d] and [that] [someone] [was] biting [his] mother").)  When

Plaintiff asked about the neighbor's identity, the officers refused to tell him.  (*Id.* ¶¶ 75, 111.) [10]

Farmingham and Kleveno "immediately" entered the apartment and "closed the door," at

which point Farmingham "push[ed] [Plaintiff] near [a] door," told him to "put [his] hand[s] up,"

and then told him to "start strip[ping] from head to foot."  (*Id.* ¶ 111.)  The officers, aware that

Plaintiff previously possessed a handgun and a pistol license, were specifically looking for a

"weapon or gun."  (*Id.*)  Farmingham then "put hand cuffs on [Plaintiff] [and] . . . start[ed] biting

Plaintiff"; Kleveno saw this occur, but did not try to intervene.  (*Id.*; *see also id.* ¶¶ 64, 71.)

Plaintiff asserts that in the process, his stomach was bruised when he was pushed up against a

door knob.  (*See* TAC 69.) [11]

At some point while in Plaintiff's apartment, Farmingham stated that he detected a "'very

strong odor of something rotting.'"  (SAC ¶ 65.)  He then "went to [Plaintiff's] refrigerator,"

"open[ed]" it, commented that it "'smell[ed] [of] rotten food,'" and asked Plaintiff whether he

was "'feeding [his] mother'" rotten food.  (*Id.* ¶ 67.)  Plaintiff responded that the officers should

---

[10] This is perhaps why Plaintiff multiple times refers to the neighbor's communication with the police as an "anonymous call."  (*See, e.g.,* FAC 1, 7, 10, 16–17, 33–34, 42, 44, 50.)

[11] Plaintiff also alleges that Crain was "involved [in] Plaintiff['s] arrest" on that day, though he does not explain how.  (FAC 10.)

"not [be] searching and opening [his] refrigerator" because they were there for the "'purpose'" of responding to the "'anonymous call,'" and that they were "'violating [his] privacy and at the same time harassing'" and "'intimidating'" him.  (*Id.*)  In a similar incident, while Plaintiff was in handcuffs, he asked Farmingham to "close[] [his] laptop" before the officers brought him to the police station, but Farmingham refused.  (*Id.* ¶ 73.)  Plaintiff alleges that he was later told by a friend who went to Plaintiff's apartment after Plaintiff was taken to jail that Farmingham searched Plaintiff's laptop and made a comment to Plaintiff's friend about Plaintiff's finances based on information he obtained in the search.  (*Id.* ¶¶ 73, 111.)

While the officers were at the scene, an ambulance arrived, as well as Crain, who appeared on behalf of APS.  (*See id.* ¶ 77.1; *see also id.* Ex. 2.0 (Incident Report, dated Aug. 20, 2010, indicating that Crain and a non-party nurse were at the scene); *id.* Ex. 2.1 (Arrest Report, dated Aug. 20, 2010, indicating same).)  All Parties present entered Plaintiff's mother's bedroom and, after examining her at the scene, decided to send her to Orange Regional Medical Center for a full evaluation.  (*See id.* Ex. 2.0.)  Although the examining doctor found "[n]o information regarding sexual or psychiatric abuse" and that there were "no fracture[s]" or "signs of infection," he did determine that Plaintiff's mother suffered from "[d]ementia," "severe dehydration," and "[p]hysical abuse" in the form of "ecchymosis on the skin of upper and lower extremities and blisters."  (*Id.* ¶ 77.1.; *id.* Ex. 2.14 (History and Physical, dated Aug. 20, 2010).)[12]  The doctor also noted that he would consider a "gynecological exam," possibly based

---

[12] Although it is unclear from the report exactly what the examining doctor meant by his diagnosis of "ecchymosis," the Court notes that that term, in medical usage, commonly refers to "the escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot or area"—in other words, a bruise.  *Webster's Third New Int'l Dictionary* 718 (2002).

on the rape allegations. (*Id.* ¶ 77.1; *id.* Ex. 2.14.) Plaintiff alleges that Lacatena later informed

him at an undisclosed time that the entire incident was "planned by . . . Murphy" and that "he

sent Crain to help." (FAC 37.)[13]

The police filed an Incident Report that day, which included an officer's account of the

arrest:

> On August 20, 2010, [Farmingham] was dispatched to [Plaintiff's apartment] to
> check the welfare of an elderly female. Upon arrival[, Plaintiff] answered the door,
> [Farmingham] informed [Plaintiff] that [he] and officer Kleveno were there to
> check the welfare of his mother. Upon [Plaintiff] answering the door there was a
> very strong odor of something rotting. [Plaintiff] immediately became defensive
> and stated to [the officers] that he had just put his mother to sleep and the [sic] he
> did not want us to wake her. [The officers] then informed [Plaintiff] that [they]
> would need to speak to his mother before leaving. [Plaintiff] agreed to let [the
> officers] speak to his mother. While walking in [Plaintiff] began to appear very
> nervous. Upon entering [the mother's] bedroom, [the officers] immediately
> observed several bruises on [the mother's] legs [and] arms and also that [the
> mother] had a black eye. [Farmingham] also observed bed sheets next to [the
> mother's] bed that were covered in urine. [Plaintiff] was asked to leave the room
> so [Farmingham] could speak to [the mother]. [Farmingham] then interviewed [the
> mother,] who was visibly shaking and appeared confused. [Farmingham]
> attempted to interview [the mother,] but due [to] a language barrier [Farmingham]
> was unable to obtain information from [the mother]. [The mother] also appeared
> to [be] frightened and afraid to speak to [the officers]. [An ambulance] was
> dispatched and [Farmingham] contacted [APS]. [Farmingham] spoke with Candice
> Crain of APS[,] who stated that she would respond to [the] location. Upon arrival
> of [the ambulance,] [Plaintiff] stated to [the officers] and in front of the [ambulance
> crew], "I tie [sic] her legs up." [The officers] then took [Plaintiff] into custody,
> [and Plaintiff] was then transported to [the] station for processing. Upon arrival of
> [Crain], [Crain] spoke with [the mother] and discovered that her legs[,] which were
> covered under the blankets[,] were still tied with a twisted plastic bag. [Crain]
> immediately removed [the mother's] legs from the restraint and informed
> [Farmingham]. [The mother] was transported to [the hospital] for evaluation . . . .
> [Crain] went to the hospital with [the mother]. Upon arrival to the hospital[, Crain]
> discovered with hospital staff further bruising on [the mother's] breast and upper
> thighs. [The doctor] stated that the bruising was consistent with [the mother] being
> physically abused.

---

[13] Plaintiff further alleges that in a letter dated March 29, 2013, Hertman told Plaintiff
that he would "'be conducting an investigation into [Plaintiff]'s complaint of failure to take
proper Police action,'" but as of the date of the FAC had not done so. (FAC 7.)

(SAC Ex. 2.0.)  The police also provided Plaintiff with an official notice, required by N.Y. Crim. Proc. § 710.30, of the county's intent later to offer Plaintiff's statement, "I tie [sic] her legs down," into evidence.  (*Id.* Ex. 2.0-2 (710.30 Notice, dated Aug. 20, 2010).)

Plaintiff was charged that day with second-degree endangering the welfare of a vulnerable elderly person (a Class E felony), N.Y. Penal Law § 260.32, third-degree assault (a Class A misdemeanor), N.Y. Penal Law § 120.00, and second-degree unlawful imprisonment (a Class A misdemeanor), N.Y. Penal Law § 135.05.  (*Id.* ¶ 65; *see also id.* Ex. 2.1 (Arrest Report, dated Aug. 20, 2010).)  In a misdemeanor information and felony complaint filed the same day, Farmingham offered an account of the incident that appears to be consistent with the account he gave in the Incident Report:

> [Plaintiff] . . . [,] on Aug[ust] 20, 2010 at approximately [3:25 p.m.,] being the caregiver for 92 year old victim (Felicidad P[.] Rana)[,] did physically tie [the] victim's feet together and then to the bed using a plastic bag, in order to prevent said victim from being able to get out of bed.  Furthermore[,] the victim was unable to stand on her own and walk to the bathroom due to the tightness in her ankles from being restrained[,] causing said victim to urinate on the floor.

(*Id.* Ex. 2.2 (Misdemeanor Information, filed Aug. 20, 2010).)[14]

> [Plaintiff] . . . [,] on Aug[ust] 20, 2010 at approximately [3:25 p.m.,] being the caregiver for 92 year old victim (Felicidad P[.] Rana)[,] did physically tie [the] victim's feet to the bed using a plastic bag.  [Plaintiff's] actions did cause swelling and severe bruising to [the] victim's ankles and feet.

(*Id.* Ex. 2.3 (Felony Complaint, filed Aug. 20, 2010).)[15]

---

[14] Plaintiff alleges that there were several inaccuracies in the charging instruments and arrest reports, which allegedly list individuals who were not present, indicate that Plaintiff had a criminal history when he did not, and lack appropriate signatures.  (*See* FAC 70; *see also id.* at 23–32 (documents pertaining to the arrest).)  Plaintiff characterizes the deficiencies as both intentional misstatements and evidence that Farmingham was not adequately trained to fill out legal documents.  (*See id.* at 70*.*)

[15] According to a "Seal Order" filed on March 21, 2013, the case was "adjudicated" on November 16, 2010, and it "was terminated in favor of [Plaintiff]."  (SAC Ex. 2.5 (Seal Order).)

Later that day, Plaintiff alleges that he visited the emergency room because of an asthma attack. (*See* TAC 70; FAC 33.) Farmingham accompanied him to the ER, and Plaintiff alleges that when he asked Farmingham to use the bathroom, Farmingham handcuffed Plaintiff to his bed and refused to allow a nurse to provide Plaintiff a plastic bag to relieve himself, causing Plaintiff to urinate on himself. (*See* TAC 70; FAC 33–34.) After his release from jail, Farmingham allegedly explained to a "Sheriff's Officer" that Plaintiff urinated in his pants because he "doesn't like . . . to go to [the] bathroom in ER Rooms." (TAC 70; FAC 34.) Plaintiff also alleges that Farmingham incorrectly told Plaintiff that Plaintiff's mother was not in the same hospital. (TAC 70; FAC 34.)

Following his visit to the ER, Plaintiff was kept in jail overnight, but the next morning he was released on bail with the assistance of his friend, Brent Borgmann ("Borgmann"). (SAC ¶ 64.) That same day, Plaintiff saw a doctor who completed a medical examination, which included taking numerous x-rays, and concluded that Plaintiff had bruises on his stomach and left arm. (*See id.* ¶ 71; *id.* Ex. H (prescription slip, noting that Plaintiff complained of being "bitten by police" and had "bruise[s]" on his chest and abdomen); *id.* Exs. I, J, K (x-ray images); *id.* Exs. L, M, N (photos of Plaintiff appearing to indicate bruises).)

### 3. June 10, 2011[16]

On June 10, 2011, Plaintiff's mother was a resident at MPRHCC, where she lived on the third floor, fifth unit, in Room #511. (SAC ¶¶ 102, 112.) While visiting his mother in her room, Plaintiff observed that his mother had been "neglected," in that she was not wearing any pants or socks, but was "covered [only] by [three] bed sheet[s]" and was therefore "chilling because [the

---

[16] Plaintiff also alleges "race discrimination" in connection with this incident, (TAC 92), but he does not allege any facts in support of that claim.

air conditioner] was so high."  (*Id.* ¶ 90; *see also id.* ¶ 102.)  He also observed that her pants,

which had been "'thrown in the garbage,'" were "full of feces and soak[ed] with urine."  (*Id.*

¶¶ 90, 102.)  Plaintiff was concerned, not only because of his mother's present situation, but also

because he knew that multiple times his mother had repeatedly pushed a "'red button'" in her

room to summon help, "but no one came[] in."  (*Id.* ¶ 90.)  Plaintiff asked two nurses, Tiffany

and Yvette, to watch his mother while he asked a third nurse, Du Bois, who was alone at a

nearby nursing station, to bring his mother some socks.  (*Id.* ¶¶ 90, 102.)  Plaintiff alleges that

Du Bois "failed to listen," despite Plaintiff's mother's repeated pushing of the red button, when

Plaintiff's mother "beg[ed] . . . Du Bois to bring[] her to her bedroom" to rest and "to be clean,"

and that, as a result, Plaintiff's mother "fell . . . [when] trying to get out of [her] wheelchair and

hit her head," causing a laceration.  (FAC 24–25; TAC 18.)

  At some point, Du Bois "reported Plaintiff to [the] Director of Nursing."  (SAC ¶ 90.)

Then, Brewster, a nursing manager, and Reyes, a physical therapist, "allegedly called the

[Wallkill] police to inform the[m] that she [sic] had heard Plaintiff yelling [at his] mother and

[making] verbal threat[s] regarding the use of [a] firearm."  (*Id.* ¶ 112.)  Two police officers

responded to the scene: Gulick, from Wallkill, and Mannix, a state trooper.  (*See id.* ¶¶ 88, 102–

03.)  They did not find a firearm at the scene, (*id.* ¶ 112), but Gulick did arrest Plaintiff and

charge him with third-degree attempted assault (a Class B misdemeanor), N.Y. Penal Law

§§ 110.00, 120.00, and first-degree endangering the welfare of an incompetent or physically

disabled person (a Class A misdemeanor), N.Y. Penal Law § 260.25, (s*ee id.* ¶¶ 88, 102; *see also*

*id.* Ex. 3.18 (Arrest Report, dated June 10, 2011).)  Plaintiff alleges that, throughout the course of

the incident, only seven people were present: Gulick, Mannix, Tiffany, Yvette, Plaintiff, his

mother, and Masterson.  (*Id.* ¶ 102.)  Conversely, he alleges that a number of Defendants—

specifically, Conklin, Small, Brewster, Green, Forman, Reyes, and Maniscalco—were not present.  (*Id.* ¶¶ 86, 87, 89, 90, 102.)

A temporary Order of Protection issued that same day, ordering Plaintiff to surrender any firearms he owned or possessed, and prohibiting Plaintiff from certain types of contact with his mother.  (*Id.* Ex. 3.15 (Order of Protection, dated June 10, 2011).)  Another temporary Order of Protection was then entered on July 12, 2011, restricting Plaintiff generally from any form of communication or contact with his mother, but allowing Plaintiff to visit his mother "only . . . under the supervision of [Plaintiff's friend] . . . Borgmann."  (*Id.* Ex. 3.21 (Order of Protection, dated July 12, 2011).)  A final temporary Order of Protection was issued on August 2, 2011, retaining the supervised-visit condition of the previous order while also ordering Plaintiff to refrain from committing "any criminal offense or interference with" his mother.  (*Id.* Ex. 3.23 (Order of Protection, dated Aug. 2, 2011).)  The Order, which expired on August 2, 2012, also entered an "adjournment in contemplation of dismissal" of Plaintiff's case, meaning that if Plaintiff complied with the Order for one year, he could expect the charges to be dismissed.  (*Id.*; *see also id.* Ex. 3.26 (Letter from Plaintiff's attorney, Craig Stephen Brown, Esq., to Plaintiff, dated Aug. 5, 2011, informing Plaintiff that he "[was] given a one . . . year Adjournment in Contemplation of Dismissal  [("ACD")] with a limited Order of Protection," and that "[i]f [he] [did] not get arrested within this one . . . year time period, the charge [would] be dismissed").)  Plaintiff alleges that after receiving the ACD, he and Borgmann went to MPRHCC to visit Plaintiff's mother, but that he was "drag[ged] . . . out [the] entrance door" by an MPRHCC guard "and immediately follow[ed] by . . . 3 or 4" nurses, including Conklin, who after several hours ordered certain unnamed police officers to "strip" Plaintiff to check if he had any weapons on him.  (FAC 20.)

Documents attached to the Second Amended Complaint—including a Domestic Incident Report and an Incident Report—contain Gulick's account of the incident that led to Plaintiff's arrest that day:

> While [Plaintiff] was visiting [his mother] at a rehabilitation/nursing facility, [Plaintiff] became verbally abusive towards [his mother] and also struck and pushed [her] several times.  [Plaintiff] was placed in custody by [Gulick].  [Plaintiff's mother] did not suffer any injuries.  [Her] [s]tatement was taken from [a] staff member who witnessed [the] incident.

(SAC Ex. 3.17 (Domestic Incident Report, dated June 11, 2011).)

> [Gulick] responded to a 911 [call].  Upon arrival [Gulick] located [Plaintiff] inside a private residential room with [his mother] and several staff members from [MPRHCC].  [Gulick] advised [Plaintiff] to exit the room and stand in the hallway. [Plaintiff] was uncooperative but eventually left the room.  [Gulick] and [Defendant Belgiovene] searched [Plaintiff] because it was reported [that] he made a verbal threat regarding the use of a firearm.  No firearm [was] located.  [Gulick] spoke with [a witness, who was a physical-therapist assistant,] who advised [that] at approx[imately] [5:00 p.m.,] she [was] walking down the hallway and heard yelling, cursing[,] and what sounded like approx[imately] [three] slaps coming from [Plaintiff's mother's] room . . . .  [The witness] observed [Plaintiff's] arm in the air in a striking position and [Plaintiff] then started forcibly pushing [his mother's] knees and legs while yelling[,] "Fucking diaper!!"  [The witness] stated [that] she is familiar with [Plaintiff] because he visits [his mother] everyday [sic] and she is aware of numerous complaints against [Plaintiff] by staff members.  [The witness] stated [that] after observing the incident, she advised [a nurse manager named Wendy,] who called 911.  [Gulick] placed [Plaintiff] into custody and transported [him] to [the Wallkill police station].  [Gulick] processed [Plaintiff] who was then [transferred] to [officer] Renwick for arraignment . . . .  [Gulick] . . . contacted [APS] and spoke with [Defendant] Andrea Leo[,] who took the case. Judge Owen issued a stay away order of protection against [Plaintiff] protecting [his mother].  [Defendant Maniscalco,] Director of Administration [at MPRHCC] was advised.  Case closed.

(*Id.* Exs. 3.19, 3.19-1 (Incident Report and Additional Narrative, dated June 10, 2011).)  The SAC also contains, as an attached exhibit, a deposition from Reyes, taken by Gulick the day of the incident, which was submitted in support of the Misdemeanor Information filed against Plaintiff and provides Reyes's account of the incident:

> I was walking down the hallway on the 5th floor when I heard yelling, cursing[,] and what sounded like approx[imately] [three] slaps coming from one of the private

residential rooms.  I had passed the room so I turned back and was able to look inside the room because the door was wide open.  I observed a male subject, [Plaintiff], who I am familiar with from being at the facility every day visiting his mother . . . who resides in the room.  [Plaintiff's] arm was in the air in a striking position and he then started forcibly pushing [his mother's] knees and legs while cursing[,] "Fucking diaper!!"  [His mother] had no pants on during the physical altercation.  I never entered the room and viewed everything from the hallway.  After witnessing [Plaintiff's] actions I walked away and immediately advised [a nursing manager named Wendy] and she then called 911.  I am aware of numerous complaints against [Plaintiff] from the nursing staff and he's also made direct comments to me threatening physical harm to members of his family and staff members.

(*Id.* Ex. 3.16.1 (Supporting Deposition of Lisa M. Reyes, dated June 10, 2011).)

### 4.  September 13, 2011

Plaintiff was arrested again on September 13, 2011.  (*Id.* ¶ 113.)  On August 9, 2011, three Defendants employed by MPRHCC—Masterson, Brewster, and Small—gave statements to Solan regarding allegations of harassment against Plaintiff.  First, Masterson stated that, "[i]n the past week, [her] staff ha[d] been receiving numerous phone calls from [Plaintiff].  [Plaintiff] call[ed] at all hours of the day[,] t[y]ing up [her] staff just to vent his frustrations with [her] and [Brewster] for having him arrested."  (*Id.* Ex. 4.5 (Masterson Statement, dated Aug. 9, 2011).)  She also alleged that these phone calls "serve[d] no legitimate purpose in that all [Plaintiff] want[ed] to do [was] vent."  (*Id.*)  She further alleged that when Plaintiff was "allowed at the facility, he would harass other visitors[,] causing a hazardous environment."  (*Id.*)  Finally, she alleged that Plaintiff's "action[s] ha[d] left [her] and other staff in fear of their safety."  (*Id.*)

Second, Brewster stated that, "on [June 10, 2010], [she] was one of the nursing staff involved in an incident between [Plaintiff] and his mother."  (*Id.* Ex. 4.6 (Brewster Statement, dated Aug. 9, 2011).)  She acknowledged that, "[s]ince the incident, [she] ha[d] not spoken with [Plaintiff]."  (*Id.*)  However, she alleged that "numerous threats were made at [her] when other

16

nursing staff ha[d] spoken with him," and she further alleged that, "[a]lthough the threats were not made directly to [her], [she] still [was] in fear for [her] safety and well[-]being." (*Id.*)

Third, Small stated that she had received a call from Plaintiff on August 8, 2011 (the previous day) "while working at [MPRHCC]." (*Id.* Ex. 4.7 (Small Statement, dated Aug. 9, 2011).) According to Small, Plaintiff "seemed very irate and rambeling [sic]" on the call. (*Id.*) In this context, he told Small, "'I know it was [Brewster] that called 911 the day I was taken into police custody. I have rights to my mother. [Brewster] and [Masterson] will pay the ultimate consequence and I can see it in my mind what I will do to you.'" (*Id.*) Small "reported the incident to [Maniscalco] . . . that day." (*Id.*)

Approximately two weeks later, on August 23, Maniscalco provided Farmingham a handwritten log of phone calls MPRHCC had received from Plaintiff since July 12, 2011, reflecting that Plaintiff had made 11 such calls. (*Id.* Ex. 4.3 (note from Maniscalco to Farmingham, dated Aug. 23, 2011).) Maniscalco also gave a statement:

> Since July of [2011] I have been receiving numerous phone calls from [Plaintiff]. [Plaintiff] is currently no longer allowed on the property due to an incident that occurred in June at my facility. [Plaintiff] calls me on a daily basis numerous times serving no legitimate purpose other th[a]n to vent his frustration against me banning him from the property. [Plaintiff] not only contacts me via the telephone but [he] has sent numerous fax messages to me which serves no legitimate purpose. [Plaintiff] has been advised by me numerous time[s] to stop all communication, phone and fax, and that all communications should be sent to the facilities attorney or his attorney regarding any matter that he may have. [Plaintiff] has failed to comply with my request and the constant phone calls I [b]elieve is causing annoyance and alarm for my safety. I wish to pursue charges against [Plaintiff].

(*Id.* Ex. 4.4 (Supporting Deposition of Vincent Maniscalco, dated Aug. 23, 2011).)

On September 13, 2011, Wallkill police arrested Plaintiff and charged him with second-degree aggravated harassment, N.Y. Penal Law § 240.30 (a Class A misdemeanor). (*Id.* Ex. 4.0 (Arrest Report, dated Sept. 13, 2011).) According to the Arrest Report, Solan was the arresting officer. (*Id.*) On the day of his arrest, Plaintiff alleges that he surrendered at 2pm with the

assistance of his lawyer, Craig Brown.  (TAC 106.)  Plaintiff claims that Solan told his lawyer

that his booking, fingerprints, and mugshot would only take 30 minutes, but that Plaintiff was

instead kept until 5pm before he was released to Borgmann.  (*Id.*)  Ultimately, the charge was

dismissed, for reasons that are not clear based on the SAC and accompanying exhibits.  (*See*

SAC Ex. 4.9 (Certificate of Disposition, dated Oct. 18, 2011).)[17]

### 5.  November 10, 2011

The fifth incident discussed in Plaintiff's SAC involves a petition for guardianship filed

on August 24, 2011, and litigated at a November 10, 2011 Surrogate's Court hearing.  On August

24, 2011, Sholes & Miller, on behalf of MPRHCC, filed a petition in Orange County Surrogate's

Court to determine whether Plaintiff's mother should be appointed a legal guardian.  (*Id.* ¶¶ 24,

108.)  The petition claimed that Plaintiff's sister, Victoria Chang ("Chang"), sought to become

her mother's legal guardian:

> Petitioner is aware that [Plaintiff's mother] had designated her son, [Plaintiff], as
> her health care proxy.  However, due to [Plaintiff's] refusal to take our calls,
> respond to our letters, and discuss his mother's care, and due to his assaults on his
> mother and orders of protection discussed below, we contacted [Plaintiff's
> mother's] alternate health care proxy, [Plaintiff's sister] Yolando Co.  When our
> social worker spoke with Ms. Co by telephone on June 30, 2011, Ms. Co advised
> that she could not make health care decisions for her mother and wanted to be
> removed as her mother's alternate health care proxy.  Ms. Co requested that all calls
> and decision making regarding her mother be directed to her sister, Victoria Chang,
> the eldest daughter of [Plaintiff's mother].  We then spoke with Ms. Chang
> regarding acting as a surrogate health care proxy pursuant to the Family Health
> Care Decision Act. . . .
>
> Although [Plaintiff] claims to be his mother's power of attorney, we have not seen
> such a document.

---

[17] Plaintiff appears to allege that the MPRHCC Defendants intended to retaliate against
Plaintiff and Borgmann.  (TAC 101.)  The nexus of the retaliation may be what Plaintiff
describes elsewhere as a small claims court action Borgmann brought against MPRHCC with
Plaintiff's assistance.  (FAC 40; TAC 8, 25.)

> Ms. Chang attended an initial care plan meeting at our facility on July 15, 2011.
> Ms. Chang indicated that she wanted to be in charge of her mother's health care
> decision making process, and also wanted her mother to reside in a nursing home
> closer to her own home, which is located in New Jersey.

(*Id.* Ex. 18 (apparent excerpt from guardianship petition).)  Along with the petition, Sholes &

Miller filed a number of supporting documents, including (1) a "Family Health Care Decision

Information" form signed by Green and dated June 29, 2011, noting that Plaintiff's mother had

an existing Health Care Proxy, that she did not have a guardian, but that she did have two

daughters (Victoria Chang and Eloisa Kern), (*see id.* Ex. 12); (2) a "Consent by Surrogate to

DNR Order" form signed by Plaintiff (as his mother's surrogate), witnessed by Green, and dated

March 31, 2011, indicating Plaintiff's consent for a physician to issue a do-not-resuscitate order

("DNR"), (*see id.* Ex. 14); (3) supporting documentation regarding the DNR consent form, (*see*

*id.* Exs. 15–17); and (4) a New Jersey police report memorializing a domestic dispute in

November 2007 involving Plaintiff's mother (as the offender), Chang (as the complainant), and a

third-party witness, (*see id.* Ex. 19).

A judge issued an Order To Show Cause the same day the petition was filed.  (*See id.*

Exs. 5.0, 5.0-1 (Order To Show Cause, dated Aug. 24, 2011).)  Moreover, at some point,

Plaintiff's mother was appointed a temporary guardian from the OCDSS, a "court evaluator,"

and an attorney from Mental Hygiene Legal Services, Inc. to represent her in connection with the

guardianship petition.  (*See id.* Ex. Index No. 2011-08338 ("Guardianship Order") (Order & J.

Appointing Guardian of the Person and Property, dated Dec. 12, 2011).)  A hearing was

originally scheduled to take place in October, but it was rescheduled to November 10.  (*See id.*

Ex. 13 (Letter from Sarah E. Sholes, Esq., to Plaintiff and others (Oct. 14, 2011).)

At the hearing, Sholes appeared on behalf of petitioner; the court evaluator appeared on

behalf of the court; Plaintiff's mother's attorney appeared on behalf of Plaintiff's mother; and

David Medford of the Orange County Attorney's Office appeared on behalf of OCDSS.  (*See id.* Ex. 5.1 ("Hr'g Tr.") (Hr'g Tr., dated Nov. 10, 2011).)  In support of the petition, Sholes called a number of witnesses, including the court evaluator, and Masterson, Forman, Smalls, Farmingham, and Crain.  (*See id.* (Index page).)  Plaintiff's mother's attorney also called a number of witnesses, including Plaintiff's mother, Chang, and Plaintiff.  (*See id.*)  The court was also presented with a number of exhibits, including the court evaluator's report, Plaintiff's mother's medical records, and exhibits from the Wallkill Police Department.  (*See* Guardianship Order 2.)

At the hearing, Plaintiff alleges that Crain, with Murphy's coaching, offered false testimony at the guardianship hearing.  (TAC 37, 40 (brackets omitted); FAC 10, 35, 37.)  Plaintiff also alleges that Sholes submitted "falsified/altered documents" with the assistance of Murphy and Jolly.  (TAC 7.)  Maniscalco, Masterson, Small, Murphy, Crain and Sholes also allegedly did not intervene when Farmingham prevented Plaintiff from giving his mother a "hug and kiss" at the hearing, or even going near her, warning Plaintiff that he would be "handcuff[ed] [and] arrested again" if he did so.  (FAC 8, 33.)

Plaintiff also identifies a number of excerpts from the Hearing Transcript of relevance.  First, the court evaluator (who is not a party to this Action) testified regarding Plaintiff's status as Power of Attorney.  After being shown a copy of a document dated November 20, 2007, wherein Plaintiff's mother appears to have granted Plaintiff power of attorney, Sholes asked the court evaluator whether he had seen that document:

> A.  The first I saw the power of attorney was a few minutes ago in chambers produced by the assistant county attorney.
>
> Q.  Does that power of attorney indicate that [Plaintiff] is [his mother's] power of attorney?

A.  Yes.  And if I was aware of this, and I had seen a copy of it, I would have requested in my report that the power of attorney be revoked immediately.

Q.  And on what basis?

A.  Based upon the maltreatment—the alleged maltreatment of [Plaintiff] relating to his mother, clearly identified by the several police reports that are attached to your petition. . . .

(Hr'g Tr. 9.)

Second, Defendant Masterson testified on direct examination regarding Plaintiff's

treatment of his mother at MPRHCC:

Q.  Are you familiar with [Plaintiff]?

A.  I am.

Q.  Can you tell us what your experience has been with him in terms of he and his mother since she has been at [MPRHCC]?

A.  My experiences have been that he has displayed volatile actions on many occasions towards his mother, towards the staff.

Q.  Can you give us some examples?

A.  I can give an example as to times that he would start yelling, start cursing.

Q.  At staff?

A.  At staff, and also yelling about her diapers, things like that.

Q.  And what would the comment about the diapers entail?

A.  F'g diapers.  F'g diapers.

Q.  And was [Plaintiff] asked by the staff not to raise his voice and not to curse?

A.  Yes.  On more than one occasion.

Q.  Did he heed any of those requests?

A.  No.

Q.  Now, did there come a time in June of this year when a physical incident occurred between [Plaintiff] and his mother at the facility?

A.  Yes.

Q.  And how did you come to learn about that?

A.  It was brought to my attention by the then assistant director of nursing, and the nursing supervisor that I needed to go to the unit where [Plaintiff's mother] was, that something was going on with her son.

Q.  Did you go to the unit?

A.  I did.

Q.  When you got there, what did you learn?

A.  I asked the staff what was the matter and they said there was a report that [Plaintiff] had been cursing at his mother and was seen slapping his mother on the leg.

Q.  Were the police called?

A.  They were.

Q.  Was [Plaintiff] arrested as a result?

A.  He was.

Q.  Now was it your understanding that a protective order was issued by a local judge as a result of that incident?

A.  Yes.

Q.  And eventually was that protective order revised to permit [Plaintiff] to visit his mother in the company of someone else?

A.  Yes.

Q.  When [Plaintiff's mother] was admitted to the facility . . . , was she on any type of special diet?

A.  She was.  She had some swallowing difficulties so she was on a special type of diet.

Q.  And did there come a time when you learned that [Plaintiff] had brought different food in for her and was feeding her different food?

A.  Yes.

Q.  And what, if any, medical issues were there with that scenario?

A.  There was the risk for aspiration for her because at that time she wasn't taking a regular texture diet with regular thin liquids.

Q.  Did the staff explain the risk of aspiration to [Plaintiff]?

A.  Correct.  They had before and during the incident.

Q.  So is it correct that even after he had been asked not to bring in that food, he continued to do so?

A.  Yes.

Q.  And was he observed feeding that food that he brought in to his mother?

A.  Yes.

. . . .

Q.  Have you noticed any changes in [Plaintiff's mother's] mood and her demeanor since [Plaintiff] stopped visiting her?

. . . .

A.  I have observed that [Plaintiff's mother] is more open with the nursing staff in that she will speak to them more.  She doesn't just use clipped one word answers.  And that she also has gained 11 points since [Plaintiff] stopped visiting her.

Q.  And was that weight gain a good thing for her?

A.  A very good thing.

(*Id.* 14–18.)[18]  Plaintiff's mother's attorney then asked Masterson a number of questions on

cross-examination:

Q.  Miss Masterson, you mentioned that at some point there was a stipulation that [Plaintiff] could visit with [his mother] with supervision?

---

[18] Plaintiff alleges that Masterson and Green lied when they alleged that Plaintiff brought in food and feed it to his mother "even after he had been asked not to bring" it in because of his mother's dietary restrictions, and that the statements of Masterson, Small, and Forman "were rehearse[d] with malice," which Maniscalco allegedly "watch[ed] and hear[d]."  (FAC 21–25.)

A.  Right.

Q.  Is that plan still in effect?

A.  No, it is not.

Q.  Why was it changed?

A.  It was changed because [Plaintiff] was not abiding by the stipulations even.  He was being adversarial.

Q.  With whom?

A.  With the staff.  Even with another visitor in the lobby.

Q.  Did the nursing home take any legal action to prevent [any] further supervised visits?

. . . .

A.  We had consulted with counsel and also with the police about the order of protection.

Q.  And was the order of protection changed or extended at any point?

A.  Yes.

Q.  And what is his current order of protection, if you know?

A.  That he cannot come to the facility.

Q.  Is he permitted supervised visits on any level?

A.  No.

Q.  Outside of the nursing facility?

A.  No.

Q.  And are you aware of the current expiration date of that order of protection?

A.  I believe that I am.  I'm not sure if it is correct.  I thought it was in December of this year.

(*Id.* 19–21.)

24

Third, Forman testified on direct examination regarding her position at MPRHCC, her

qualifications, and her presence at the scene of the July 20, 2011 incident:

Q.  Miss Forman, where are you currently employed?

A.  [MPRHCC].

Q.  In what capacity?

A.  Director of social services.

Q.  Are you a social worker?

A.  I am.

Q.  Are you licensed in New York State?

A.  Not licensed.  Master's in social work.

Q.  Okay.  Where did you obtain your master's?

A.  Rutgers University.

. . . .

Q.  Did you become aware in June of [2011] of an incident involving [Plaintiff] and
his mother?

A.  Yes.

Q.  How did you learn about that?

A.  I was at the facility at the time. . . .  And I was informed the same time Mrs.
Masterson was.

Q.  Did you go to [Plaintiff's mother's] room?

A.  I did.

Q.  Tell us what you observed and heard?

A.  When I entered the room, [Plaintiff] was in there with his mother and another
nurse's aide.  And when asked to leave, he refused to leave, and he started yelling
and screaming.

Q.  And can you tell us what types of things he was yelling and screaming?

A.  "I'm not going anywhere.  I didn't do anything.  What are you talking about?  What are you talking about?"  And then the police came.  They came very quickly.

Q.  Was [Plaintiff] arrested?

A.  Yes he was.

Q.  What was your understanding as to what had happened with him and his mother?

A.  Another staff member apparently witnessed [Plaintiff] slapping his mother and yelling at her while in the room with her.

Q.  And did you speak to that staff member?

A.  No, I didn't.

(*Id.* 22, 24–25.)

Fourth, Small testified on direct examination about her prior conversations with Plaintiff:

Q.  Now, have you had any conversations with [Plaintiff] over the time his mother has resided at [MPRHCC]?

A.  Yes.

Q.  Can you tell us about those conversations, what his tone and demeanor was?

A.  I remember one time I had to go out on a doctor's appointment with [Plaintiff's mother].  And he was telling me about his brother who smoked and did a lot of drinking.  And he wished that his brother would die.  And the brother ended up with lung cancer.  And the brother, I guess, wanted to make amends with him, and he refused.  He said, I hope you die.  And then the brother died.

I have spoken to [Plaintiff] several times on the phone.  One time in August.  He said he knew that it was Wendy Brewster that called 911 that day he was taken into police custody.  And that Wendy and Eileen Masterson would pay the ultimate consequence for keeping him from his mother.

Q.  What did you interpret paying the ultimate consequence to mean?

A.  It could mean anything. I thought, you know, physical retaliation.

Q.  Did you notify Miss Masterson that he made that remark?

A.  Yes.

Q.  Did [Plaintiff] ever raise his voice to you or within ear s[h]ot of you?

A.  Yes.

Q.  And can you explain what his tone was when those things happened, what the reason for it was, if any?

A.  The day we approached him about him feeding his mother the unsafe diet texture, I believe it was soup with pieces of carrots and celery and rice in it.  And she was on a pureed diet at the time.  And he says, "Don't tell me how to feed my mother.  I know how to feed my mother.  I read about it on the internet how to feed my mother."  And he was very angry.

Q.  Were there further examples of him feeding his mother food that was not on her pureed diet?

A.  Just that one time that I witnessed.

Q.  Did any of your staff ever tell you that there were other incidents where he had been seen trying to feed his mother food that was not on her diet?

A.  Yes.

Q.  And did you counsel him about that?

A.  Yes.

Q.  More than once?

A.  Yes.

Q.  Did there come a time when he told you that he had been up in a tree?

A.  Yes.

Q.  Can you tell us about that?

A.  It was one of the social workers and myself.  He was talking about his sister Victoria [Chang] and how he wanted to kill her.  And he was sitting up in a tree with a gun.  And that God came to him in the tree and said that you do not want to do this.  So he climbed down from the tree.

27

(*Id.* at 33–35.)[19]

Fifth, Farmingham testified about his interactions with Plaintiff:

Q.  Did there ever come a time [on August 20, 2010] when you were called to the Senior Horizons facility in the Town of Wallkill?

A.  Yes, sir.

Q.  Why were you called there?

A.  For a check the welfare call.  An anonymous caller called to complain about the neighbor in the close proximity of their apartment and continuously hearing slapping noises, and it sounded like somebody moaning in pain.

Q.  What did you do after you received that call?

A.  I responded to the Senior Horizons complex.  Went to the apartment number that was issued to me over the radio in the car.  Knocked on the door, and which was answered by [Plaintiff].

Q.  Have you ever met [Plaintiff] before that time?

A.  I have.

Q.  When you first encountered him, did you recognize him?

A.  I did.

Q.  Once you saw [Plaintiff], what did you do then?

A.  I informed him that I received a call about the welfare of his mother.  I told him—I informed him that I needed to speak to him.  And while standing at the doorway I smelled a very strong odor of something which seemed to be rotting.  It was a very foul odor, almost as if it were more rotting flesh, or something that may have been partially had food, or possibly somebody deceased in the residence.

Q.  What did you do after that?

A.  He immediately was very hesitant to let me in.  And I informed him that I wasn't going to go anywhere until I was able to speak to his mother.  He agreed to let me in.  And we walked into the apartment.

---

[19] Plaintiff "demands [that] the US Marshals . . . investigate" this statement because of his sister's proximity to the house at issue.  (TAC 25.)

Q.  Would you describe the apartment?

A.  Very disheveled.  Messy.  Unorganized.  Very foul odor.  Very stale air.  As if no windows had been opened for several weeks.  It was just a mess.  A complete mess.

There was pads that were near the mother's bed that were covered in urine.  There was a towel on the bed that was covered in urine and brown stains, which I would have assumed that would be fecal matter.

Q.  Did you find [Plaintiff's] mother in the apartment that day?

A.  Yes, I did.

Q.  Where was she located?

A.  She was in the bedroom when you open the door, the living room.  If you're looking in, the living room is on the left, the bedroom is kind of straight ahead on the right.

Q.  When you found her in the apartment, was she laying down on the bed or was she sitting up?

A.  She was laying down on the bed with the blankets over her legs.

Q.  What happened after you noticed where [Plaintiff's mother] was?

A.  I went in to speak with her.  She appeared very disheveled.  Very kind of out of it.  [Plaintiff] began to speak very loudly.  Very aggravated and agitated.  I told him that I needed to speak to his mother and I asked him to leave the room.  He refused.  I told him, listen, I need to speak to your mom.  She wouldn't talk to me.  She was very—she seemed to be very fearful.  And the fact that he was so agitated and screaming seemed to make her very more uneasy of my presence to speak to me.

Q.  Did there ever come a time when you called for any assistance?

A.  I did.  I called for an ambulance to, at the bare minimum, come and evaluate her.  I contacted my sergeant, and I also notified—I got the number for [APS] and I got the calls started to [APS].

Q.  While you were at the scene, did any of the people you called arrive at the apartment?

A.  They did. . . .  Town of Wallkill Volunteer Ambulance Corps.[] arrived and also [APS].  I believe her name is Candace.  And she is in the room.

. . . .

Q.  Now once the case worker from [APS] arrived, what happened then?

A.  [Plaintiff] already had been taken into custody and brought back to the station by [Kleveno] in a marked patrol unit.  When the ambulance arrived, I believe Miss Crain arrived shortly thereafter or right before.  She spoke with her.  She went to the hospital with her.

When she went into the room and came back out after speaking with her, she had informed me that she had found [Plaintiff's mother's] leg tied to the bed, which was covered by the blankets.

Q.  Did you go back into the room at that point?

A.  I did not.  The ambulance had put her on the stretcher and so forth.  She had, Miss Crain had removed the leg before I had seen it.

Q.  What did you do then?

A.  I—they were taken—I had another Officer come in with a camera to take pictures of the scene.

. . . .

Q.  Now, sir, I'm gonna ask you to take a look at [certain photographs] for identification purposes. . . .

. . . .

Q.  [What is] picture number 6?

A.  It is a picture . . . of the plastic bag used to tie [Plaintiff's mother's] legs.  Again of her bed in the apartment.

. . . .

Q.  Picture number 7?

A.  Again, another picture of the rope, just a different angle, that was used to tie her legs.

. . . .

Q.  . . . .  Do you recognize Exhibit 19A?

. . . .

A.  The paper bag which I placed the rope in for evidence.

Q.  How do you know it's the paper bag that you placed the rope into?

A.  Because I filled everything out and I signed it that I was the one that sealed it and placed it on the evidence.

. . . .

Q.  What is Exhibit 19B[?]

A.  It is a plastic bag that is spun around to use to tie her legs down.

(*Id.* at 39–48.)

Finally, Crain testified as to her recollection of the events of August 20, 2010:

Q. . . .  What were the circumstance[s] why you were called into the field [on August 20, 2010]?

A.  Officer Far[m]ingham had made a referral for [Plaintiff's mother], so I went out to the apartment.  And when I got there Officer Far[m]ingham was there and the paramedics were there.  And [Plaintiff's mother] was there.

Q.  And once you got there, what did you find?

A.  I found [Plaintiff's mother] in her bedroom lying on the bed.  She was in a night gown.  And she appeared to have some bruising on her face, on her arms.  And the paramedic had pointed out that one of her ankles was very bruised.

So while I was there I decided to move the blanket and that is when I noticed that her other leg was still tied to the bed.

Q.  What kind of bed was it?

A.  It was a twin bed.  I believe it had the hospital bars on the side.

Q.  And how was her leg tied?

A.  It was with a long, like a plastic bag that appeared to be tied a couple times.  And it was wrapped around her ankle and then tied to the hospital bed bar.

Q.  Once you noticed that this was on her leg, what did you do?

A.  Tried to remove it.

31

Q. Were you able to remove it?

A. Actually it was tied so tight that the paramedic had to remove it.  I tried.

. . . .

Q. Ma'am, do you recognize [Exhibit] 19B?

A. Yes.  . . . . [It is] [t]he rope that bound [Plaintiff's mother's] leg to the bed.

(*Id.* at 51–53.)  Crain also examined and testified to a number of photographs taken at the hospital on August 20, 2010, purportedly depicting bruises on various parts of Plaintiff's mother's body.  (*See id.* at 53–56.)

On December 12, 2011, the Surrogate's Court issued an order finding that Plaintiff's mother was sufficiently "incapacitated" that she would "likely suffer harm because of her functional limitations" and that "the appointment of a Guardian [was] necessary to prevent such harm."  (Guardianship Order 2–3.)  Accordingly, the court appointed Chang guardian.  (*Id.* at 3.)  The order also decreed that "all health care proxies and power of attorney documents previously executed by [Plaintiff's mother] [were] [t]hereby revoked and vacated and any appointments made thereunder [were] [t]hereby terminated."  (*Id.* at 7.)  And it issued a permanent Order of Protection against Plaintiff, ordering that he "remain at least 500 feet from [his mother] [at] all times" and "refrain from any and all telephone and other contact" with her.  (*Id.* at 7–8; *see also* SAC Ex. Index No. 2011-008338 (Order of Protection, dated Dec. 12, 2011).)  Plaintiff's mother passed away approximately one month later, on January 10, 2012.  (SAC ¶ 81.)

### 6. September 3, 2013

In the TAC, Plaintiff alleges, for the first time, that an additional incident occurred on September 3, 2013.  (TAC 27.)  Plaintiff alleges that on that day he was charged with a registration violation and an inspection certificate violation, both of which were dismissed.  (*Id.*

28; *see also id.* at 149–50 (traffic tickets with not guilty plea).)  Because Plaintiff does not allege

any further detail about the incident, and the tickets indicate that the violations were issued by

non-party Patrick Marcial, (*see id.* at 149–50), the Court does not consider these allegations in

the context of Defendants' Motions.

### B.  Procedural History

#### 1.  Initial Complaints

Plaintiff filed the instant Action on February 6, 2012.  At that time, the Complaint was 12

pages long (not including approximately 56 pages of exhibits), contained allegations involving

only the August 2010, June 2011, and September 2011 incidents, and named only the Town of

Wallkill Police Department and MPRHCC as defendants—although it did include references to,

inter alia, Farmingham, Reyes, Tiffany, Yvette, Du Bois, Maniscalco, and Gulick.  (*See* Dkt. No.

2.)  On March 27, 2012, the Court issued an Order noting that the Complaint contained

numerous allegations against Farmingham, and therefore "directed [the Clerk of Court] to amend

the caption of th[e] action to add [Farmingham] as a defendant."  (Dkt. No. 7 at 3–4.)  The Court

also directed the Clerk "to substitute as a defendant the Town of Wallkill for the Town of

Wallkill Police Department."  (*Id.* at 4.)

The Court held an initial conference on November 30, 2012, at which Plaintiff and

counsel for Wallkill, Farmingham, and MPRHCC appeared.  (*See* Dkt. (minute entry for Nov.

30, 2012).)  At that conference, the Court granted Plaintiff leave to file an amended complaint.

(*See id.*)  After successfully seeking numerous extensions of the original January 15, 2013

deadline, Plaintiff ultimately filed his Amended Complaint on May 7, 2013.  (*See* Dkt. No. 23.)[20]

---

[20] The Amended Complaint is listed as the twenty-third entry on the Docket, but many of
the exhibits can be found in the twenty-second entry, which is the May 4, 2013 letter from

The Amended Complaint, now consisting of 34 pages and a number of exhibits, named
MPRHCC, Wallkill, and Farmingham as Defendants, but also added a number of new Parties,
including Maniscalco, Conklin, Masterson, Small, Brewster, Green, Du Bois, Forman, Reyes,
Tiffany, Yvette, Hertman, Procak, Kleveno, Gulick, Solan, Orange County Department of Social
Services, Murphy, Crain, Labuda, Lacatena, Mannix, and the Shole Defendants.  (*See id.*)

On July 11, 2013, the Court issued, sua sponte, an Order directing Plaintiff to submit a
second amended complaint.  After reminding Plaintiff that, in granting him leave to file his
Amended Complaint, the Court "specifically directed [him] to be clearer as to the entities and/or
persons he intend[ed] to sue, the actionable conduct those entities or persons allegedly engaged
in, and the federal statutory or constitutional basis for his claims," the Court noted that the
Amended Complaint was "extremely difficult to follow," and that "it [was] in many respects less
clear than [the] original Complaint."  (Order ("July 2013 Order") 1–2 (Dkt. No. 25).)  The Court
was able to "discern that Plaintiff intends to pursue malicious prosecution, excessive force,
failure to intervene, and false imprisonment claims against the law enforcement Defendants,"
and it could "construe some of the allegations in the Amended Complaint to support a claim
against the law enforcement Defendants for violating Plaintiff's right to familial association with
his mother."  (*Id.* at 6.)  However, the Court noted that "by presenting a great amount of
disjointed and nonsequential information to the Court about the various events giving rise to
Plaintiff's arrests, Plaintiff ha[d] rendered it impossible to comprehend what actually happened
to him."  (*Id.*)  It therefore held that "[Plaintiff's] claims against the law enforcement Defendants
. . . [did] not satisfy the pleading requirements of Rule 8."  (*Id.*)  It also held that, with regard to

---

Plaintiff to the Court wherein Plaintiff submitted his Amended Complaint and accompanying
exhibits.  (*See* Dkt. No. 22.)

the other Defendants, "Plaintiff [did] not clearly or specifically allege how they were personally involved in any alleged wrongdoing or any basis for their liability under federal law," and it therefore held that "[t]he balance of the Amended Complaint . . . also [did] not satisfy the pleading requirements established by Rule 8." (*Id.*)

The Court then granted Plaintiff "one more opportunity to file an Amended Complaint…in order [to] correct the above deficiencies and to allege clearly and concisely facts to support his claims." (*Id.* at 7.) The Court specifically instructed Plaintiff to "provide a short plain statement of the relevant facts, in separate numbered paragraphs in chronological order, supporting each claim against each Defendant." (*Id.*) It also instructed Plaintiff to allege, in the second amended complaint, "who violated Plaintiff's federally protected rights; what facts show that his federally protected rights were violated; when such violation(s) occurred; where such violation(s) occurred; and why Plaintiff is entitled to relief." (*Id.* at 8.) Finally, the Court instructed Plaintiff to "allege, in separate numbered paragraphs, for each named Defendant, what that Defendant did to be personally involved in the violation of Plaintiff's constitutional rights," and it warned Plaintiff that "[i]f [he] [did] not comply with this instruction, his pleading may be dismissed as against any Defendant whose personal involvement [could not] be discerned from reading the pleading." (*Id.*) It also twice told Plaintiff that "this may be his final opportunity to amend." (*Id.* at 7; *see also id.* at 8 ("[T]he Court may not grant Plaintiff another chance to amend.").)

### 2.  Second Amended Complaint

Plaintiff submitted his SAC on September 24, 2013.  (*See* Dkt. No. 32.)[21]  On December 18, 2013, the Court issued an Order directing Plaintiff to serve the 36 Defendants named in the SAC, and advising Plaintiff that, "[i]f within 120 days of issuance of [a] summons, Plaintiff ha[d] not made service or requested an extension of time in which to do so, under Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure, the Court [might] dismiss th[e] action for failure to prosecute."  (*See* Dkt. No. 36 at 2.)  Plaintiff had previously served MPRHCC, Wallkill, and Farmingham in 2012, when he originally filed his Complaint.  (*See* Dkt. (entry for Apr. 5, 2012, indicating issuance of summons); Dkt. No. 8 (Motion To Dismiss filed by MPRHCC, dated May 2, 2012); Dkt. No. 13 (notice of appearance filed on behalf of Farmingham and Wallkill, dated June 29, 2012).)  Plaintiff therefore filed USM-285 forms for the remaining Defendants, which forms were received on January 13, 2014, resulting in the issuance of a summons on February 14, 2014.  (*See* Dkt. (entries for Jan. 13, 2014 and Feb. 14, 2014).)

### 3.  2014 Opinion and Order

The Court has held two pre-motion conferences in this case.  The first was held on December 17, 2013, at the request of counsel for Wallkill and Farmingham, each of whom was

---

[21] There is a second entry on the Docket that is also labeled as Plaintiff's SAC.  (*See* Dkt. No. 23.)  However, that submission is actually plaintiff's First Amended Complaint, as Plaintiff did not file an amended complaint before that document was docketed.  (*See* Dkt; *see also* Dkt. No. 25, at 2 (noting that Docket Number 23 is Plaintiff's Second Amended Complaint).)  The Court directs the Clerk of the Court to change the name of the document filed as Docket Number 23 to "First Amended Complaint."

named in the original Complaint.  (*See* Dkt. (minute entry for Dec. 17, 2013).)[22]  The Court set a briefing schedule for Wallkill's and Farmingham's Motion To Dismiss at that conference, (*see* Dkt. No. 35), pursuant to which those Defendants filed their Motion on January 17, 2014, (*see* Dkt. Nos. 39–41), and Plaintiff filed his Memorandum of Law in opposition to the Motion on February 26, 2014, (*see* Dkt. No. 43).  The second pre-motion conference was held on May 21, 2014, at which counsel for all Defendants appeared.  (*See* Dkt. No. 76 (Order); Dkt. (minute entry for May 21, 2014).)  Pursuant to a Scheduling Order adopted at that conference, the remaining briefs were filed.  (*See* Dkt. Nos. 105–114, 118–126, 128, 131, 133.)

On September 29, 2014, the Court issued an Opinion and Order (the "2014 Opinion and Order"), granting Defendants' Motions in part and denying them in part.  The Court (1) dismissed without prejudice all claims against Defendants New York State, Yvette, Tiffany, and Guzman without prejudice for failure to serve; (2) dismissed all claims with prejudice against Defendants Conklin, Labuda, and Lacatena for failure to comply with Federal Rule of Civil Procedure 8; (3) dismissed without prejudice all claims against Kammarada, McLymore, Belgiovene, Moskowitz, and Leo for failure to comply with Federal Rule of Civil Procedure 8; (4) denied Defendants' Rule 8 motions in all other respects, without prejudice to file a Rule 12(b)(6) motion to dismiss; (5) dismissed with prejudice all claims against Mannix for failure to state a claim; and (6) dismissed all claims against Defendants Orange County, Murphy, and

---

[22] Defendant MPRHCC was also named in the original Complaint, but it did not initially request a pre-motion conference and it did not appear at the December 2013 pre-motion conference.  In this context, the Court notes that MPRHCC filed a motion to dismiss in May 2012 (presumably shortly after Plaintiff served the original Complaint at some point after April 5, 2012), but the Court summarily denied it "without prejudice for failure to comply with the Court's Individual Practices" requiring parties to request a pre-motion conference before filing a dispositive motion.  (*See* Dkt. No. 11.)

Crain without prejudice for failure to state a claim.  *Ong v. Park Manor (Middletown Park) Rehab. and Healthcare Ctr.*, 51 F. Supp. 3d 319, 356 (S.D.N.Y. 2014).  The Court also granted Plaintiff leave to file a third amended complaint with respect to Kammarada, McLymore, Belgiovene, Moskowitz, Leo, Murphy, Crain, and Orange County, and made clear that the third amended complaint should "contain[] . . . allegations only against these Defendants."  (*Id.* at 356.)  The Court also granted Plaintiff leave to include allegations against new Defendants Jolly and Yeddu.  (*Id.* at 356 n.29.)

### 4.  Subsequent Complaints

Plaintiff filed his TAC on November 19, 2014, alleging substantially the same claims against substantially the same Defendants as those in the SAC, though for the first time Plaintiff added a claim for intentional infliction of emotional distress. (*See, e.g.,* TAC 6.)  The Court accepted Plaintiff's TAC for filing, and dismissed Defendant Sholes & Miller's Motion To Dismiss as moot because it sought to dismiss Plaintiff's SAC.  (*See* Dkt. No. 163.)  In the same Order, the Court adopted a briefing schedule for motions to dismiss the TAC.  (*See id.*; *see also* Dkt. Nos. 165, 168, 177 (requesting a schedule for putative motions to dismiss).)

On January 5, 2015, Plaintiff filed another complaint, presumably because Plaintiff "had more to add[]" to his allegations which included, for the first time, claims for negligence and negligent infliction of emotional distress.  (*See, e.g.,* FAC 7, 47.)  The Court construed Plaintiff's filing as his FAC and adjusted the briefing schedule for motions to dismiss accordingly.  (*See* Dkt. No. 173).  Pursuant to this briefing schedule, the Orange County Defendants filed a Motion To Dismiss and associated documents on February 4, 2015, (Dkt. Nos. 178–182), the Sholes Defendants filed a Motion To Dismiss and associated documents on the same day, (Dkt. Nos. 183–187), the Wallkill Defendants filed a Motion To Dismiss and associated dockets on

February 5, 2015, (Dkt. Nos. 188–190), and the MPRHCC Defendants filed a Motion To

Dismiss and associated documents on the same day, (Dkt. Nos. 191–195).  Plaintiff filed an

Affirmation in Opposition on March 10, 2015.  (Dkt. No. 198).  The Sholes Defendants filed a

Reply on March 26, 2015, (Dkt. No. 199), as did the Orange County Defendants, (Dkt. No. 201).

Plaintiff subsequently requested oral argument on August 3, 2015, (Dkt. No. 208), which request

the Court denied as unnecessary to its consideration of the instant Motions, (Dkt. No. 209).

## II.  DISCUSSION

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of

his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *See Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Instead, the Supreme

Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above

the speculative level," *see id.*, and that "once a claim has been stated adequately, it may be

supported by showing any set of facts consistent with the allegations in the complaint," *id.* at

563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its

face."  *Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from

conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will

. . . be a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense.  But where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that

39

the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ.

P. 8(a)(2))).

     For the purposes of Defendants' Motions To Dismiss, the Court is required to consider as

true the factual allegations contained in the Complaint.  *See Ruotolo v. City of New York*, 514

F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint

pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all

reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v.*

*Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) ("On a Rule 12(b)(6) motion to dismiss a

complain, the court must accept a plaintiff's factual allegations as true and draw all reasonable

inferences in his favor.").  "In adjudicating a Rule 12(b)(6) motion, a district court must confine

its consideration to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal

quotation marks omitted).  Because Plaintiff is proceeding pro se, the court construes his

"submissions. . . liberally" and interprets them "to raise the strongest arguments that they

*suggest.*"  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal

quotation marks omitted).  Furthermore, for the same reason, it is appropriate to consider

"materials outside the complaint to the extent that they are consistent with the allegations in the

complaint," *see Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y.

Aug. 2, 2013) (internal quotation marks omitted), including "documents that a pro se litigant

attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6

(E.D.N.Y. Dec. 15, 2010) (italics omitted); *see also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d

Cir. 2013) (noting that a court may consider "factual allegations made by a pro se party in his

papers opposing the motion") (italics omitted); *Rodriguez v. Rodriguez*, No. 10-CV-891, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013) ("Although the Court is typically confined to the allegations contained within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a court may consider factual allegations contained in a pro se litigant's opposition papers and other court filings." (citations and internal quotation marks omitted)).

    B.  Analysis

       Plaintiff makes several claims in his TAC and FAC.  In the TAC, those claims include § 1983 claims for false arrest, false imprisonment, "strip search," "conspiracy," failure to intervene, and malicious prosecution, (TAC 6), state law claims for malicious abuse of process, violation of the New York Civil Rights Act, false arrest and imprisonment, assault, battery, conspiracy, "coercion and intimidation," "intentional torts," and "intentional infliction of emotional distress.  (*See, e.g., id.* at 6.)  In the FAC, Plaintiff removed his "intentional torts" and "coercion and intimidation" claims, and added claims for negligence and negligent infliction of emotional distress.  (*See, e.g.,* FAC 2–3.)  The Court will proceed by liberally construing the most recent explanation of Plaintiff's claims, namely included in the FAC, and therefore dismisses any claims for "coercion and intimidation" or "intentional torts."  Given that Plaintiff has clearly laid out the claims he wishes to allege, the Court also, except as otherwise noted below, will not consider claims that Plaintiff merely makes passing reference to in his TAC, FAC, and Opposition because, as discussed in the 2014 Opinion and Order, those claims fail to meet Rule 8's fair notice requirement in that the FAC and TAC do not allege facts that specifically support those claims.  (*See, e.g.,* FAC 40, 46 (discussing defamation); Aff'n in Opp'n to Mot. (Pl.'s Opp'n) (Dkt. No. 198) (noting that "Plaintiff[] will be claiming 'Defamation of Character' on several Defendants"); Reply Mem. of Law in Supp. of the County Defs.' Mot.

To Dismiss 4 ("Orange County Reply") (Dkt. No. 201) (listing several new claims contained

Plaintiff's Opposition).)  *See Park Manor*, 51 F. Supp. 3d at 350; *see also Salahuddin v. Cuomo*,

861 F.2d 40, 42 (2d Cir. 1988) ("When a complaint does not comply with the requirement that it

be short and plain, the court has the power, on its own initiative or in response to a motion by the

defendant, to strike any portions  that are redundant or immaterial . . . ."); *Ceparano v. Suffolk

Cty.*, No. 10-CV-2030, 2010 WL 5437212, at *3 (E.D.N.Y. Dec. 15, 2010) ("[P]rolix,

unintelligible, speculative complaints that are argumentative, disjointed[,] and needlessly ramble

have routinely been dismissed in this Circuit." (collecting cases)); *cf. Raghavendra v. Trustees of

Columbia Univ.*, Nos 06-CV-6841, et al., 2012 WL 3778714, at *11 n. 20 (S.D.N.Y. July 11,

2012) n.20 (noting that the pro se plaintiff's mere "passing references" to age discrimination

claims without supporting factual allegations beyond the plaintiff's approximate age are

insufficient), *adopted by* 2012 WL 3778823 (S.D.N.Y. Aug. 31, 2012); *Windley v. Leonardo,*

No. 89-CV-7839, 1990 WL 106774, at *2 (S.D.N.Y. July 24, 1990) (noting that the pro se

plaintiff's "passing references" to the Fourteenth Amendment without reference to any case law

were inadequate to give notice of a Fourteenth Amendment claim).

### 1.  Scope of Leave to Amend

As the Sholes Defendants argue in their Motion, the Court expressly granted Plaintiff

only limited leave to amend his SAC.  (*See* Mem. of Law in Supp. of Defs. Sholes & Miller

LLP's and Sara Sholes, Esq.'s Motion To Dismiss Pl.'s Fourth Am. Compl. ("Sholes Mem.") 6–

9 (Dkt. No. 184).)  Specifically, the Court granted leave to amend as to Defendants Kammarada,

McLymore, Belgiovene, Moskowitz, Leo, Murphy, Crain, Orange County, Jolly, and Yeddu.

*Park Manor*, 51 F. Supp. 3d at 356 & n.29.  Accordingly, as to all other Defendants, the Court

has adequate basis to dismiss Plaintiff's new claims, and to disregard any new allegations, on

this ground alone.  *See, e.g., Ebron v. Lantz*, No. 04-CV-1375, 2006 WL 3246770, at *1, *4 (D.

Conn. Nov. 6, 2006) (dismissing claims against new defendants in an amended complaint

because the court "did not grant [the plaintiff] permission to add . . . new defendants, and [the

plaintiff] never sought that permission); *Pagan v. N.Y. State Div. of Parole,* No. 98-CV-5840,

2002 WL 398682 (S.D.N.Y. Mar. 13, 2002) (granting the defendants' motion to dismiss with

prejudice as to new state law claims alleged in amended complaint when the court's order

granted plaintiff leave to re-plead only his Title VII, § 1981, and NYSHRL claims); *Willett v.

City Univ. of N.Y.,* No. 94-CV-3873, 1997 WL 104769 (E.D.N.Y. Feb. 18, 1997) (declining to

consider five of eight new claims in amended complaint, on basis they exceeded scope of court's

order granting plaintiff leave to amend); *Kuntz v. N.Y. State Bd. of Elections,* 924 F. Supp. 364,

367 (N.D.N.Y. 1996), *aff'd*, 113 F.3d. 326 (2d. Cir. 1997) (dismissing three new claims in

amended complaint where they "appear[ed] to proceed on entirely new factual allegations and

legal bases and clearly exceed the mandated scope of the Court's leave to amend"); *see also

Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) (finding no

abuse of discretion in district court's decision to "reject [an] amended complaint as exceeding the

parameters of the leave that was given," and noting that "[d]istrict courts in this Circuit have

routinely dismissed claims in amended complaints where the court granted leave to amend for a

limited purpose and the plaintiff filed an amended complaint exceeding the scope of the

permission granted.").

    Given Plaintiff's pro se status, and the Court's obligation to liberally construe pro se

pleadings, the Court is hesitant to dismiss Plaintiff's FAC and TAC on this ground.  Instead,

except as noted below, the Court will proceed as if its acceptance of the FAC and TAC for filing

constituted nunc pro tunc approval of their content.  *See Vitale v. Marlborough Gallery*, No. 93-

CV-6276, 1994 WL 644494, at *1 n.1 (S.D.N.Y. July 5, 1994) (granting "leave to amend [the

complaint] nunc pro tunc" after an amended complaint was filed (italics omitted)); *First Marine

Shipyard, Inc. v. Harbor Ins. Co.*, No. 86-CV-2005, 1987 WL 27003, at *1 (E.D.N.Y. Nov. 25,

1987) (same); *see also Ross v. Patrusky, Mintz & Semel*, No. 90-CV-1356, 1997 WL 214957, at

*14 (S.D.N.Y. Apr. 29, 1997) (granting leave to amend nunc pro tunc because the amended

complaint's "factual allegations are largely similar to those contained in the initial complaint,"

and the challenging defendant "failed to articulate any way in which it would be prejudiced").[23]

## 2.  Defendants Previously Dismissed with Prejudice

In its 2014 Opinion and Order, the Court dismissed Plaintiff's claims against Conklin,

Labuda, Lacatena, and Mannix with prejudice.  *Park Manor*, 51 F. Supp. 3d at 356.

Nonetheless, Plaintiff once again filed claims against Conklin, Labuda, Lacatena, and Mannix in

his TAC and FAC.  (*See* FAC 8; *see also* Orange County Mem. 8; MPRHCC Mem. 6.)  Because

Plaintiff did not seek, and the Court did not grant, leave to amend as to these Defendants, and

because Plaintiff has neither moved for nor provided a basis for reconsideration of the Court's

2014 Opinion and Order, the Court dismisses Plaintiff's claims against Conklin, Labuda,

Lacatena, and Mannix with prejudice once again.  *See Collier v. Boymelgreen Developers*, No.

06-CV-5425, 2008 WL 835706, at *5 (E.D.N.Y. Mar. 28, 2008) (declining to revisit claims that

were previously dismissed with prejudice); *Cancall PCS, LLC v. Omnipoint Corp.*, No. 99-CV-

3395, 2001 WL 293981, at *6 (S.D.N.Y. Mar. 26, 2001) (noting fact that the plaintiff's claim

---

[23] For the same reason, despite the Orange County Defendant's insistence that Plaintiff
abandoned the issues underlying their Motion by failing to directly address them in his reply,
(*see* Orange County Reply 3), the Court is hesitant to dismiss on this basis given that Plaintiff
did, at least, submit an Affirmation in Opposition, (*see* Pl.'s Opp'n).  *Cf. Tribble v. City of New
York*, No. 10-CV-8697, 2013 WL 69229, at *9 (S.D.N.Y. Jan. 3, 2013) (deeming claims
abandoned where the pro se plaintiff "ha[d] not opposed the motion" at all).

"was already dismissed with prejudice" is "by itself[] grounds to dismiss" that claim in an amended complaint).

### 3.  Service of Process

As of the Court's 2014 Opinion and Order, Plaintiff had failed to serve New York State, Yvette, Tiffany, Guzman, Belgiovene and Moskowitz.  *See Park Manor*, 51 F. Supp. 3d at 340. After filing his FAC, Plaintiff filed an Affirmation of Service, averring that he served his TAC and FAC on all Defendants.  (*See* Dkt. No. 196.)  Based on the Affirmation, Plaintiff served attorneys that have already appeared in this Action, and did not directly serve those Defendants who had not yet been served.  (*See id.* at 2 (indicating that Plaintiff served Katherine J. Zellinger and Victor Carmine Piacentile on behalf of the MPRHCC Defendants, James Randazzo and Caitlin Grace Scheir on behalf of the Wallkill Defendants, Michael Francis Albanese on behalf of Defendants New York State and Mannix, Carol C. Pierce on behalf of the Orange County Defendants, and Kenneth McLellan and Robert Roussel on behalf of the Sholes Defendants).) Such service is insufficient, particularly because Plaintiff has not alleged, and the Court is not aware of any circumstances suggesting, that the unserved Defendants authorized any attorneys to accept service on their behalf.  *See Santos v. State Farm Fire & Cas. Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990) ("[S]ervice of process on an attorney not authorized to accept service for his client is ineffective."); *Zherka v. Ryan*, 52 F. Supp. 3d 571, 577 (S.D.N.Y. 2014) (same).[24]

---

[24] Of note, while an attorney may engage in "activities" sufficient "to warrant a finding of implied authority to receive services of process," *see Fed. Home Loan Mortg. Corp. v. Mirchandani*, No. 94-CV-1201, 1996 WL 534821, at *5 (E.D.N.Y. Sept. 18, 1996) (internal quotation marks omitted), "merely making a general appearance before the court will not constitute a waiver of the [insufficient service of process] defense so long as the party makes a timely challenge to the court's jurisdiction."  *Zherka*, 52 F. Supp. 3d at 577.

The same infirmity applies to Plaintiff's attempts to serve new Defendants Yeddu, Brennan, and Terwillinger, as well.  Plaintiff purportedly served attorneys on behalf of these Defendants instead of serving them directly.  (*See* Mem. of Law in Supp. of Defs.' Park Manor (Middletown Park) Rehabilitation Center, Vincent Maniscalco, Darla Conklin, Eileen Masterson, Jennifer Small, Wendy Brewster, Jenna Green, Suzanna Forman, Lisa M. Reyes, Ms. Yvette, Ms. Dawn, Ms. Tiffany, Lynn Terwillinger, Jennifer Brennan, et al. Mot. To Dismiss Pl.'s Second Am. Compl. ("MPRHCC Mem.") 6 (Dkt. No. 195); Dkt. No. 196, at 2.)[25]

The Court is unaware of any other action that Plaintiff has taken in an attempt to serve these Defendants, and Plaintiff has not otherwise requested an extension of time to do so or assistance from the Marshals Service under Federal Rule of Civil Procedure 4(c), as he has done in the past.  (*See* MPRHCC Mem. 6; Mem. of Law in Supp. of Town of Wallkill Defs.' Mot. To Dismiss Pl.'s Fourth Amended Complaint ("Wallkill Mem.") 13 (Dkt. No. 190); MPRHCC Mem. 6.)  Accordingly, pursuant to Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure, and as warned by the Court in its December 18, 2013 Order, (Dkt. No. 36), and 2014 Opinion and Order, *see Park Manor*, 51 F. Supp. 3d at 339–341, 356 (dismissing some Defendants for failure to serve), Plaintiff's claims against Defendants New York State, Yvette, Tiffany, Guzman, Belgiovene, Moskowitz, Yeddu, Brennan, and Terwillinger are dismissed, with prejudice, for failure to serve.

---

[25] No attorney has entered an appearance for Brennan and Yeddu, though Plaintiff's claims against Brennan are addressed in MPHRCC's Motion.  (*See* MPHRCC Mem. 6.) Katherine J. Zellinger entered a notice of appearance for Terwillinger on February 5, 2005, (*see* Dkt. No. 192), which was three days after Plaintiff filed his Affirmation of Service, (*see* Dkt. No. 196), meaning she could not be served on Terwillinger's behalf, *see Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 485 (S.D.N.Y. 2014) (dismissing claims for failure to serve when the plaintiff served the defendants' attorney before that attorney represented the defendants).

The same infirmity also applies to Plaintiff's attempted service of Sholes and Jolly.  The Court noted in its 2014 Opinion and Order that Plaintiff had previously made "no attempt to add Sholes as a Defendant or to serve her," *Park Manor*, 51 F. Supp. 3d at 339 n.7, and once again only attempted to serve the attorneys for Sholes and Miller on her behalf, (*see* Dkt. No. 196 at 2). Plaintiff likewise attempted to serve an attorney on behalf of Jolly, rather than Jolly himself, (*see* Dkt. No. 196), even though that attorney, Carol Pierce, did enter an appearance on behalf of Jolly two days after Plaintiff filed his Affirmation of Service, (Dkt. No. 179).

Neither the Sholes Defendants nor the Orange County Defendants argue in their respective Motions that Sholes and Jolly were not adequately served.  (*See generally* Sholes Mem; Orange County Mem.)  Nonetheless, Federal Rule of Civil Procedure 4(m) "authorizes sua sponte dismissal for failure to serve, provided that the plaintiff has received notice of that possibility." *Ringer v. People of the State of N.Y.*, 2010 WL 1169949, at *1 (S.D.N.Y. Feb. 25, 2010) (italics omitted) (citing *Thompson v. Maldonado*, 309 F.3d 107, 110 (2d Cir. 2002)), *adopted by* 2010 WL 1169949 (S.D.N.Y. Feb. 25, 2010).  As outlined above, Plaintiff has been given more than ample notice that his failure to serve Defendants would result in the dismissal of his claims against those Defendants.  (*See* Dkt. No. 32 (warning Plaintiff that failure to serve would result in dismissal).). *See also Park Manor*, 51 F. Supp. 3d at 339–341, 356 (dismissing some Defendants for failure to serve); *Ringer*, 2010 WL 1169949, at *2 (finding that a letter from the court that "expressly notified [the] [p]laintiff that it would recommend dismissing the case if he failed to serve [the] [d]efendants" by a certain date "without…good cause for that failure" constituted sufficient notice).  Accordingly, the Court dismisses Plaintiff's claims against Sholes and Jolly, with prejudice, for failure to serve.

### 4.  OCDSS as a Suable Entity

The Orange County Defendants argue, in their Motion, that OCDSS is not a suable entity. (Mem. of Law in Supp. of County Defs.' Mot. To Dismiss ('Orange County Mem.") 8 (Dkt. No. 181).)  They are technically correct: Under Federal Rule of Civil Procedure 17(b), "an entity can only be sued in federal court if it would be suable under the laws of the state where it was created," New York law in this case.  *MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010).  "In New York…agencies of a municipality are not suable entities because they are merely administrative arms of a municipality, [and] do not have a legal identity separate and apart from the municipality."  *Id.* (alteration in original) (internal quotation marks omitted)*; see also Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 551 (E.D.N.Y. 2013) (dismissing claim against the Suffolk County Department of Social Services "because it is not a suable entity"), *aff'd*, 560 F. App'x 6 (2d Cir. 2014).  While this would normally be sufficient for the Court to dismiss Plaintiff's claims against OCDSS, on May 27, 2014, counsel for the Orange County Defendants requested that Orange County be substituted for OCDSS, presumably because OCDSS is not a suable entity, as discussed at the May 21, 2014 pre-motion conference. (*See* Dkt. No. 96.)  Accordingly, in light of Plaintiff's pro se status, rather than dismiss Plaintiff's claims against OCDSS on this ground, the Court will construe Plaintiff's claims against OCDSS as claims against the Orange County, per counsel for the Orange County Defendants' previous request.[26]

---

[26] Similarly, as the Wallkill Defendants tacitly accept in a footnote, the Court will, for the same reason, construe Plaintiff's claims against the Town of Wallkill Police Department as claims against the Town of Wallkill (hereinafter referred to as "Wallkill") itself.  (*See* Dkt. No. 7 (ordering the substitution of the Town of Wallkill for the Wallkill Police Department); *see also* Wallkill Mem. 14 n.4 (referencing the substitution).)

5.  Statute of Limitations

In their Motions, the MPRHCC Defendants, Orange County Defendants, and Sholes

Defendants seek to dismiss portions of Plaintiff's TAC and FAC as untimely.  Specifically, (a)

the Wallkill Defendants contend that "the new claims asserted in the Fourth Amended

Complaint" are time-barred as to the new MPHRCC [D]efendants," namely Terwillinger, Yeddu,

and Brennan (the "new MPHRCC Defendants"), because of the three-year statute of limitations

governing § 1983 and § 1985 claims, and the one-year statute of limitations governing claims of

"false imprisonment, malicious prosecution, libel, [and] slander" under New York law,

(MPRHCC Mem. 5); (b) the Orange County Defendants argue that Plaintiff's § 1983 and § 1985

claims stemming from incidents on March 30, 2010, March 31, 2010, and August 20, 2010 are

time-barred because "[t]he [Orange] County Defendants were only added to Plaintiff' Second

Amended Complaint on September 24, 2013," that Plaintiff's new allegations that Orange

County officers denied Plaintiff's "requests for a late dinner" on March 31, 2010 and that Crain

was somehow involved in Plaintiff's arrest on August 20, 2010 raise claims that are time-barred,

and that Plaintiff's new claim of intentional infliction of emotional distress is barred by the one-

year statute of limitations provided by New York Civil Practice Law and Rules § 215(3) (Orange

County Mem. 9–10); and (c) the Sholes Defendants argue that Plaintiff's claim for intentional

infliction of emotional distress is time-barred for the same reason argued by the Orange County

Defendants, (Sholes Mem. 9–10).

Although "[t]he lapse of a limitations period is an affirmative defense that a defendant

must plead and prove[,]" a statute of limitations defense may be "raise[d] . . . in a pre-answer

Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v. Hartford

Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Zhou v. Wu,* No. 14-CV-1775, 2015

WL 925962, at *3 (S.D.N.Y. Mar. 3, 2015) (same); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("[B]ecause the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (alteration in original) (internal quotation marks omitted)); *cf. Wang v. Palmisano,* 51 F. Supp. 3d 521, 536–37 (S.D.N.Y. 2014) (refusing to dismiss several employment claims under state and federal law as untimely pursuant to Rule 12(b)(6) because of two uncertainties on the face of the complaint as to when the claims accrued).

To this end, Defendants properly identify the three-year limitations period that governs Plaintiff's federal claims.  Because § 1983 "does not provide a specific statute of limitations," "courts apply the statute of limitations for personal injury actions under state law."  *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013); *see also Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir. 1997) (finding that in considering Section 1983 claims, courts should apply "the general or residual [state] statute [of limitations] for personal injury actions" (alteration in original) (internal quotation marks omitted)).  Therefore, "[§] 1983 actions filed in New York are . . . subject to a three-year statute of limitations."  *Hogan*, 738 F.3d at 517; *see also Ormiston*, 117 F.3d at 71 (explaining that "New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs § 1983 actions in New York").  Section 1985 claims are likewise governed by the same three-year statute of limitations. *See Nguyen v. Bush*, No. 15-CV-641, 2015 WL 1966296, at *2 (E.D.N.Y. May 1, 2015) ("In New York State, the statute of limitations for actions brought pursuant to Sections 1983 and 1985 is three years." (citing *Paige v. Police Dep't of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001)).  Defendants also properly identify the one-year limitations period that governs Plaintiff's

intentional infliction of emotional distress claim.  *See Solomon v. Siemens Indus., Inc.,* No. 11–CV–1321, 2014 WL 1271192, at *19 (E.D.N.Y. Mar. 26, 2014) ("[T]he limitations period applicable to claims for intentional infliction of emotional distress is one year."); *accord Patterson v. Balsamico,* 440 F.3d 104, 112 n. 4 (2d Cir. 2006) (noting that "New York courts have held that a claim for damages for intentional infliction of emotional distress is subject to the one-year statute of limitations in C.P.L.R. Section 215(3)" (citations omitted)).  The Court will begin in the reverse order and first consider the timeliness of Plaintiff's intentional infliction of emotional distress claim.

### a.  Intentional Infliction of Emotional Distress

Given that there is no dispute as to when the relevant alleged incidents occurred, namely on or before November 20, 2011, and that Plaintiff did not allege this claim until he filed his TAC on November 19, 2014, it is clear that, absent tolling, Plaintiff's claim for intentional infliction of emotional distress is time-barred.  Accordingly, the Court must consider whether, under Federal Rule of Civil Procedure 15(c), Plaintiff's intentional infliction of emotional distress claim relates back to the date of his original complaint.  Under Rule 15(c), a claim relates back to the filing of the original complaint if

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

> (ii) knew or should have known that the action would have been brought
> against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1); *see also Maccharulo v. Gould*, 643 F. Supp. 2d 587, 593 n.10 (S.D.N.Y. 2009) (same).

The Court finds that his intentional infliction of emotional distress claim "advances a new legal theory . . . premised upon the same set of facts alleged in the [o]riginal Complaint." *Maccharulo*, 643 F. Supp. 2d at 593.  In his original Complaint, Plaintiff made clear that he wanted to be "compensated" for his "emotional stress" stemming from events occurring prior to, and including, his mother's death on January 10, 2012.  (Dkt. No. 2 at 5.)  The instant claim grows from that same allegation.  The Court therefore construes Plaintiff's intentional infliction of emotional distress claim as filed on February 6, 2012, the date of Plaintiff's original Complaint.  (Dkt. No. 2).  *See also Tiller v. Atl. Coast Lin R.R. Co.*, 323 U.S. 574, 581 (1945) (holding that an amended complaint that sets forth a claim arising under a different statute based on the same underlying facts relates back under Rule 15(c)).  Plaintiff's intentional infliction of emotional distress claim is therefore timely, in general, because the Court deems it made within a year of at least some of the factual allegations contained in his TAC and FAC.

Even if Plaintiff's intentional infliction of emotional distress claim as made on February 6, 2012 related back to the date of his original complaint, the Orange County Defendants and Sholes Defendants were not added to this Action until Plaintiff filed his SAC on September 24, 2013, and the new MPHRCC Defendants were not added to this Action until Plaintiff filed his TAC on November 19, 2014, both well over one year after the most recent misconduct that Plaintiff alleges.  Accordingly, unless Plaintiff's addition of the Orange County Defendants, Sholes Defendants, and new MPHRCC Defendants relates back to the Original Complaint—an

issue which no Party has briefed—Plaintiff's intentional infliction of emotional distress claim is

untimely as to those Defendants.

> Under Federal Rule of Civil Procedure 15(c)(3)
>
> [a]n amendment to a pleading that attempts to bring in a new party will "relate
> back" to the date of the original pleading when (1) the claim arises out of the same
> conduct originally pleaded and (2) within (ordinarily) 120 days of the original filing
> date, the party to be brought in by amendment (A) has received such notice of the
> institution of the action that the party will not be *prejudiced* in maintaining a
> defense on the merits, and (B) knew or should have known that, but for a *mistake*
> concerning the identity of the proper party, the action would have been brought
> against the party.

Fed. R. Civ. P. 15(c)(3); *see also Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996)

(same).  The Court need not discuss each of these conditions, as Plaintiff cannot demonstrate that

the Orange County Defendants, Sholes Defendants, and new MPRHCC Defendants "knew or

should have known that but for a mistake concerning the identity of the proper party, the action

would have been brought against [them]."

"[W]here a Plaintiff can show that he misapprehended the identity of the person he

wished to sue (a factual mistake), or failed to understand the legal requirements of his claim (a

legal mistake), then the claim satisfies the mistake requirement of Rule 15(c)." *Maccharulo*, 643

F. Supp. 2d at 595 (internal quotation marks omitted); *see also In re WorldCom. Inc. Sec. Litig.*,

Nos. 02-CV-3146 et al., 2004 WL 540450, at *4 (S.D.N.Y. Mar. 19, 2004) ("A mistake

regarding the identity of the proper party for purposes of Rule 15(c) can be a mistake of either

fact or law." (internal quotation marks omitted)).  There is no indication in Plaintiff's TAC or

FAC, and Plaintiff does not otherwise argue, that he failed to include the Defendants at issue

because of a factual or legal error.  Rather, Plaintiff appears to have added claims against

Defendants he either already knew of but strategically decided to leave out, *see In re WorldCom*,

2004 WL 540450, at *5 (finding no mistake where "the plaintiff made a strategic decision to

name only one of two entities"), or learned were involved during his investigation of the case, *see Rodriguez v. City of New York*, No. 10-CV-1849, 2011 WL 4344057, at *8 (S.D.N.Y. Sept. 7, 2011) ("[The] [p]laintiff did not know the identity of the officers he now seeks to add and therefore did not make a mistake concerning the parties' identities.").  Therefore, the Court will not deem Plaintiff's addition of the Orange County Defendants, Sholes Defendants, or new MPRHCC Defendants to relate back to the original Complaint.  Plaintiff's intentional infliction of emotional distress claim is dismissed as untimely, with prejudice, as to the Sholes Defendants, Orange County Defendants, and new MPRHCC Defendants.

### b.  Other Claims Against New MPHRCC Defendants

Given the new MPHRCC Defendants were not added until November 19, 2014, more than three years after all of the alleged misconduct, and their addition does not relate back to any previously filed Complaint, most of Plaintiff's other claims, as the MPHRCC Defendants argued, (MPHRCC Mem. 5), are time-barred as to those Defendants.  As indicated above, the statute of limitations for Plaintiff's federal claims is three years.  Additionally, with two exceptions, namely negligence and negligent infliction of emotional distress, which are both subject to a three-year statute of limitations, (*see* N.Y. C.P.L.R. § 214(5) (providing three-year statute of limitations for "action[s] to recover damages for a personal injury," unless an exception applies), all of Plaintiff's state law claims are intentional torts, which are subject to a one-year statute of limitations.  (*See* N.Y. C.P.L.R. § 215(3) (providing one-year statute of limitations for a number of intentional torts, including "assault, battery, false imprisonment, libel, slander"); *see also Borison v. Cornacchia*, No. 96-CV-4783, 1997 WL 232294, at *1 (S.D.N.Y. May 7, 1997) ("[A]ll appellate courts . . . recognize that a claim for damages for an intentional tort such as abuse of process is subject to the one-year limitations period.").  Accordingly, all of Plaintiff's

state law claims, except those for negligence and negligent infliction of emotional distress, and all of Plaintiff's federal claims, are dismissed as to the new MPHRCC Defendants as time-barred, with prejudice.

### c.  Other Claims Against the Orange County Defendants

The Court also finds that Plaintiff's claims stemming from conduct alleged to have occurred as part of the March 30–31 and August 20, 2010 incidents are untimely as to the Orange County Defendants.  As discussed above, Plaintiff's federal claims are governed by a three-year statute of limitations, his state intentional tort claims are governed by a one-year statute of limitations, and the Orange County Defendants were added in Plaintiff's SAC on September 24, 2013, more than three years after misconduct alleged to have occurred as part of these incidents.  (*See* Orange County Mem. 8–10.)  Therefore, because the addition of the Orange County Defendants does not relate back to the initial Complaint, the Court dismisses Plaintiff's federal claims, and state law claims other than negligence and negligent infliction of emotional distress, against the Orange County Defendants, with prejudice, insofar as they stem from conduct that occurred on March 30–31 or August 20, 2010.[27]

### 6.  Absolute Immunity

Defendants assert two absolute immunity claims.  First, the Wallkill Defendants argue that Farmingham is absolutely immune from liability for any allegedly false testimony he gave at the guardianship hearing under *Briscoe v. LaHue*, 460 U.S. 325 (1983).  (*See* Wallkill Mem. 23.)  As the Second Circuit has made clear, because "[t]he functions of a police officer witness in a judicial proceeding are the same as those of any other witness," a police officer is entitled to

---

[27] This renders moot the Orange County Defendants' contention that Plaintiff's additional factual allegations raise claims that are time-barred, because all those factual allegations refer to the March 30-31, 2010 and August 20, 2010 incidents.

absolute immunity when testifying at a judicial proceeding, provided that he is not a complaining witness, i.e., a witness instituting the proceeding. *Sykes v. James*, 13 F.3d 515, 519–21 (2d Cir. 1993); *see also Collins v. City of New York*, 923 F. Supp. 2d 462, 467, 472–73 (E.D.N.Y. 2013) (finding that an assistant district attorney was entitled to absolute immunity when averring to no wrongdoing in an affirmation submitted in response to a petitioner's collateral attacks on his conviction); *cf. Gardner ex rel. Gardner v. Parson*, 874 F.2d 131, 145–46 (3d Cir. 1989) (noting that a guardian ad litem is entitled to absolute immunity when testifying). Because guardianship hearings are a form of judicial proceeding, *see Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 358 (2d Cir. 2004) (noting that "guardianship proceedings [are] a form of judicial proceedings"), Farmingham is entitled to absolute immunity for his testimony. Accordingly, the Court dismisses all of Plaintiff's claims against Farmingham stemming from the allegedly false testimony he gave at the guardianship hearing.[28]

Second, the Orange County Defendants argue that Murphy, Crain, and Jolly are absolutely immune from suit because they were "performing duties within the scope of their employment" under New York Social Services Law § 473(3). (Orange County Mem. 10–13.) New York Social Services Law § 473(3) provides that

> [a]ny social services official . . . shall have immunity from any civil liability that might otherwise result by reason of providing such services, provided such official or his designee was acting in the discharge of his duties and within the scope of his employment, and that such liability did not result from the willful[] act or gross negligence of such official or his designee.

---

[28] Plaintiff's other allegation against Farmingham related to the November 10, 2011 incident is that he prevented Plaintiff from giving his mother a "hug and kiss" at the hearing, or even going near her, warning Plaintiff that he would be "handcuff[ed] [and] arrested again" if he did so. (FAC 8, 33.) It is not clear which of Plaintiff's rights Farmingham violated in keeping him away from his mother, given he was suspected of harming his mother (the nexus of the guardianship hearing). Accordingly, Plaintiff does not state a claim based on this allegation.

N.Y. Soc. Serv. Law § 473(3); *see also Shinn v. City of New York*, 884 N.Y.S.2d 466, 467 (App. Div. 2009) (affirming grant of summary judgment to defendants, including New York City Adult Protective Services, because they were immune from civil liability under this statute when they acted "pursuant to a court order granting access to the plaintiff as an adult person believed to be in need of protective services").  In support of their immunity contention, the Orange County Defendants argue that "the alleged conduct occurred while the Orange County Defendants were executing their duties and responsibilities as employees of the Department of Social Services," which include "reporting, investigation, and providing . . . protective services to Plaintiff's mother, who was determined to be an adult person in need of protection."  (Orange County Mem. 12.)  However, under the plain language of the law, if Plaintiff plausibly alleges that Murphy, Crain, and Jolly are liable by virtue of a willful act, were grossly negligent, or acted outside the scope of their employment, then they are not entitled to immunity.  *See Cortlandt v. Westchester Cty.*, No. 07-CV-1783, 2007 WL 3238674, at *9–10 (S.D.N.Y. Oct. 31, 2007) (finding that the defendants were not be immune from suit under § 473 because the plaintiff alleged that they acted in a grossly negligent manner and contrary to the requirements of the Mental Hygiene Law).

Alternatively, the Orange County Defendants argue that, under New York Social Services Law § 473-b, Murphy, Crain, and Jolly are immune from civil liability for their testimony at the guardianship proceeding.  (Orange County Mem. 13.)  New York Social Services Law § 473-b provides that

> [a]ny person who in good faith believes that a person . . . may be an endangered adult or in need of protective or other services . . . testifies in any judicial or administrative proceeding arising from such report or referral shall have immunity from any civil liability that might otherwise result [from the] . . . giving of such testimony.

N.Y. Soc. Serv. Law § 473-b.  In support of this contention, the Orange County Defendants argue that Crain was "clearly . . . testifying at a guardianship hearing as an employee of" the Department of Social Services, which is "well within the scope of her employment," that Murphy's presence at the hearing was similarly "within the scope of his employment," and that under Social Services Law § 473(5), Murphy, Crain, and Jolly are "mandatory reporters" such that they must "report and/or investigate any allegation of abuse," which, "as part of their duties and responsibilities," requires "testify[ing] at judicial proceedings."  (Orange County Mem. 13.)  However, under the plain language of the law, if Plaintiff plausibly alleges that Murphy, Crain, and Jolly testified in bad faith, then they are not entitled to immunity.

While the Court notes that it has already dismissed most of Plaintiff's claims against the Orange County Defendants as untimely, and all claims against Jolly for failure to serve, it evaluates the Orange County Defendants' claim of immunity in the alternative.  First, it is impossible for the Court to evaluate Jolly's entitlement to immunity because Plaintiff makes almost no allegations against him, as discussed below.  Second, with regard to Murphy and Crain, the Court finds that they are not, at this stage, entitled to immunity from Plaintiff's claims.

On their face, both § 473(3) and § 473-b appear to apply.  With regard to § 473(3), while the cases that the Orange County Defendants cite are not particularly persuasive, (*see* Orange County Mem. 12–13), Murphy and Crain do appear to have been acting within the scope of their employment here when testifying (or, in Murphy's case, accompanying a subordinate who was testifying) at a hearing consistent with their reporting requirement under New York Social Services Law § 473(5).  With regard to § 473-b, as discussed above, Crain, at least, was clearly "testifying in [a] judicial or administrative proceeding" arising from a "report or referral."  (TAC 19; FAC 25.)  *See Marilyn S. v. Indep. Grp. Home Living Program, Inc.*, 904 N.Y.S. 2d 70, 72

(App. Div. 2010) (granting the defendants immunity for "act[ing] in good faith when they reported allegations of sexual abuse made by the Plaintiffs' son"). The central question, though, is whether Murphy and Crain are liable by virtue of a "willful[] act or gross negligence," N.Y. Soc. Serv. Law § 473(3), or otherwise testified in "good faith," *id.* § 473-b. Plaintiff alleges that that Crain, with Murphy's coaching, testified falsely at the hearing with a "malicious" motive, namely the "intent to harm Plaintiff[]." (FAC 10, 37.) While not backed by the sort of factual underpinning to render Plaintiff's allegations particularly compelling, they do suggest the sort of "bad faith" or "willful act" that vitiates immunity. *See Cortlandt*, 2007 WL 3238674, at *9–10 (denying motion to dismiss on immunity grounds because the plaintiff alleged that the social services officials acted in a "grossly negligent manner"); *Recant v. N.Y. Presbyterian Hosp.*, 2009 WL 3490940, at *4 (N.Y. Sup. Ct. Oct. 15, 2009) (denying motion to dismiss on immunity grounds because the plaintiff alleged that the defendant made allegations in bad faith, and the defendant "fail[ed] to come forward with evidence of her good faith"). Accordingly, the Court declines to dismiss Plaintiff's claims against Murphy, Crain, and Jolly on immunity grounds.

### 7. Failure to State a Claim

#### a. Personal Involvement

As the Court has made clear on multiple occasions, *see Park Manor*, 51 F. Supp. 3d at 339 (noting that the Court previously warned Plaintiff that his complaint may be dismissed "as against any Defendant whose personal involvement could not be discerned from reading the pleading" (brackets and internal quotation marks omitted)), 353 (same), 356 (warning that "if Plaintiff does not comply with the Court's instruction that he allege a Defendants' personal involvement, the Court will dismiss his claims against that Defendant without leave to amend), Plaintiff must allege the personal involvement of Defendants in order to state a claim against

them, *see id.* at 352 (finding that allegations were "insufficient to meet [the] burden of stating a

plausible claim for relief" under § 1983 because they did not allege "personal involve[ment]");

*see also Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that,

in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff

must show . . . the defendant's personal involvement in the alleged constitutional deprivation.");

*Inside Connect. Inc. v. Fischer*, No. 13-CV-1138, 2014 WL 2933221, at *10 (S.D.N.Y. June 30,

2014) ("[W]here the complaint names defendants in the caption but contains no allegations

indicating how they violated the law or injured the plaintiff, dismissal is appropriate." (brackets

and internal quotation marks omitted)).   Nonetheless, Plaintiff has failed to allege sufficient

personal involvement as to several Defendants.

  First, Plaintiff has failed to allege any personal involvement of Kammarada and

Moskowitz.   Other than listing them as Defendants, Plaintiff includes no allegations regarding

any misconduct in which they engaged.   (*See* Wallkill Mem. 13; Orange County Mem. 14.)

Accordingly, Plaintiff has failed to allege personal involvement, and Plaintiff's claims against

Kammarada and Moskowitz, acknowledging that the Court has already dismissed Plaintiff's

claims against Moskowitz for failure to serve, are dismissed in their entirety, with prejudice.

  Second, Plaintiff alleges insufficient personal involvement with regard to several other

Defendants.   Beginning with the MPRHCC Defendants, with regard to Green, Plaintiff only

alleges that he met with Green on March 31, 2011, and that on that date, at Green's request,

Plaintiff showed or gave Green a number of documents concerning Plaintiff's power to make

medical decisions for his mother.   (TAC 2, 8, 92; FAC 4, 11, 40.)[29]   With regard to Yeddu, who

---

[29] Plaintiff may be confused as to what it means to be a Defendant in a case, as opposed
to what it means to act as a witness in a case.   Indeed, the only role that Plaintiff assigns to Green

the Court has already dismissed for failure to serve and because Plaintiff's claims against her are

time-barred, Plaintiff alleges only that he "took Plaintiff's signature" on March 31, 2011 when

Plaintiff provided the aforementioned documents to Green, (TAC 5), that Yeddu had treated

Plaintiff's mother's laceration in some way, (*see id.* at 18), and that she "knows which

documents are 'falsified/altered'" by other Defendants, (*see id.* at 105).[30]  With regard to

Terwillinger, who the Court has already dismissed for failure to serve and because Plaintiff's

claims against her are time-barred, Plaintiff alleges that Plaintiff met with her in April 2011, at

which time she "called [Plaintiff's] attention" to MPRHCC's nursing home policy and provided

Plaintiff with a copy of the policy.  (FAC 4, 38–39; *see also* MPHRCC Mem. 4, 6.)[31]  With

regard to Brennan, who the Court has already dismissed for failure to serve and because

Plaintiff's claims against her are time-barred, Plaintiff only alleges that she was a "finance

manager," that she "ha[d] . . . knowledge" of the allege retaliation against Plaintiff, and that she

refused to provide a refund when Borgmann asked for a refund after Plaintiff's mother's death.

(TAC 9, 101, 105, 133–34; *see also* MPHRCC Mem. 4, 6.)

Moving next to the Wallkill Defendants, with regard to McLymore, other than acting as a

"supervisor," (TAC 69), Plaintiff alleges only that McLymore attested to the existence of

---

is that she "will be called to testify" that the documents at issue were modified by Sholes.  (TAC
8–9; *see also* FAC 11, 39.)  *See also Park Manor*, 51 F. Supp. 3d at 350 n.25 (discussing this
confusion, and noting that the Court previously informed Plaintiff that he could call witnesses
without naming them as defendants).

[30] As with Defendant Green, Plaintiff appears to have again confused naming Yeddu as a
Defendant with calling Yeddu as a witness.  Plaintiff states explicitly in his TAC that he "added
. . . Yeddu to testify [that the] documents [at issue]" are authentic.  (TAC 9.)

[31] As with Defendants Green and Yeddu, Plaintiff appears to have again confused adding
Terwillinger as a Defendant with calling Terwillinger as a witness.  Plaintiff notes that he "added
this person [to] testify that Plaintiff[] has legitimate or legal documents" demonstrating Plaintiff
was his mother's "health care agent."  (TAC 8.)

Plaintiff's criminal record, and that his name shows up in an incident report. (*See* FAC 39, 50; *see also* Wallkill Mem. 13.) With regard to Belgiovene, who the Court has already dismissed for failure to serve, Plaintiff's alleges only that Belgiovene assisted Gulick in arresting Plaintiff on June 10, 2011 (without explaining what role Belgiovene actually played), and that the arrest was "unlawful and malicious." (FAC 34–35; *see also* Wallkill Mem. 13.)

Finally, as far as the Orange County Defendants are concerned, with regard to Leo, Plaintiff only alleges that she "took" Plaintiff's mother's "case," that she was at one point "called" by Masterson, and that she was somehow "involved" the conspiracy at issue. (*See* TAC 17, 89; FAC 19, 36, 40.)

As was true in the Second Amended Complaint, the problem with Plaintiff's allegations against Green, Yeddu, Terwillinger, Brennan, McLymore, Belgiovene, and Leo, is that they either are, once again, only "assertion[s] of liability without any explanation as to [each Defendant's] role in harming Plaintiff," *Park Manor*, 51 F. Supp. 3d at 350, or contain no allegations of liability at all. Accordingly, acknowledging that the Court has already dismissed claims against some of these Defendants for other reasons, the Court nonetheless dismisses Plaintiff's claims against Green, Yeddu, Terwillinger, Brennan, McLymore, Belgiovene, and Leo for failure to allege personal involvement, with prejudice.[32]

---

[32] While Defendants do not argue, in their Memoranda, that Plaintiff failed to allege personal involvement of Yeddu or Leo, the Court reaches this question sua sponte. As detailed above, Plaintiff had more than adequate notice that a failure to allege personal involvement of a Defendant would result in dismissal. *See Gonzalez v. Ocwen Home Loan Servicing*, 74 F. Supp. 3d 504, 519 (D. Conn. 2015) ("The Second Circuit has held that in general, a district court cannot dismiss a claim sua sponte unless the plaintiff has been given notice of the court's intention to dismiss and the opportunity to respond." (italics omitted) (citing *Perez v. Ortiz*, 849 F.2d 793, 797–98 (2d Cir. 1988))); *see also Abascal v. Jarkos*, 357 F. App'x 388, 390 (2d Cir. 2009) (affirming dismissal of § 1983 claims sua sponte in part because the plaintiff failed to allege a defendant's personal involvement); *Wright v. Nunez*, 950 F. Supp. 610, 611

The Wallkill Defendants and Orange County Defendants also argue that Plaintiff failed to allege personal participation of certain supervisory Defendants.  A plaintiff does not state a claim against a defendant under § 1983 when he asserts that an official is liable solely because he or she has a supervisory role or a position of authority.  *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) ("We see no error in the dismissal of the claim against Coughlin for lack of personal involvement, since a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *2 (E.D.N.Y. Aug. 18, 2015) ("[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a position of high authority."); *Kee v. Hasty,* No. 01-CV-2123, 2004 WL 807071, at *2 (S.D.N.Y. Apr. 14, 2004) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." (citations omitted)).  A plaintiff is personally involved as a supervisor when he or she "(1) . . . participate[s] directly in the alleged constitutional violation, (2) . . . after being informed of the violation through a report or appeal, fail[s] to remedy the wrong, (3) . . . create[s] a policy or custom under which unconstitutional practices occurred, or allow[s] the continuance of such a policy or custom, (4) . . . [is] grossly negligent in supervising subordinates who commit[] the wrongful acts, or (5) . . . exhibit[s] deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Black,* 76 F.3d at 74 ("We have construed personal involvement for these

_____

(S.D.N.Y.1997) (dismissing the plaintiff's § 1983 claims sua sponte because he failed to allege the personal involvement of the warden of the prison and commissioner of DOC).

purposes to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates.").

The Wallkill Defendants argue that Plaintiff fails to allege sufficient personal involvement of Hertman, Spano, and Procak. (Wallkill Mem. 15–16.) With regard to Hertman, Plaintiff alleges that Hertman "[did] not . . . listen to Plaintiff['s] request" to have his firearm returned, that he indicated, in a March 29, 2013 letter, that he would "conduct[] and investigation" into Plaintiff's "'complaint of failure to take proper Police action'" yet never did so," that he "fail[ed[] to supervise, monitor, or investigate" certain police officers, and that he "admitted that several officers violated" their duties with respect to Plaintiff on March 31, 2010. (TAC 12, 103; FAC 7–8, 15, 32, 37, 39, 47.) With regard to Spano, Plaintiff alleges only that he is liable by virtue of his failure to "supervise, monitor, and investigate" certain police officers. (FAC 8, 32, 37, 39, 47.) With regard to Procak, Plaintiff alleges only that Procak stated in a police report that he assisted with the June 10, 2011 arrest and that Gulick actually arrested Plaintiff that day, assisted by Mannix. (TAC 139; FAC 35.)

On this basis of these allegations, the Court finds that Plaintiff has only alleged the personal involvement of Hertman. Plaintiff arguably alleged that in failing to act on Plaintiff's report, Hertman personally failed to remedy a wrong reported to him. *See Colon*, 58 F.3d at 873. By contrast, Plaintiff's allegations against Spano and Procak are wholly inadequate. With regard to Spano, Plaintiff does not allege how Spano's supervision was lacking, never mind how it may have been "grossly negligent," such that Plaintiff's theory is liability is based on anything more than Plaintiff's supervisory role. With regard to Procak, Plaintiff suggests that Procak was not involved in the only arrest Plaintiff associates him with, and does not explain how signing the

64

police report at issue had any effect on Plaintiff at all.  These allegations are not only insufficient to state a § 1983 claim, but are also insufficient to demonstrate any liability at all.  Accordingly, the Court dismisses Plaintiff's claims against Spano and Procak.

In the same vein, the Orange County Defendants contend that Plaintiff failed to allege sufficient personal involvement of Murphy and Jolly.  (*See* Orange County Mem. 14–16.)  With regard to Defendant Murphy, Plaintiff alleges, in relevant part, that he coached Crain to offer false testimony at the guardianship hearing with "malicious intent," (TAC 37, 40 (brackets omitted); FAC 10, 35, 37), and that he "assist[ed]" Sholes in submitting of "falsified/altered documents" at the Guardianship hearing, (TAC 7, 43).   With regard to Defendant Jolly, Plaintiff only alleges that Jolly "assist[ed]" Sholes in submitting "falsified/altered documents" at the Guardianship hearing.  (TAC 7, 43.)  In this context, the Court finds that Plaintiff has alleged sufficient personal involvement with respect to Murphy, but insufficient personal involvement with respect to Jolly.  While Murphy's acts of "coaching" certainly allege personal involvement, it is not clear from the TAC and FAC how Jolly "assisted" Sholes in the filing of falsified documents, what such assistance entailed, and which documents were false.  *Cf. Leeds v. Meltz*, 83 F.3d 51, 55 (2d Cir. 1996) (noting that the "bare conclusion . . . that various . . . employees somehow 'prevented' publication" of the plaintiff's advertisement in the school newspaper were insufficient)).[33]  Accordingly, acknowledging that the Court has already dismissed Plaintiff's claims against Jolly for failure to serve, it nonetheless once again dismisses Plaintiff's claims against Jolly.

---

[33] Additionally, it appears that Sholes, the attorney who originally petitioned the Surrogate's Court, submitted those documents, as Plaintiff alleges on several occasions in his FAC.  (*See, e.g.,* FAC 6 ("Sholes presented as legitimate documents . . . falsified/altered documents . . . ."), 40 ("Sholes . . . submitted to surrogates courts [sic] with intent to lied submitted []falsified/altered documents . . . .").)

The Orange County Defendants argue that Plaintiff failed to allege the personal involvement of Crain and Orange County.  (*See* Orange County Mem. 14.)  Plaintiff alleges that Crain, in relevant part, together with other Defendants as part of a conspiracy, made false statements under oath at the November 10, 2011 guardianship hearing, "resulting in Plaintiff losing certain rights related to his mother," (TAC 37, 40; FAC 4, 10, 35, 37).[34]  As the Court found in its 2014 Opinion and Court, these allegations establish sufficient personal involvement with respect to Crain's participation in the November 10, 2011 guardianship hearing.  *See Park Manor*, 51 F. Supp. 3d at 354.  With regard to the personal involvement of Orange County, because that involvement directly implicates *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), the Court will address the viability of Plaintiff's claims against Orange County in a separate section.

The MPRHCC Defendants argue that Plaintiff did not sufficiently allege the personal involvement of Brewster, Reyes, Masterson, Maniscalco, and Small, arguing that the FAC "fail[s] to delineate the specific actions that [P]laintiff claims deprived him of his constitutional rights."  (MPHRCC Mem. 4.)  With regard to Brewster, Plaintiff alleges that she called the police on June 10, 2011 to falsely report that she heard Plaintiff yelling at his mother and making verbal threats about using a firearm, leading to Plaintiff's arrest on that day.  (TAC 16; FAC 4, 18, 35–36, 44.)  Plaintiff also alleges that Brewster gave false statements to Solan on August 9, 2011 regarding Plaintiff's alleged harassment of her, leading to Plaintiff's arrest September 13, 2011.  (TAC 18, 36; FAC 4, 20–21, 23.)  With regard to Reyes, Plaintiff alleges that Reyes called the police on June 10, 2011 with Brewster, (TAC 16, 36; FAC 4, 18), and that she

---

[34] Plaintiff also notes that Crain's business card was attached to an allegedly false police report.  (FAC 50.)  Plaintiff also previously alleged that Crain had kept Plaintiff's house key for 44 days and copied the Court's summary of that allegation in his TAC.  (*See* TAC 40.)

provided a false sworn statement of that incident to Gulick that day, (TAC 17; FAC 18, 35–36, 44).  With regard to Masterson, Plaintiff alleges that she was "present" during the June 10, 2011 incident, (TAC 16; FAC 18), provided a false, sworn statement to Solan on August 9, 2011 that contributed to his arrest on September 13, 2011, (TAC 18, 36; FAC 21, 23, 35), acted as a witness and falsely testified in the guardianship hearing, (TAC 20–22, 24–25, 37; FAC 4, 26, 33, 35, 45–46), and did not intervene when Farmingham prevented Plaintiff from giving his mother a "hug and kiss" at the hearing, (FAC 8, 37).[35]  With regard to Maniscalco, Plaintiff alleges that Small reported a call from Plaintiff in which he allegedly threatened Brewster and Masterson to Maniscalco on August 8, 2011, (TAC 18; FAC 23), that Maniscalco provided Famingham with a false handwritten log of phone calls from Plaintiff to MPRHCC since July 12, 2011 and allegedly made a false statement about them on August 23, 2011, (TAC 18, 25, 36; FAC 20–21, 23, 35), and that Maniscalco "watch[ed]/coach[ed] Masterson, Small[,] and Forman" at the guardianship hearing and made false statements at it, (FAC 10, 33, 35, 37).  With regard to Small, Plaintiff alleges that Small reported the aforementioned call from Plaintiff, (TAC 18; FAC 23), that, on August 9, 2011, she gave a false sworn statement to Solan leading to Plaintiff's arrest on September 13, 2011, (TAC 18, 25, 36; FAC 4, 20–23, 35), that she testified falsely at the guardianship hearing, (TAC 20, 22, 24–25, 36; FAC 4, 33, 35, 45–46), and that she also did not intervene when Farmingham prevented Plaintiff from giving his mother a "hug and kiss" at the hearing, (FAC 8, 37).  While the Court does not, in this section, weigh whether these allegations are sufficient to state a claim, they all allege personal involvement, at the very least with regard to the allegedly false statements made in connection with the September 13, 2011

---

[35] Plaintiff also alleges that Du Bois reported Plaintiff to Masterson on June 10, 2011. (FAC 35.)

arrest and at the November 10, 2011 guardianship hearing.  Accordingly, the Court will not dismiss claims against these Defendants for failure to allege personal involvement.

### b.  Federal Claims

Prior to considering the Plaintiff's individual claims, it is worth taking stock of those Defendants and claims that the Court has already dismissed, and those that remain.  While the Court will detail exactly which claims were dismissed, and whether those dismissals are with or without prejudice, at the conclusion of this Opinion, the Court notes that it has dismissed all claims against Defendants Conklin, Green, Tiffany, Yvette, Terwilliger, Yeddu, Brennan, Spano, Kammarada, McLymore, Procak, Belgiovene, Moskowitz, Guzman, New York State, Mannix, Labuda, Lacatena, Leo, Jolly, and Sholes.

Accordingly, at this point, Plaintiff only has viable claims against nineteen Defendants: MPRHCC, Maniscalco, Masterson, Forman, Small, Brewster, Reyes, Du Bois, Orange County, Murphy, Crain, Wallkill, Hertman, Farmingham, Dewey, Kleveno, Gulick, Solan, and Sholes & Miller.  The Court has explicitly limited the scope of these claims as to five Defendants: Plaintiff's claims against Sholes and Miller are viable except for intentional infliction of emotional distress, his claims against Orange County, Murphy, and Crain are viable only with regard to the August 20, 2010 incident and except for intentional infliction of emotional distress, and his claims against Farmingham are viable except with regard to the November 10, 2011 guardianship hearing.

### i.  Conceded Claims

In their Memoranda the Court notes that the Wallkill Defendants "acknowledge that the [FAC] states federal claims" for conduct during the August 20, 2010 arrest.  (Wallkill Mem. 2.) Specifically, the Wallkill Defendants concede that Plaintiff states a claim "against Farmingham

for false arrest, unlawful search[,] and excessive force" on August 20, and a claim "against

Kleveno for failure to intervene in connection with Plaintiff's . . . arrest" on the same day.  (*Id.*)

The Wallkill Defendants do not seek to dismiss those claims.  (*Id.*)  While some of Plaintiff's

other claims against Farmingham and Kleveno are dismissed below, the Court notes that the

Wallkill Defendants do not contend that Plaintiff cannot maintain a malicious prosecution claim

based on the same incident.  (*See* Wallkill Mem. 21 (noting that "Defendants concede that there

are sufficiently plead claims against Farmingham and Kleveno" in connection with the August

20 arrest).)  Accordingly, the Court notes that Plaintiff may still pursue a malicious prosecution

claim against Farmingham and Kleveno as well.

### ii.  False Arrest, False Imprisonment, and Malicious Prosecution

Given the Wallkill Defendants concede that Plaintiff has stated claims against

Farmingham and Kleveno based on the August 20, 2010 arrest, the Court notes that the only

other allegations against a specific Defendant that Plaintiff makes in connection with the August

20 incident are against Crain.  The Court has, however, already limited Plaintiff's claims against

Crain to those arising from the November 10, 2011 guardianship hearing.  Accordingly, there are

no Defendants, other than Farmingham and Kleveno, against whom Plaintiff states a claim in

connection with the November 10, 2010 arrest.

The Wallkill Defendants allege that Plaintiff does not state a claim for false arrest, false

imprisonment, or malicious prosecution based on any of the remaining incidents.  (*See* Wallkill

Mem. 18.)  To state a false arrest or false imprisonment claim, a plaintiff must allege that "(1)

the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the

confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was

not otherwise privileged."  *Willey v. Kirkpatrick*, — F.3d —, 2015 WL 5059377, at *17 (2d Cir.

Aug. 28, 2015) (internal quotation marks omitted).  An arrest may be "otherwise privileged" when conducted with probable cause.  *See Curley v. AMR Corp.*, 143 F.3d 5, 13 (2d Cir. 1998) (noting that one example of such privilege is "confinement . . . with probable cause"); *see also Morel v. Reed*, Nos. 11-CV-1808 et al., 2015 WL 1506132, at *4 (E.D.N.Y. Mar. 31, 2015) (defining the fourth element as "the confinement was not otherwise privileged by probable cause" (brackets omitted)).  To state a claim for malicious prosecution, a plaintiff must allege "'(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice.'"  *Oxman v. Downs*, 999 F. Supp. 2d 404, 412–413 (E.D.N.Y. 2014) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).  A finding of probable cause is also enough to overcome a malicious prosecution claim, *see Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) ("Probable cause is a complete defense to any action for false arrest or malicious prosecution in New York."); *Fiore v. Rivera*, No. 14-CV-3570, 2015 WL 5007938, at *3 (E.D.N.Y. Aug. 20, 2015) (noting that probable cause is a "required element of both false arrest and malicious prosecution claims"). Additionally, a plaintiff cannot establish a claim of false arrest, false imprisonment, or malicious prosecution, "if he was convicted of the offense for which he was arrested," *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986), even if those charges are resolved by plea*, see Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996); *see also Larocco v. Jackson*, No. 10-CV-1651, 2012 WL 760396, at *3 (E.D.N.Y. Mar. 8, 2012) (noting that the plaintiff could not establish a lack of probable cause for his arrest and that guilty plea precluded a finding that the proceedings had been terminated in his favor).

Probable cause for an arrest (or imprisonment) exists where the arresting officer "has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 1996) (internal quotation marks omitted).  By contrast, "[t]he standard for probable cause in the case of malicious prosecution is slightly different—probable cause exists when the facts and circumstances 'would lead a reasonably prudent person in like circumstances to believe [the] plaintiff [to be] guilty.'" *Thimmesch v. City of New York*, No. 12-CV-8882, 2013 WL 1558699, at *1 n.3 (S.D.N.Y. Apr. 9, 2013) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).  Either way, probable cause exists when a law enforcement officer "receive[s] . . . information from some person, normally the putative victim or eyewitness, . . . unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *see also Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.").  "Probable cause may also exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

With regard to the March 30–31, 2010 incident, the Wallkill Defendants point out that Plaintiff "concedes he was convicted of one count of endangering the welfare of a child and one count of disorderly conduct."  (Wallkill Mem. 20 (citing FAC 13–15).)  For this reason, Plaintiff cannot maintain a claim for false arrest, false imprisonment, or malicious prosecution on the

basis of that incident, and accordingly those claims are dismissed.  *See Cameron*, 806 F.2d at
387.

      With regard to the June 10, 2011 incident, the Wallkill Defendants allege that Gulick
"obtained a sworn statement from [a] witness detailing the allegations and arrested Plaintiff for
the crimes of attempted assault in the third degree and endangering the welfare of an
incompetent or physically disabled person."  (Wallkill Mem. 21–22.)  Based on the exhibits
integrated into Plaintiff's TAC and FAC (or exhibits that were attached to the SAC that are
referenced in the TAC and FAC), it is clear that Gulick obtained a statement "from [a] staff
member who witnessed [the] incident," Reyes, (Declaration of James A. Randazzo ("Randazzo
Decl.") Ex. L (Dkt. No. 189); TAC 96), whose statement Gulick obtained at the scene, (*see*
Randazzo Decl. Ex. J; TAC 17 (referencing this exhibit)).  Plaintiff does not respond to the
Wallkill Defendants' claim, nor does he advance any reason why Gulick should have doubted
Reyes's statement.  Accordingly, Plaintiff cannot maintain a claim for false arrest or false
imprisonment based on this incident.  *See Panetta*, 460 F.3d at 395.  Moreover, because
Plaintiff's charges were resolved with an adjournment in contemplation of dismissal, (*see*
Randazzo Decl. Ex. I (Letter from Plaintiff's attorney, Craig Stephen Brown, Esq., to Plaintiff,
dated Aug. 5, 2011, informing Plaintiff that he "[was] given a one . . . year Adjournment in
Contemplation of Dismissal  [("ACD")] with a limited Order of Protection," and that "[i]f [he]
[did] not get arrested within this one . . . year time period, the charge [would] be dismissed");
TAC 17 (referencing this exhibit), Plaintiff cannot maintain a malicious prosecution claim.  *See
Smith v. City of New York*, 2013 WL 592224, at *3 ("An adjournment in contemplation of
dismissal does not constitute a favorable termination for the purposes of a malicious prosecution
claim." (citing *Shain v. Ellison*, 273 F.3d 56, 68 (2d Cir. 2001)).  Accordingly, Plaintiff's claims

for false arrest, false imprisonment, and malicious prosecution based on the June 20, 2011 incident are dismissed.

With regard to the September 13, 2011 incident, the Wallkill Defendants argue, based on exhibits integrated into Plaintiff's TAC and FAC, that prior to Solan's arrest of Plaintiff, "[t]he police obtained sworn deposition statements from known witnesses alleging numerous phone calls from Plaintiff serving no legitimate purpose, and the police were provided with a handwritten log of some of those phone calls." (Wallkill Mem. 23.)  Based on Plaintiff's TAC, FAC, and the referenced exhibits, it is clear that Solan received sworn statements from Masterson, Brewster, Small, and Maniscalco that discussed Plaintiff's phone calls, (Randazzo Decl. Ex. M–O, Q; TAC 113–16), and that Farmingham received a call log, (*id.* Ex. P; TAC 117), all before Plaintiff's arrest on September 13.  Once again, Plaintiff did not respond to the Wallkill Defendants' argument, nor does he offer any reason why Solan should have questioned the voracity of the information he received.  Even if, as Plaintiff asserts, Masterson, Brewster, Small, and Maniscalco each were lying to Solan at the time, Plaintiff does not allege that Solan was aware of it.  Accordingly, Solan had sufficient information to arrest Plaintiff for aggravated harassment, and to believe him guilty.  (*Id.* Ex. R.)  Accordingly, Plaintiff's claims for false arrest, false imprisonment, and malicious prosecution based on the September 13, 2011 incident are dismissed.[36]

---

[36] The Wallkill Defendants also argue that they are entitled to qualified immunity for any false arrest claims stemming from the March 30, 2010, June 20, 2010, and September 13, 2011 incidents.  (*See* Wallkill Mem. 24–25.)  The Court does not consider this contention, as it is mooted by the Court's dismissal of Plaintiff's false arrest claims stemming from those incidents.

### iii.  Excessive Force

Plaintiff also may allege an excessive force claim in connection with the March 30–31, 2010 incident.  (*See, e.g.,* TAC 11 (discussing excessive force in the context of this incident).)  "'Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard."  *Usavage v. Port Auth.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (some internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Mickle v. Morin*, 297 F.3d 113, 120 (2d Cir. 2002).  Accordingly, "courts should examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them . . . ."  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (internal quotation marks omitted).

The Wallkill Defendants argue that Plaintiff does not state a claim for excessive force based on the March 30, 2010 because he does not allege any resulting injury.  (*See* Wallkill Mem. 20.)  The Court agrees: absent a demonstration of injury, Plaintiff cannot demonstrate that the use of force at issue was "objectively sufficiently serious or harmful enough to be actionable."  *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008); *see also Riddick v. Thomas*, No. 11-CV-2986, 2012 WL 919328, at *4 (S.D.N.Y. Mar. 15, 2012) ("Nothing in the record suggests that [the] plaintiff in fact suffered any actual injuries or that any injuries he suffered were related to his being escorted from the post office.  Accordingly, [the] plaintiff has not raised a triable issue of fact with respect to the excessive force claim."); *Warheit v. City of New York*, No. 02-CV-7345, 2006 WL 2381871, at *8 (S.D.N.Y. Aug. 15, 2006) ("[The

Defendant's] action caused no physical injury to [plaintiff] . . . .  Any force was de minimis, and therefore does not amount to a constitutional violation." (italics omitted)), *aff'd* 271 F. App'x 123 (2d Cir. 2008).  Accordingly, to the extent that Plaintiff intended to allege for excessive force based on the March 30, 2010 incident, that claim is dismissed.

### iv.  Seizure of Plaintiff's Firearm

Plaintiff also claims that, because his firearm was seized in connection with the March 30, 2010 incident, Defendants conduct constituted a search in violation of the Fourth Amendment, and a seizure of his firearm in violation of the Second Amendment.  (*See* TAC 12, 45, 64–66.)  In response to Plaintiff's Fourth Amendment claim, the Wallkill Defendants assert that Plaintiff's firearm was not seized the next day, as Plaintiff alleges, but rather was seized on the day of the incident.  (Wallkill Mem. 20–21.)  Accordingly, the Wallkill Defendants contend, based on an exhibit to the SAC that is referenced in the TAC and FAC, that Plaintiff's firearm was seized when the officer permissibly searched Plaintiff's "person and the area within his immediate control . . . the area from within which he might gain possession of a weapon or destructible evidence."  *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (internal quotation marks omitted).  The search therefore, according to the Wallkill Defendants, did not violate Plaintiff's Fourth Amendment Rights.  The relevant part of the pertinent exhibit is a narrative indicates that Dewey "turned" over Plaintiff's firearm and that it was "seized by . . . Dewey at the scene of a violent domestic incident."  (*See* Randazzo Decl. Ex. D; *see also* TAC 12–13 (referencing exhibit); FAC 15 (same).)  While suggestive, the exhibit only indicates where Dewey seized the firearm; it does not indicate when, and the fact that the firearm was turned over on March 31, rather than March 30, also suggests that Dewey seized the gun after the arrest in

question.  Accordingly, the Court declines to dismiss Plaintiff's Fourth Amendment claim based on the March 30–31, 2010 incident.

The Wallkill Defendants also argue that because "the right to bear arms is not a right to hold some particular gun," *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 217 (S.D.N.Y. 2005), and Plaintiff does not allege that Defendants prevented Plaintiff from acquiring another gun, his conduct does not amount of a Second Amendment violation.  The Court agrees, and accordingly dismisses Plaintiff's Second Amendment Claim, with prejudice.  *See Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 429–30 (S.D.N.Y. 2013) (dismissing Second Amendment claim because the plaintiff did not allege that the Defendants' "actions . . . affected [the] [p]laintiff's ability to retain or acquire other firearms or ammunition, and no law has been cited that infringes on [the] [p]laintiff's right to obtain other firearms"); *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 217, 219 (S.D.N.Y. 2005) (dismissing Second Amendment claim based on destruction of gun seized incident to an arrest where the plaintiff had not alleged that "any action taken by [the] defendants would prevent him from acquiring another weapon").

### v.  Failure to Intercede

The Wallkill Defendants also argue that Plaintiff cannot maintain a § 1983 failure to intercede claim based on the March 30-31, 2010, June 20, 2011, and September 13 2011 incidents.  (*See* Wallkill Mem. 19.)  "A police officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'"  *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 565 (S.D.N.Y. 2010) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)).  As such, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim."  *Henry-Lee*, 746 F. Supp. 2d at 566 (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997).  Because Plaintiff

has not established a false arrest, false imprisonment, or malicious prosecution claim, as discussed above, he has not established a constitutional violation and cannot maintain a failure to intercede claim.  *See id.* at 566 (granting summary judgment on failure to intercede claim because the plaintiff failed to establish an issue of material of fact as to "whether a constitutional violation occurred").  Accordingly, Plaintiff's failure to intercede claim, phrased in the TAC as "refusing or neglecting to prevent," (TAC 6), is dismissed.[37]

### vi. *Monell*

The Wallkill Defendants argue that Plaintiff's claims against the Town of Wallkill should be dismissed because Plaintiff has failed to allege a *Monell* claim.  (*See* Wallkill Mem. 14.)  The Orange County Defendants make the same argument, claiming that Plaintiff has failed to allege that Orange County "created a custom, policy[,] or practice" that was unconstitutional.  (Orange County Mem. 15, 16.)

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.[38]  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts

---

[37] While Plaintiff also alleges that Maniscalco, Masterson, Small, Murphy, Crain and Sholes also all did not intervene when Farmingham prevented Plaintiff from giving his mother a "hug and kiss" at the hearing, or even going near her, warning Plaintiff that he would be "handcuff[ed] [and] arrested again" if he did so, (FAC 8, 33), the Court is unaware of any duty that these Defendants violated, given they are not officers.  *Cf. Bah v. City of New York*, No. 13-CV-6690, 2014 WL 1760063, at *7 (S.D.N.Y. May 1, 2014) (noting that an officer may liable for failure to intercede only if "he had a duty to intercede and the failure to intercede was a proximate cause of the harm").

[38] The same analysis applies to § 1981 claims.  *See, e.g., Philippeaux v. N. Cent. Bronx Hosp.*, 871 F. Supp. 640, 655 (S.D.N.Y. 1994) ("[M]unicipal liability for public officials' violations of §1981 must be found under §1983 using the *Monell* analysis." (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989)); *Chin v. N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 561 (S.D.N.Y. Sept. 9, 2008) ("A municipality can be liable for violating [§] 1981 only if the

of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing claim against municipal agencies where plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cty.*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (recommending dismissal of claim against county because complaint did "not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cty. Dep't of Corr.*, No. 09-CV-3727 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).  The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v.*

---

injury at issue resulted from the execution of a racially discriminatory policy or custom." (footnote and internal quotation marks omitted)).

*Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural persons . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

> A plaintiff may satisfy the "policy or custom" requirement by alleging:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Under the third method, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *See Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997); *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"). Therefore, a plaintiff may establish municipal liability by demonstrating that a policy maker "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *See Miller v. Cty. of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent and well-settled. *See Praprotnik*, 485 U.S. at 127 (noting that the Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law'" (quoting

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970) (some internal quotation marks

omitted))).  Accordingly, and of particular importance in this case, "a custom or policy cannot be

shown by pointing to a single instance of unconstitutional conduct by a mere employee of the

[municipality]."  *See Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. v. Tuttle*, 471 U.S.

808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is

not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it

was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a

municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y.

2002) ("A single incident by itself is generally insufficient to establish the affirmative link

between the municipal policy or custom and the alleged unconstitutional violation.").  In the end,

"a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the alleged injury."  *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at

404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to

'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy

be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative

link between [for example] the training inadequacies alleged, and the particular constitutional

violation at issue."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing

of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a

finding of liability against the City."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL

666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a

municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative

link—between the policy and the deprivation of his constitutional rights" (internal quotation

marks omitted)).

At this stage, of course, Plaintiff need not prove these elements, but he must still plead them sufficiently to make out a plausible claim for relief.  Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration in original) (internal quotation marks omitted).  Thus, to survive a Motion To Dismiss, Plaintiff cannot merely allege the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists."  *Santos v. New York City*, 847 F. Supp. 2d 573, 575-76 (S.D.N.Y. 2012).

Plaintiff makes no attempt, anywhere in his TAC or FAC, to allege a custom, policy, or practice.  Rather, Plaintiff explicitly relies on *respondeat superior* liability, (*see* FAC 42–43, 46–47 (referring to "respondent superior")), which, as is made clear above, is insufficient to state a claim, *see Pembaur*, 475 U.S. at 478.  Accordingly, the Court dismisses Plaintiff's claims against the remaining municipal entities, Wallkill and Orange County.

The Second Circuit has recognized that there is a "narrow opening for § 1983 claims…seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007).  Specifically, "a government supervisor who fails to take obvious steps to prevent manifest misconduct is subject to suit under § 1983 in certain, limited circumstances." *Id.* at 192.  Nonetheless, even when alleging a failure to supervise, Plaintiff must still:

> (1) establish . . . [the] defendant['s] duty to act by proving [he] should have known [his] inadequate supervision was so likely to result in the alleged deprivations so as [to] constitute[e] deliberate indifference . . . , (2) identify obvious and severe deficiencies in the…defendants' supervision that reflect a

purposeful rather than negligent course of action; and (3) show a causal
relationship between the failure to supervise and the alleged deprivations to
plaintiffs.

*Id.* at 193; *see also Poventud v. City of New York*, No. 07-CV-3998, 2015 WL 1062186, at *12

(S.D.N.Y. Mar. 9, 2015) (identifying the elements as "(1) a policymaker knows 'to a moral

certainty' that city employees will confront a particular situation, (2) the situation either presents

the employees with a difficult choice that training or supervision will make less difficult or there

is a record of employees mishandling the situation, and (3) the wrong choice by the employees

frequently will cause the deprivation of constitutional rights" (citing *Walker v. City of New York*,

974 F.2d 293, 297-98 (2d Cir. 1992)).  Indeed, the supervisor's failure must be so "patently

inadequate as to amount to deliberate indifference."  *See McKay v. Vill. of Spring Valley*, No. 12-

CV-3077, 2013 WL 5745923, at *5 (S.D.N.Y. Oct. 23, 2013) (internal quotation marks omitted).

　　As explained above, Plaintiff alleges that Hertman, the only remaining supervisory

Defendant, "[did] not . . . listen to Plaintiff[']s[] request" to have his firearm returned, that he

indicated, in a March 29, 2013 letter, that he would "conduct[] and investigation" into Plaintiff's

"'complaint of failure to take proper Police action'" yet never did so, " that he "fail[ed[] to

supervise, monitor, or investigate" certain police officers, and that he "admitted that several

officers violated" their duties with respect to Plaintiff on March 31, 2010.  (TAC 12, 103; FAC

7–8, 15, 32, 37, 39, 47.)  While the only non-conclusory aspect of these allegations arguably

assert a single deficiency in Hertman's supervision—a failure to investigate Plaintiff's

complaint's about police misconduct—the allegations do not establish (a) that Hertman was

aware of the risks associated with his failure to supervise, or that they were obvious, because

Plaintiff has only alleged that Hertman was aware of one instance of misconduct, as compared to

"repeated complaints of civil rights violations," *See Green v. City of Mount Vernon*, — F. Supp.

82

3d —, 2015 WL 1455701, at *30 (S.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted);

*see also Walker v. City of New* York, 53 F. Supp. 3d 301, 312 (E.D.N.Y. 2014) (dismissing

failure to supervise claim because the plaintiff failed to identify "any additional, similar

examples of unconstitutional practices" beyond a single instance alleged in the complaint); *cf.*

*Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) ("Normally, a custom or

policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere

employee of the municipality") (brackets and internal quotation marks omitted), or (b) that there

was any causal relationship between the alleged failure to supervise, the only specific instance of

which occurred in March 2010 or later, and the harm alleged, which occurred, at latest, in 2011.

Accordingly, Plaintiff also fails to state a *Monell* claim against Hertman.

### vii.  Conspiracy

The Orange County Defendants and Wallkill Defendants also argue that Plaintiff has

failed to plead a conspiracy.  To state a § 1983 conspiracy claim, a plaintiff must plead "(1) an

agreement between two or more state actors or between a state actor and a private entity; (2) to

act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that

goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also*

*Brooks v. Cty. of Nassau*, 54 F. Supp. 3d 254, 258 (E.D.N.Y. 2014) (same).  Similarly, to state a

§ 1985(3) conspiracy claim, a plaintiff must plead

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of equal protection of the laws, or of equal privileges
> and immunities under the laws; (3) an act in furtherance of the conspiracy; (4)
> whereby a person is either injured in his person or property or deprived of any
> right of a citizen of the United States.

*See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *see also*

*Brooks*, 54 F. Supp. 3d at 258-59 (same).  Further, a § 1985(3) conspiracy must "be motivated by

some racial or perhaps otherwise class-based, invidious discriminatory animus behind the

conspirators' action. *Mian*, 7 F.3d at 1088 (quoting *Untied Bhd. of Carpenters & Joiners of*

*America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 829 (1983)).  In both cases, a plaintiff

must also allege a factual foundation for a "meeting of the minds" among the Defendants.  *See*

*Webb v. Goord,* 340 F.3d 105, 111 (2d Cir. 2003) (dismissing conspiracy claim where the

plaintiffs alleged only "in the most conclusory fashion[] that any such meeting of the minds

occurred among any or all of the defendants") (2d Cir. 2003); *Bermudez v. City of New York*, No.

11-CV-750, 2013 WL 593791, at *8 (S.D.N.Y. Feb. 14, 2013) ("[A] plaintiff must allege facts

that plausibly suggest a meeting of the minds such as that [the] defendants entered into an

agreement, express or tacit, to achieve the unlawful end." (internal quotation marks omitted).

Both the Orange County Defendants and the Wallkill Defendants contend that Plaintiff has not

included sufficient allegations to plausibly state a conspiracy claim under §§ 1983 and 1985.

The Court agrees.  Mere "conclusory allegations of conspiracy are insufficient to survive a

motion to dismiss."  *Bermudez*, 2013 WL 593791, at *8 (alterations and internal quotation marks

omitted); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)

("[C]omplaints containing only conclusory, vague, or general allegations that the defendants

have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly

dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific

instances of misconduct." (internal quotation marks omitted)).  Yet Plaintiff's claims are largely

this ilk: other than using the word "conspiracy" several times in the TAC and FAC, (*see, e.g.,*

TAC 16 ("Very simply, Plaintiff[] [is] alleging/asserting that there was a conspiracy . . . ."), 137

("Defendants conspired against Plaintiff throughout the court of the June 10, September 13, and

November 10 incidents."); FAC 10 (same)), and stating the elements of a conspiracy claim, (*see,*

*e.g.,* FAC 7–8), Plaintiff alleges simply that Defendants "conspired to defame and setup Plaintiff" in the context of all of the misconduct alleged, (FAC 7).

The only allegations that arguably establish an element of the "meeting of the minds" are the allegations and Murphy and Maniscalco coached others, (*see, e.g.,* FAC 10, 33, 35, 37), and Plaintiff's allegation that Lacatena told Plaintiff that the August 20, 2011 incident was "planned by . . . Murphy" and that the statements made at the guardianship hearing were "rehearse[d]" with Crain and "planned . . . together with . . . Maniscalco," (FAC 36–37). Plaintiff's allegations are flawed in several ways, however. First, Plaintiff fails to allege "at what point the meeting of the minds occurred," namely when the conspiracy came to be. *Bermudez*, 2013 WL 593791, at *9 (dismissing the plaintiff's conspiracy claim in part for this reason). Indeed, the bulk of Plaintiff's allegations regarding a meeting of the minds refer to the guardianship hearing, the last incident in the series of incidents alleged. Second, the mere fact of "planning" or "coaching," as the Court recognizes is common before any witness testifies at a hearing, does not plausibly establish the existence of a conspiracy among the Defendants. Accordingly, the mere allegation of joint planning or decision-making does not establish that the planning was in furtherance of a conspiracy. *See id.* (finding conspiracy allegations insufficient because, inter alia, the plaintiff did not allege how the Defendants "conspired together" when he alleged that they "'intentionally elected not to call'" a witness, or that the decision "was based on a conspiracy . . . rather than" prosecutorial discretion).[39] Third, Plaintiff fails to provide any detail about his alleged

---

[39] Moreover, as the Wallkill Defendants argue, (*see* Wallkill Mem. 17), given Murphy is alleged to have coached Crain, who is also an employee of OCPSS, and Maniscalco is alleged to have coached Masterson, Small, and Forman, who are all also employees of MPRHCC, the coaching itself cannot constitute conspiracy by operation of the intracorporate conspiracy doctrine. *See Rodriguez v. City of New York*, No. 05-CV-5117, 2008 WL 420015, at *25 (E.D.N.Y. Feb. 11, 2005) ("The intracorporate conspiracy doctrine posits that the officers,

conversation with Lacatena, including when it occurred and what the alleged end of the conspiracy was.  Indeed, the lack of supportive facts renders this portion of Plaintiff's TAC and FAC devoid of any hint of plausibility.  Accordingly, the Court dismisses Plaintiff's § 1983 and § 1985(3) conspiracy claims with prejudice.

The Court also notes that to the extent that Plaintiff is attempting to allege a § 1986 failure-to-intervene claim, that claim is also dismissed with prejudice because it must be premised on a valid, underlying § 1985 claim.  *See Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) ("[A] § 1986 claim must be predicated on a valid § 1985 claim . . . ." (internal quotation marks omitted)).

### viii.  Section 1983 Claims Against the Sholes Defendants

Insofar as Plaintiff alleges a § 1983 claim against the Sholes Defendants, they argue that Plaintiff's claim must fail because neither Defendant "acted under color of state law or deprived Plaintiff of any of his constitutional rights."  (Sholes Mem. 12.)  *See also Gerardi v. Huntington Union Free Sch. Dist.*, — F. Supp. 3d —, 2015 WL 5062451, at *19 (E.D.N.Y. Aug. 25, 2015) ("In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." (some internal quotation marks omitted) (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F. 3d 107, 122 (2d Cir. 2004)).  The Court agrees.  While "[p]rivate parties act under the color of state law if they jointly participate or conspire with a state actor to violate an individual's federal rights," *Fish v. Letterman*, 401 F. Supp. 3d 362, 376 (S.D.N.Y. 2005) (citing *Adickes*, 398 U.S. at 152), the Sholes Defendants

---

agents, and employees of a single corporate municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.")

represented MPRHCC in the guardianship hearing, a private entity, "in its application to have a private guardian appointed" for Plaintiff's mother, (Sholes Mem. 12–14), and Plaintiff did not allege any facts suggesting conspiracy with state authorities, as discussed elsewhere in this Opinion. Plaintiff's only allegation in response, which is wholly conclusory, is that Sholes "want[ed] to be a[] 'state private actor.'" (TAC 19). Accordingly, recognizing that the Court has already dismissed Sholes for failure to serve, the Court finds that Plaintiff has not plausibly alleged that the Sholes Defendants acted under color of law, and any § 1983 claim against the Sholes Defendants is dismissed. *See Fisk*, 401 F. Supp. 2d at 378 (recommending dismissal of § 1983 claim against private attorney because there were no facts presented to infer that attorney conspired with state officials to violate the plaintiff's constitutional rights).

### c. State Claims

#### i. Notice of Claim

The Wallkill Defendants allege that Plaintiff's state law claims should be dismissed because Plaintiff has not served Defendants with a notice of claim, nor has he alleged that he has done so. (*See* Wallkill Mem. 13.) "[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (emphasis omitted). More specifically, as a "condition precedent to commencing a tort claim against any employee of [a] municipality," a plaintiff must file a notice of claim with that municipality within ninety days from the time his cause of action accrued in order to "permit the defendant to conduct a proper investigation and assess the merits of the claim." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 396 (S.D.N.Y. 2013) (some internal quotation marks omitted) (quoting *Aegis Ins. Servs., Inc. v. Port Auth.*, 435 F. App'x 18, 25 (2d Cir. 2011)); *see also* N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1); *Brooks*, 54 F. Supp. 3d at 257–58 ("It is well

settled that the failure to file a notice of claim bars state claims against individual defendants sued in their official capacities.").

"Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94. Plaintiff has not alleged that he filed a timely notice of claim, which § 50-i requires, *see Allen v. Antal*, No. 12-CV-8024, 2014 WL 2526977, at *14 (S.D.N.Y. Mar. 13, 2014), and the Wallkill Defendants likewise allege that they have never been served with one, (Wallkill Mem. 13). Accordingly, Plaintiff's state law claims against the remaining Wallkill Defendants—Wallkill, Hertman, Dewey, Farmingham, Kleveno, and Solan—are dismissed in their entirety. *See Vassilev v. City of New York*, No. 13-CV-5385, 2014 WL 39282783, at *3 (S.D.N.Y. Aug. 12, 2014) (dismissing the plaintiff's state law claims as time-barred because the plaintiff "did not file a timely notice of claim").[40]

### ii. Conspiracy

As the Court noted in its 2014 Opinion and Order, and as the Sholes Defendants argue, (*see* Sholes Mem. 10), conspiracy to commit a tort is not a cause of action independent of the underlying tort itself. *Park Manor*, 51 F. Supp. 3d at 347; *Aaprea v. N.Y.S. Bd. of Elections*, 960 N.Y.S.2d 255, 257 (App. Div. 2013) ("Conspiracy to commit a tort is not an independent cause

---

[40] Even if the Court considered extending Plaintiff's time to file a notice of claim, as discussed above, the most recent of Plaintiff's claims accrued in September of 2013, more than two years ago, and the Court cannot extent the period to file a Notice of Claim beyond one year and ninety days. *See Allen*, 2014 WL 2526977, at *15 (noting that the court could not extend the time to file a Notice of Claim because "[t]he one year and ninety day statute of limitations ha[d] expired"); *In re Dayton*, 786 F. Supp. 2d 809, 824–25 (S.D.N.Y. 2011) (holding that it is unclear whether federal court even has jurisdiction to extend time for notice of claim, but in any event, the extension cannot exceed the one-year-and-ninety-day statute of limitations).

Additionally, while Plaintiff does not appear to have filed, or pled that he filed, a Notice of Claim as to any other Defendant, the Court declines to dismiss those claims on this ground sua sponte in light of Plaintiff's pro se status.

of action.").  Accordingly, while the Court previously construed Plaintiff's state law conspiracy

claim as an abuse of process claim in the context of its discussion of Rule 8, *Park Manor*, 51 F.

Supp. 3d at 347–48, for the sake of clarity, the Court dismisses Plaintiff's claim for conspiracy as

to all Defendants.

### iii.  Abuse of Process

As the Court did in its 2014 Opinion and Order, it once again construes Plaintiff's

allegations of conspiracy and perjury as abuse of process claims.  *See Park Manor*, 51 F. Supp.

3d at 347–48.  The Orange County Defendants, (*see* Orange County Mem. 19), and Sholes

Defendants, (*see* Sholes Mem. 11), move to dismiss the claim.

To plead a claim of abuse of process under New York law, Plaintiff "must plead . . . that

there was (1) regularly issued civil process, (2) an intent to do harm without excuse or

justification, (3) use of the process in a perverted manner to obtain a collateral objective, and (4)

actual or special damages." *Mosdos Chofetz Chaim,* 14 F. Supp. 3d at 212 (brackets, ellipses, and

internal quotation marks omitted); *see also D'Amico v. Corr. Med. Care, Inc.,* 991 N.Y.S.2d 687,

692 (App. Div. 2014) (same).  Plaintiff alleges that Masterson, Forman, Small, Farmingham, and

Crain "gave false statements under oath at the November 10, 2011 hearing, resulting in Plaintiff

losing certain rights related to his mother," (FAC 4), and that Murphy and Maniscalco "coached"

these statements, (TAC 37, 40; FAC 4, 10, 33, 35, 37).  Plaintiff also alleges that Murphy

"planned by" the August 20, 2010 incident and" sent Crain to help," (FAC 37), that Brewster and

Reyes gave false statements to police, resulting in Plaintiff's arrest on June 10, 2011, (TAC 16,

36; FAC 4, 18), and that Masterson, Brewster, Small, and Maniscalco gave false statements to

Spano, resulting in Plaintiff's arrest on September 13, 2011, (TAC 17, 18, 25, 26; FAC 18, 20–

21, 23, 35, 44).

Plaintiff alleges generally that Defendants' collective motivation was "to prosecute [P]laintiff[] with malice [and] intent to harm." (FAC 50.) More specifically, Plaintiff alleges that Crain and Farmingham made "false statements with malice," (FAC 10), that Murphy coached Crain with a "had a malicious [intent]" so they could "get what they want[ed]," and that Maniscalco also "witness[ed]/coach[ed] his nursing staff, as well as Crain, "to intimidate, harass[], and coerc[e]" Plaintiff, (TAC 33, 40–41; FAC 37.) Plaintiff also appears to suggest that the false statements were intended to "make questionable" Plaintiff's other claims and prevent plaintiff from "proceed[ing] to federal court[]," and that some of Defendants' conduct may also been motivated by assistance he provided to Borgmann small claims court. (*Id.* at 40; TAC 8, 25.)[41] Separately, Plaintiff also alleges that Sholes provided "false statements, false allegations, [and] falsified/altered documents" at the guardianship hearing, (FAC 33), and that she acted maliciously in doing so to "coerc[e]" and "intimidate[e]" Plaintiff, (*id.* at 40).

As the Court previously stated, "a malicious motive alone does not give rise to a cause of action for abuse of process" under New York law. *Savino v. City of New York,* 331 F.3d 63, 77 (2d Cir. 2003) (brackets, ellipses, and internal quotation marks omitted) (quoting *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466 (App. Div. 1984)); *see also Allen v. Antal,* No. 12–CV–8024, 2014 WL 2526977, at *16 (S.D.N.Y. Mar. 13, 2014) ("Neither retaliation nor a malicious motive . . . is a sufficient collateral objective to satisfy that element of a cognizable malicious abuse of process claim." (internal quotation marks omitted)); *Shakima O. v. Westchester Cty.,* No. 12–CV–9468, 2014 WL 521608, at *3 (S.D.N.Y. Feb. 10, 2014) ("The allegation that defendants' actions arose out of personal animosity towards plaintiffs is not

---

[41] Plaintiff makes a cryptic reference to "intentions" and a "mission" in his FAC, but does not explain what those intentions were. (FAC 51.)

sufficient to state a claim for abuse of process, because personal animosity is a collateral motive, not a collateral purpose." (brackets and internal quotation marks omitted)).  Moreover, to the extent the Third Amended Complaint asserts that Crain had a collateral objective to cryptically get what she wanted, or that the Defendants were otherwise motivated to prevent Plaintiff from getting to federal court or to retaliate for Plaintiff's small claims court assistance, the allegations are conclusory and the Court need not consider them in evaluating Defendants' Motion.  *See Burroughs v. Dorn,* No. 13–CV–3609, 2013 WL 3820673, at *6 (E.D.N.Y. July 22, 2013) (dismissing an abuse-of-process claim where the plaintiff "offer[ed] nothing more than conclusory statements as to [the] allegation that [a defendant] intended to do harm without justification"); *Jovanovic v. City of New York,* No. 04–CV–8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (dismissing an abuse-of-process claim where the plaintiff "allege[d] a collateral objective only in the most conclusory fashion, failing to provide any basis for assessing [a defendant's] motive for the [use of process]"), reconsideration granted in part on other grounds, 2008 WL 355515 (S.D.N.Y. Feb. 7, 2008).  Therefore, because Plaintiff fails to allege a sufficient collateral objective, (*see* Orange County Mem. 20; Sholes Mem. 12), the Court dismisses Plaintiff's abuse of process claim.[42]

---

[42] Additionally, as noted in a footnote in the Court's 2014 Opinion and Order, in the context of alleging that multiple Defendants submitted false statements, committed perjury, or falsified documents, Plaintiff makes a number of references to a provision of the New York Penal Code that criminalizes, as a Class A misdemeanor, any making of a "false statement." (*See, e.g.,* TAC 22 (citing N.Y. Penal Law § 210.45).)  That provision cannot form the basis of a civil claim, nor can it form the basis of a § 1983 or related claim given that those statutes apply only to violations of federal constitutional rights. *See Peterec v. Hilliard,* No. 12–CV–3944, 2013 WL 5178328, at *8 (S.D.N.Y. Sept. 16, 2013) (dismissing a false-statement claim based on New York Penal Law because "private citizens do not have a private cause of action for criminal violations" (internal quotation marks omitted)); *Grimes v. Fremont Gen. Corp.,* 933 F.Supp.2d 584, 611 (S.D.N.Y.2013) (dismissing forgery claims under New York Penal Law because "[n]o private right of action exists to enforce [such] provisions"); *cf. Hammer v. Am. Kennel Club,* 771

Of note, the only specific allegations that Plaintiff makes against Murphy are that he "planned" the August 20, 2011 incident and "coached Crain to give false statements" at the guardianship proceeding, and the only specific allegations against Crain are that she was "involved" in Plaintiff's arrest on August 20, 2011 and that she "gave false statements" at the guardianship hearing, (TAC 37; FAC 4, 10, 35, 37.)[43]  Because of the narrow scope of these allegations, the Court previously construed Plaintiff to have only alleged "claims against Crain and Murphy (and, by extension, Orange County) that relate . . . to those Defendants' participation in the November 10 guardianship petition hearing."  *Park Manor*, 51 F. Supp. 3d at 354.  Plaintiff's allegations in the TAC and FAC against Crain and Murphy are the same as those in the SAC, with the exception of the allegations that pertain to the August 20, 2011 incident. Those allegations, however, are wholly conclusory because Plaintiff does not explain how, exactly, Crain participated in the arrest, or how Murphy could have played any role in planning it given the arrest was carried out by Wallkill officials.  Accordingly, those allegations are insufficient to state a claim.  *See In re Barclays Liquidity Cross and High Frequency Trading Litig.*, No. 14-MD-2589, 2015 WL 5052538, at *6 (S.D.N.Y. Aug. 26, 2015) (noting that "mere conclusory statements . . . must be disregarded" when evaluating a motion to dismiss). Accordingly, given the Court has already dismissed Plaintiff's claims against Labuda, Lacatena, and Jolly, that Plaintiff, as described above, failed to allege any personal involvement on behalf

---

N.Y.S.2d 493, 495 (App. Div. 2003) ("Where a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute may be had only if a private right of action may fairly be implied." (internal quotation marks omitted))

[43] As noted above, Plaintiff also alleges that Murphy and Crain were present and did not stop Farmingham from preventing Plaintiff from hugging and kissing his mother at the guardianship hearing, (FAC 8), but it is not clear what relevance these allegations have, given does not allege any reason that Murphy or Crain had an obligation to intervene.

of Leo, and that the Court has already dismissed Plaintiff's abuse of process claim—the only

claim that the Court can construe based on his allegations pertaining to the November 10, 2011

guardianship hearing, Plaintiff has no remaining claims against the Orange County Defendants.

### 8.  Remaining Claims

Based on Plaintiff's remaining allegations, Plaintiff cannot maintain any additional

claims because the allegations at issue are either insufficient to state a claim or fail to provide

fair notice of a claim.

With regard to the March 30–31, 2010 incident, Plaintiff's only specific allegations

pertain to Farmingham, Dewey and Hertman.  Given the Court has already dismissed Plaintiff's

§ 1983 claims for false arrest, false imprisonment, and malicious prosecution arising out of that

incident (except for Plaintiff's Fourth Amendment search claim), Plaintiff's § 1985 and § 1986

claims to the extent he intends to allege them, and all state law claims as to all Wallkill

Defendants, Plaintiff cannot state any further claims as to Farmingham and Dewey March 30–31

incident.

With regard to the August 20, 2010 incident, the only unaddressed allegations are those

pertaining to Farmingham's conduct at the hospital.  As explained above, when Plaintiff asked

Farmingham to use the bathroom, Farmingham handcuffed Plaintiff to his bed and refused to

allow a nurse to provide Plaintiff a plastic bag to relieve himself, causing Plaintiff to urinate in

his pants, and that Farmingham incorrectly told Plaintiff that Plaintiff's mother was not in the

same hospital.  (*See* TAC 70; FAC 33–34.)  Because the Wallkill Defendants have conceded the

viability of false arrest, unlawful search, and excessive force claims against Farmingham, to the

extent Plaintiff believes these allegations are relevant to those claims—the sole federal claims

from Plaintiff's TAC and SAC that remain viable as to this incident—Plaintiff may seek

discovery to that effect.  However, because the Court has dismissed all state claims against the

Wallkill Defendants for failure to provide a Notice of Claim, they cannot make out a new,

separate state cause of action.  Accordingly, Plaintiff cannot state any new claims stemming from

the August 20, 2010 incident.

With regard to the June 10, 2011 incident, the only specific allegations about Defendants

who have not already been dismissed from the case are against Du Bois, Brewster, Reyes,

Gulick, and Maniscalco.  First, given the Court has already dismissed Plaintiff's § 1983 claims

arising out of that incident, all of Plaintiff's § 1985 and § 1986 claims, and all state law claims as

to all Wallkill Defendants, Plaintiff cannot state any further claims against Gulick.  Second,

because the Court has already dismissed Plaintiff's abuse of process claim, Plaintiff cannot state

any further claim against Brewster or Reyes because their only alleged involvement in the

incident was making false statements to police.  (*See* TAC 16, 36; FAC 4, 18.)[44]  Third,

Plaintiff's only alleges that Maniscalco was "present" during the incident, (TAC 16; FAC 18),

which states no misconduct at all, never mind the sort of personal involvement that, as discussed

above, can form the basis for a claim.  *Cf. Park Manor*, 51 F. Supp. 3d at 350 (dismissing claims

because Plaintiff's allegation that Defendants were merely "present during the June 10 incident"

did not give "fair notice of [any] claims").  Fourth and finally, with regard to Du Bois, Plaintiff

alleges that he asked Du Bois to bring his mother some socks, that Du Bois, while at the nursing

station that night, "failed to listen" when Plaintiff's mother "'beg[ed] . . . Du Bois to bring[] her

to her bedroom" to rest and "to be clean," despite Plaintiff's mother's repeated pushing of a red

---

[44] The Court notes that the giving false statements to police does not constitute "malicious prosecution" because "[t]o initiate a prosecution, a defendants must do more than report the crime or give testimony."  *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010).

"alert" button, that Plaintiff's mother suffered a laceration when, as a result of Du Bois's behavior, she tried to get up out of her wheelchair, (FAC 24–25; TAC 18), and that Du Bois reported Plaintiff's behavior to Masterson that day, (FAC 35).  While Du Bois's behavior, as alleged, is troubling, Plaintiff does not allege how Du Bois did anything to harm him, and therefore does not state a claim against her.  *Cf. Park Manor*, 51 F. Supp. 3d at 350 (dismissing claims under Rule 8 because Plaintiff did not allege that certain Defendants, including Du Bois, "did anything to harm Plaintiff").[45]

With regard to the September 13, 2011 incident, the only specific allegations about Defendants who have not already been dismissed are against Masterson, Brewster, Small, Solan, and Farmingham.  Given the Court has already dismissed Plaintiff's § 1983 claims arising out of that incident, has dismissed all of Plaintiff's § 1985 and § 1986 claims, and has dismissed all state law claims as to all Wallkill Defendants, Plaintiff cannot state any further claims against Solan and Farmingham.  Moreover, the only allegations against Brewster, Small, and Masterson are that that they provided false statements—or in Masterson's case, a false call log—to Solan.

---

[45] The Court notes that while it is possible that Plaintiff is entitled to third-party standing to assert claims on behalf of his mother, *see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005) (explaining that "a plaintiff seeking third-party standing . . . must . . . demonstrate[e] a close relation to the injured third party and a hindrance to that party's ability to protect its own interests"), Plaintiff has not met his burden to establish a right to such standing, *see Espada v. N.Y. Bd. of Elections*, No. 07-CV-7622, 2007 WL 2588477, at *3 n.39 (S.D.N.Y. Sept. 4, 2007) (noting, in the context of third-party standing and a pro se plaintiff, that "[t]he burden of establishing standing rests with the party invoking federal jurisdiction"), because he makes no allegations relating to his mother's inability to pursue claims prior to her death, *see Mazzocchi v. Windsor Owners Corp.*, No. 11-CV-7913, 2012 WL 3288240, at *5 (S.D.N.Y. Aug. 6, 2012) (finding no third party standing where the pro se plaintiff had failed to allege, inter alia, that the third party suffered "incapacity caused by [an] illness"), nor does he even suggest that he intendeds to allege claims on his mother's behalf in the first place, *see Burton v. Stergue*, 1998 WL 893151, at *5 (D. Conn. Sept. 29, 1998) (dismissing claim "in the absence of any indication that the plaintiff claims third-party standing").

Given the Court already dismissed Plaintiff's abuse of process claim, Plaintiff cannot state any further claim as to the Brewster, Small, or Masterson arising out of that incident either. Accordingly, Plaintiff cannot state any further claims based on the September 13 incident.

With regard to the November 10, 2011 incident, the only specific allegations against Defendants who have not already been dismissed or deemed immune from claims stemming from this incident are Maniscalco, Masterson, Forman, Green, Small, and Sholes & Miller. Given that the Court has dismissed Plaintiff's abuse of process and failure to intercede claims (except Plaintiff's claims for failure to intercede against Kleveno stemming from the August 20 incident), Plaintiff cannot state any claims stemming from the November 10 incident.[46]

---

[46] Insofar as Plaintiff seeks to maintain a claim for negligence, while the Sholes Defendants correctly argue that they cannot be liable because Plaintiff did not allege that the Sholes Defendants owed him a legal duty, (Sholes Mem. 10), because lawyers generally hold "no duty of due care to third parties," *Friedman v. Hartmann,* No. 91-CV-1523, 1994 WL 97104, at *7 (S.D.N.Y. Mar. 23, 1994); *see also Pope v. Rice,* No. 04-CV-4171, 2005 WL 613085, at *10 (S.D.N.Y. Mar. 14, 2005) (same), the Court dismisses Plaintiff's new claims for negligence and negligent infliction of emotional distress as against all Defendants because, as explained above, Plaintiff alleges no facts that could potentially support those claims, including what duty Defendants owed Plaintiff that underlies the negligence claims. Accordingly, Plaintiff does not meet Rule 8's fair notice requirement. *See Salahuddin,* 861 F.2d at 42 ("We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible, or where the substance of the claim pleaded is frivolous on its face." (citations omitted)); *Ceparano,* 2010 WL 5437212, at *3 ("[P]rolix, unintelligible, speculative complaints that are argumentative, disjointed[,] and needlessly ramble have been routinely dismissed in this Circuit." (collecting cases)); *cf. Raghavedra,* 2012 WL 3778714, at *11 n.20 (noting that the pro se plaintiff's mere "passing references" to age discrimination claims without supporting factual allegations are insufficient); *Windley* 1990 WL 106774, at *2 (noting that the pro se plaintiff's "passing references" to the Fourteenth Amendment without reference to any case law were inadequate to give notice of a Fourteenth Amendment claim).

The Court also notes that, because it has dismissed all claims against the individual MPHRCC Defendants, Plaintiff also has no basis for any claim against the MPHRCC itself, either. Any claims against MPHRCC are, accordingly, also dismissed.

### III.  CONCLUSION

In light of the foregoing, the Court holds that Defendants Motions are granted in part and denied in part.  Plaintiff's claims against the MPHRCC Defendants, New York State, Mannix, the Orange County Defendants, and the Sholes Defendants are dismissed in their entirety, with prejudice.  Plaintiff's claims against Farmingham and Kleveno are dismissed except for Plaintiff's § 1983 for false arrest, false imprisonment, malicious prosecution, and failure to intercede claims stemming from the August 20, 2010 incident.  Because Plaintiff has had several chances to amend his complaint, the Court makes clear that Plaintiff may not amend his Complaint at this stage without prior leave of the Court.

The Clerk of the Court is directed to terminate the pending motions.  (Dkt. Nos. 178, 183, 188, 191.)

SO ORDERED.

Dated:      September 30, 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

97