UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIENVENIDO PILAO ONG,

                              Plaintiff,

        -v-

PARK MANOR (MIDDLETOWN PARK)
REHABILITATION AND HEALTHCARE
CENTER, et al.,

                              Defendants.

No. 12-CV-974 (KMK)

OPINION & ORDER

Appearances:

Bienvenido P. Ong
Middletown, NY
*Pro Se Plaintiff*

James A. Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants Police Officers Jason Farmingham, Thomas Kleveno, and Andrew Dewey*

Caitlin G. Scheir, Esq.
John M. Murtagh, Jr., Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, NY
*Counsel for Defendants Police Officers Jason Farmingham, Thomas Kleveno, and Andrew Dewey*

KENNETH M. KARAS, District Judge:

        Plaintiff Bienvenido Ong ("Plaintiff"), proceeding pro se, brings this Action against

former Town of Wallkill police officers Jason Farmingham ("Farmingham"), Thomas Kleveno

("Kleveno"), and Andrew Dewey ("Dewey," and collectively, "Defendants"), alleging various

claims arising out of incidents that occurred on March 30 and August 20, 2010.[1]  Plaintiff

originally asserted a multitude of claims against numerous defendants, but those claims have

been dismissed with prejudice; only claims against Farmingham, Kleveno, and Dewey remain.

Before the Court is Defendants' Motion for Summary Judgment (the "Motion").  For the

following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

#### 1.  March 30, 2010

On March 30, 2010, Plaintiff resided in Middletown, New York, with his wife, two

daughters, Bernadette Ong ("Bernadette") and Belinda Ong ("Belinda"), and his granddaughter.

(Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 5 (Dkt. No. 281).)  In the early evening of March

30, Belinda and Plaintiff had an argument about Belinda's ex-boyfriend.  (*Id.* ¶ 7.)  During the

argument, Belinda called Bernadette, who in turn called 911.  (*Id.* ¶ 8.)  At approximately 5:30

p.m., Town of Wallkill police officers Dewey and Farmingham were dispatched to the Ong

residence on the report of a domestic disturbance.  (*Id.* ¶ 9.)  Upon arrival, Plaintiff let Dewey

and Farmingham into the house.  (*Id.* ¶ 10.)[2]  Once inside, the officers spoke with Belinda.  (*Id.*

¶ 11.)

---

[1] It turns out Jason Farmingham is actually Jason Farningham, i.e., Plaintiff misspelled
Farmingham's last name.  For the sake of consistency, the Court will continue to use Plaintiff's
spelling.  *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 555 n.* (1980) ("Although
respondents spell their name 'Millhollin,' throughout this litigation their name has been
misspelled as 'Milhollin.'  Because legal research catalogs and computers are governed by the
principle of consistency, not correctness, we feel constrained to adhere to the erroneous
spelling.").

[2] Defendants refer to Plaintiff's residence as an apartment, (*see* Defs.' 56.1 ¶ 10), while
Plaintiff insists that he lived in a "residential house," (*see* Aff'n of Service 7 (Dkt. No. 305)).

Belinda explained to the officers that she and Plaintiff got into an argument about Belinda's ex-boyfriend and that Plaintiff became very angry. (*Id.* ¶ 13.) During the argument, Belinda explained, Plaintiff picked up a nine-inch kitchen knife and a glass vase and chased Belinda around the house. (*Id.*)[3] Belinda, who was holding her baby as she was being chased around, thought that Plaintiff was going to kill her. (*Id.*; Decl. of James A. Randazzo, Esq., in Supp. of Defs.' Mot. for Summ. J. ("Randazzo Decl.") Ex. O (Sworn Statement of Belinda Ong) (Dkt. No. 284) ("I thought I was going to die as he was chasing me.").) After the officers spoke with Belinda, Plaintiff was arrested. (Defs.' 56.1 ¶ 14.) Farmingham thereafter transported Plaintiff to the Town of Wallkill Police Department. (*Id.* ¶ 15.)

Dewey remained at the scene to complete a Domestic Incident Report. (*Id.* ¶ 16.) While Dewey was gathering information from Belinda for the report, Belinda told Dewey that Plaintiff had a pistol permit and kept a pistol in the residence and asked Dewey to remove the gun. (*Id.* ¶¶ 17–18; *see also* Randazzo Decl. Ex. D ("Dewey Aff.") ¶ 11.) Belinda then escorted Dewey to a bedroom and told Dewey that the pistol was located in a case underneath her father's bed. (Dewey Aff. ¶ 12 ("Belinda walked me to a bedroom and told me that the pistol was in a green case underneath her father's bed.").) Dewey entered Plaintiff's bedroom and retrieved the unlocked case from underneath Plaintiff's bed. (Defs.' 56.1 ¶ 20; *see also* Dewey Aff. ¶ 12 ("I retrieved the case and opened it. The case was not locked."); Randazzo Decl. Ex. H ("Pl.'s Dep.") 58 ("It's in my bedroom, underneath, which my daughter doesn't know and my wife

---

The Court will assume for purposes of this Opinion that Plaintiff lived in a house on March 30, 2010.

[3] Plaintiff explained at his deposition that he picked up a knife in self-defense because Belinda threatened to kill him. (*See* Decl. of James A. Randazzo, Esq., in Supp. of Defs.' Mot. for Summ. J. Ex. H, at 37, 44–45 (Dkt. No. 284).)

doesn't know.").)  Inside the case was a pistol, 100 rounds of ammunition, and a pistol permit. (Defs.' 56.1 ¶ 21.)  Dewey seized these items for "safe-keeping and to confirm whether the permit was valid," (Dewey Aff. ¶ 12), and additionally seized the kitchen knife and glass vase, (Defs.' 56.1 ¶ 23).  The seized items were placed into evidence at the Wallkill Police Department, and on March 31, 2010, the pistol and permit were turned over to Orange County Deputy Sheriff Justin Butterfield ("Butterfield").  (*Id.* ¶¶ 24–25.)

Plaintiff was charged with the crimes of Menacing in the Second Degree and Endangering the Welfare of a Child.  (*Id.* ¶ 14.)  Bail was set at $1,000 cash or $2,000 bond, but Plaintiff was remanded and remained in jail until he was released on April 4, 2010.  (*See* Second Am. Compl. ("SAC") ¶ 59 (Dkt. No. 32); *id.* Ex. 1.2.; Pl.'s Dep. 68.)[4]  On April 7, 2010, a county court judge issued an Order of Suspension, directing Plaintiff to surrender all weapons to the Orange County Sheriff's Department.  (Defs.' 56.1 ¶ 28.)

### 2.  August 20, 2010

On August 20, 2010, at approximately 3:30 p.m., Town of Wallkill police officers Farmingham and Kleveno were dispatched to Apartment 228 of the Senior Horizons Apartment Complex in Middletown, New York, after a person living in the complex reported that he or she heard slapping noises and someone moaning inside of Plaintiff's apartment.  (*Id.* ¶¶ 29–30.) After the officers knocked on the door to Apartment 228, Plaintiff, who resided in the apartment with his 92 year-old mother, Felicidad Rana ("Rana"), opened the door.  (*Id.* ¶¶ 31–32, 37.)

---

[4] There is a second entry on the Docket that is also labeled as Plaintiff's Second Amended Complaint.  (*See* Dkt. No. 23.)  However, that submission is actually Plaintiff's First Amended Complaint, as Plaintiff did not file an amended complaint before that document was docketed.  (*See* Dkt.; *see also* Dkt. No. 25, at 2 (noting that Docket Number 23 is Plaintiff's Amended Complaint).)

When Plaintiff opened the door to his apartment, the officers detected a foul odor. (Defs.' 56.1 ¶ 33.)  Farmingham explained to Plaintiff that the officers had received a call about a domestic disturbance in the apartment and needed to check on Rana's welfare.  (*Id.* ¶ 34.)  At first, Plaintiff refused to let the officers speak with Rana, but relented after Farmingham said the officers would not leave without speaking to her.  (*Id.* ¶¶ 35–36.)

Farmingham located Rana in a hospital-type bed in a bedroom in the apartment.  (*Id.* ¶ 38.)  Plaintiff slept on a futon in the same room.  (*Id.* ¶ 39.)  Plaintiff followed Farmingham into the bedroom, but was asked to leave so that Farmingham could question Rana.  (*Id.* ¶ 41; Pl.'s Dep. 96 ("Q: Did you follow him into the room?  A: I follow, and he puts me go out, and he close the door.").)  Farmingham observed that Rana had numerous bruises on her arms and legs, a black eye, and that there was a urine soaked towel on the bed.  (Defs.' 56.1 ¶¶ 42–43.)  Farmingham attempted to interview Rana, who was shaking and appeared frightened and confused, but was unable to do so because of a language barrier.  (*Id.* ¶¶ 44–45.)  Farmingham requested an ambulance and contacted Candice Crain ("Crain") of Adult Protective Services.  (*Id.* ¶ 46.)[5]  After spending approximately five minutes with Rana, Farmingham exited the bedroom.  (*See* Pl.'s Dep. 96–97.)  What happened next is subject to dispute.

According to Plaintiff, Farmingham walked into the kitchen area and immediately handcuffed him.  (*Id.* at 98.)  After Farmingham placed Plaintiff in handcuffs, Farmingham allegedly began beating Plaintiff.  (*Id.* at 101.)[6]  First, Farmingham allegedly pushed Plaintiff

---

[5] During her deposition, Crain noted that her name has since changed to Candice Fotovich.  (*See* Randazzo Decl. Ex. I, at 5.)

[6] Plaintiff's deposition testimony differs from what Plaintiff alleged in the Second Amended Complaint, where Plaintiff alleged that Farmingham started biting Plaintiff after Plaintiff was handcuffed.  (*See* SAC ¶ 64.)  The Court addresses this inconsistency later in this Opinion.

into a doorknob, (*id.*), and then punched Plaintiff several times on the left side and grabbed

Plaintiff's arm, (*id.* at 105–08). The alleged beating lasted "somewhere" around 10 minutes. (*Id.*

at 113.) Plaintiff claims that Kleveno stood by and watched as Farmingham beat Plaintiff. (*Id.*

at 112–13.) While Plaintiff was still in the apartment, Farmingham went to Plaintiff's

refrigerator and opened it, apparently in search of the source of an odor. (*See* SAC ¶ 67; Third

Am. Compl. ("TAC") 14 (Dkt. No. 162) ("Then Farmingham went to near refrigerator while

Plaintiff[] was [in] handcuffs [and] open[ed] the refrigerator and detected a very strong odor of

something rotting." (internal quotation marks omitted)).)[7] Plaintiff was then taken out of the

apartment building and placed in a patrol car. (Pl.'s Dep. 125.) While Plaintiff was in the back

of the car, he observed an ambulance approaching his residence. (*Id.* at 127.)

Defendants' version of events differs substantially from Plaintiff's. According to

Defendants, after Farmingham requested an ambulance, emergency medical technicians Karen

Melendez ("Melendez"), Eric Shorette, and Robert Schertzer of the Town of Wallkill Volunteer

Ambulance Corps. arrived on the scene. (Defs.' 56.1 ¶ 48.) Melendez observed that Rana had

bruises on her right eyelid, right cheekbone, both forearms, both wrists, right breast, both thighs,

right hip, and left ankle, and that her right foot was tied to the bed with a rope. (*Id.* ¶ 50;

Randazzo Decl. Ex. V (pictures of the rope and of the bruising on various parts of Rana's

body).)[8] Melendez untied the rope from Rana's leg. (Defs.' 56.1 ¶ 63.) Upon detecting a foul

---

[7] Because many of the paragraphs contained in Plaintiff's Third Amended Complaint are not clearly numbered, the Court cites page numbers rather than paragraph numbers. Additionally, Plaintiff breaks the Third Amended Complaint into different sections, and he does not sequentially number across sections. In the interest of clarity, the Court will treat Plaintiff's Third Amended Complaint as sequentially numbered, without indicating that individual pages are "unnumbered" in citation sentences.

[8] Plaintiff denies tying Rana's leg to the bed. (Pl.'s Dep. 117–18.)

odor in the apartment, Melendez directed a member of her crew to check the refrigerator to determine whether it was the source of the odor. (*Id.* ¶ 51.)

While Melendez and her crew were tending to Rana, Plaintiff, Farmingham, and Kleveno were standing in and around the apartment's kitchen. (*Id.* ¶ 52.) At some point after Plaintiff admitted that he had tied up Rana's legs, (Randazzo Decl. Ex. E ("Farmingham Aff.") ¶ 13), Plaintiff was placed under arrest a "few feet" from the refrigerator, (Defs.' 56.1 ¶¶ 53, 56). Farmingham admits pushing Plaintiff against a closet door to gain control of Plaintiff, but denies striking or punching Plaintiff. (Farmingham Aff. ¶¶ 14–15.) Plaintiff was then patted down for safety reasons and placed into Kleveno's police car. (Defs.' 56.1 ¶ 59.) Kleveno took Plaintiff to the police station. (*Id.* ¶ 60.)

There is little dispute about what happened after Plaintiff was removed from the apartment. Crain arrived on the scene and attempted to speak with Rana. (*Id.* ¶ 61.) She observed that one or both of Rana's legs were tied to the bed. (*Id.* ¶ 62.) At approximately 4 p.m., the ambulance crew transported Rana to Horton Hospital. (*Id.* ¶ 64; Randazzo Decl. Ex. J, at 31.) Crain followed the ambulance to the hospital, (Randazzo Decl. Ex. I, at 15–16), where she called Farmingham and informed him that Rana had bruises on her breasts and upper thighs, and that the bruising was consistent with abuse, (Defs.' 56.1 ¶¶ 65–66). A nurse at the hospital also noted that Rana's bruising was consistent with abuse. (*Id.* ¶ 67.)

Around 5 p.m., Plaintiff's neighbor, Brent Borgmann ("Borgmann"), went to Plaintiff's apartment. (Randazzo Decl. Ex. M ("Borgmann Dep.") 11.)[9] He observed Farmingham and

---

[9] The Court questions the timing of Borgmann's arrival at Plaintiff's apartment. Borgmann did not see Plaintiff in the apartment, (Borgmann Dep. 11–12), but did see Kleveno, (*id.* at 13). This is peculiar because Kleveno was the officer responsible for transporting Plaintiff to the police station. (*See* Defs.' 56.1 ¶ 60.) It is unclear, however, whether Kleveno returned to Plaintiff's apartment after making the trip to the station.

Kleveno standing in the apartment. (*Id.* at 13.) Farmingham was "studying" an open laptop computer on a table in the apartment, (*id.* at 15), and remarked that Plaintiff was worth a lot of money, (*id.* at 29). Borgmann informed Plaintiff about this incident, (*see* Pl.'s Dep. 161), but Plaintiff was not present, (*see* Borgmann Dep. 11–12). Farmingham denies searching Plaintiff's laptop. (Farmingham Aff. ¶ 22.)

While at the police station, at approximately 6 p.m., Plaintiff complained that he was having an asthma attack. (Defs.' 56.1 ¶ 71.) The Town of Wallkill Volunteer Ambulance Corps. was called and a crew responded to the police station. (*Id.* ¶ 73.) Plaintiff was transported from the police station to the Orange County Regional Medical Center, Horton Campus. (*Id.* ¶ 74.) During transport, Plaintiff mentioned that his arm hurt, but did not say that he was beaten by the police. (*Id.* ¶ 75; Pl.'s Dep. 134 ("I—I just mention it, I—my arm is hurting. I did not say I was beaten up.").) At the hospital, Plaintiff's asthma was treated. (Defs.' 56.1 ¶ 77.) Plaintiff did not complain to the treating physician about his arm or state that he was beaten by the police. (*Id.* ¶ 78; Pl.'s Dep. 138 ("Q: Did you tell the doctor you had been beaten? A: No. I did not."); *id.* at 140 ("Q: Did you mention your arm to the doctor? A: I did not mention the arm.").)

The following day, Plaintiff went to see his primary care physician because Plaintiff noticed that he had bruises on his stomach, both arms, and his torso. (Defs.' 56.1 ¶ 80; Pl.'s Dep. 139.) The doctor noted that Plaintiff had a "very small" bruise on his upper abdomen and another bruise on the left side of his chest. (Randazzo Decl. Ex. CC, at 6.) The doctor further noted that Plaintiff "appear[ed] to be doing well." (*Id.*)

As a result of the August 20, 2011 incident, Plaintiff was charged with Endangering the Welfare of an Elderly Person in the Second Degree, Unlawful Imprisonment in the Second Degree, and Assault in the Third Degree. (Defs.' 56.1 ¶ 69; Randazzo Decl. Ex. X.) The

charges were resolved when Plaintiff agreed to accept an Adjournment in Contemplation of Dismissal. (Defs.' 56.1 ¶ 70; Randazzo Decl. Ex. Y.)

B. Procedural Background

Plaintiff filed the instant Action on February 6, 2012. (*See* Dkt. No. 2.) At a conference held on November 30, 2012, the Court granted Plaintiff leave to file an amended complaint. (*See* Dkt. (minute entry for Nov. 30, 2012).) After successfully seeking numerous extensions of the original January 15, 2013 deadline, Plaintiff ultimately filed his Amended Complaint on May 7, 2013. (*See* Dkt. No. 23.)[10] The Amended Complaint named over 20 defendants. (*See id.*)

On July 11, 2013, the Court issued, sua sponte, an Order directing Plaintiff to submit a second amended complaint. After reminding Plaintiff that, in granting him leave to file his Amended Complaint, the Court "specifically directed [him] to be clearer as to the entities and/or persons he intend[ed] to sue, the actionable conduct those entities or persons allegedly engaged in, and the federal statutory or constitutional basis for his claims," the Court noted that the Amended Complaint was "extremely difficult to follow," and that "it [was] in many respects less clear than [the] original Complaint." (Order 1–2 (Dkt. No. 25).) The Court was able to "discern that Plaintiff intend[ed] to pursue malicious prosecution, excessive force, failure to intervene, and false imprisonment claims against the law enforcement [d]efendants," and it "construe[d] some of the allegations in the Amended Complaint to support a claim against the law enforcement [d]efendants for violating Plaintiff's right to familial association with his mother." (*Id.* at 6.) However, the Court noted that "by presenting a great amount of disjointed and

---

[10] The Amended Complaint is listed as the 23rd entry on the Docket, but many of the exhibits can be found in the 22nd entry, which is the May 4, 2013 letter from Plaintiff to the Court wherein Plaintiff submitted his Amended Complaint and accompanying exhibits. (*See* Dkt. No. 22.)

nonsequential information to the Court about the various events giving rise to Plaintiff's arrests, Plaintiff ha[d] rendered it impossible to comprehend what actually happened to him." (*Id.*) It therefore held that "[Plaintiff's] claims against the law enforcement [d]efendants . . . [did] not satisfy the pleading requirements of Rule 8." (*Id.*) It also held that, with regard to the other defendants, "Plaintiff [did] not clearly or specifically allege how they were personally involved in any alleged wrongdoing or any basis for their liability under federal law," and it therefore held that "[t]he balance of the Amended Complaint . . . also [did] not satisfy the pleading requirements established by Rule 8." (*Id.*) The Court then granted Plaintiff "one more opportunity to file an Amended Complaint . . . in order [to] correct the above deficiencies and to allege clearly and concisely facts to support his claims." (*Id.* at 7.)

The Second Amended Complaint was filed on September 24, 2013. (*See* Dkt. No. 32.) The defendants named in the Second Amended Complaint moved to dismiss on various grounds. (*See* Dkt. Nos. 41, 106, 110, 113, 120.) On September 29, 2014, the Court issued an Opinion & Order, granting defendants' motions in part and denying them in part. *See Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 356 (S.D.N.Y. 2014) ("*Ong I*"). The Opinion & Order granted Plaintiff leave to file a Third Amended Complaint, but only against certain defendants. *See id.* at 356–57.

Plaintiff filed his Third Amended Complaint on November 19, 2014, alleging substantially the same claims against many of the same defendants as those named in the Second Amended Complaint. (*See* Dkt. No. 162.) On January 5, 2015, after the Court adopted a briefing schedule on the defendants' motions to dismiss the Third Amended Complaint, (*see* Dkt. No. 163), Plaintiff filed another complaint—the Fourth Amended Complaint, (*see* Dkt. No. 172).

The Court accepted the filing and adjusted the briefing schedule for Defendants' motions to dismiss accordingly.  (*See* Dkt. No. 173.)

On September 30, 2015, the Court issued an Opinion & Order, granting the defendants' motions in part and denying them in part.  *See Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2015 WL 5729969 (S.D.N.Y. Sept. 30, 2015) ("*Ong II*").  As relevant here, the Court dismissed all of the claims asserted in the Third and Fourth Amended Complaints, except for: (1) Plaintiff's claim that Dewey violated the Fourth Amendment during the search and seizure that occurred on March 30, 2010; (2) Plaintiff's false arrest, malicious prosecution, unlawful search, and excessive force claims relating to the August 20, 2010 incident, as Farmingham conceded that Plaintiff had plausibly stated these claims; and (3) Plaintiff's claim against Kleveno for failure to intervene, as Kleveno conceded that Plaintiff had plausibly stated a claim.  *See id.* at *35, *38.

Following the conclusion of discovery, Defendants sought leave to file the instant Motion.  (*See* Dkt. No. 275.)  Pursuant to a scheduling order, Defendants filed their Motion and supporting papers on October 7, 2016.  (*See* Dkt. Nos. 281–85.)  Plaintiff filed papers in opposition on November 9, 2016.  (*See* Dkt. No. 288.)  Defendants declined to file reply papers.  (*See* Dkt. No. 289.)  Plaintiff subsequently filed numerous documents in opposition to Defendants' Motion.  (*See* Dkt. Nos. 290–97, 303–08, 313–14.)

## II.  Discussion

The only causes of action to have survived to this stage are: (1) Plaintiff's Fourth Amendment claim against Dewey relating to the search of Plaintiff's bedroom and seizure of Plaintiff's pistol on March 30, 2010; (2) Plaintiff's false arrest, malicious prosecution, excessive force, and unlawful search claims against Farmingham arising out of the August 20, 2010

incident; and (3) Plaintiff's failure to intervene claim against Kleveno for failing to intervene and stop Farmingham's use of excessive force on August 20, 2010.[11]  Defendants argue that they are entitled to summary judgment on these claims because: (1) Belinda consented to the search of Plaintiff's bedroom that occurred on March 30, 2010; (2) Farmingham had probable cause to arrest Plaintiff on August 20, 2010 based on observations Farmingham made inside of Plaintiff's apartment; (3) Farmingham did not use excessive force while arresting Plaintiff; and (4) the searches that occurred on August 20, 2010 either did not happen or were conducted pursuant to an exception to the warrant requirement.  (*See generally* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 283).)  Additionally, Defendants argue that even if they violated Plaintiff's constitutional rights, Defendants are entitled to qualified immunity because it was objectively reasonable for them to believe that their actions did not violate clearly established law.  (*Id.* at 18.)  The Court first addresses whether there are material disputes of fact

---

[11] Defendants believe that a claim for failure to supervise, monitor, or investigate against Robert Hertman ("Hertman") remains, (*see* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. 1 (Dkt. No. 283)), but the Court has already dismissed this claim to the extent that it was based on Hertman's role as a supervisor, *see Ong II*, 2015 WL 5729969, at *42 ("While the only non-conclusory aspect of these allegations arguably assert a single deficiency in Hertman's supervision—a failure to investigate Plaintiff's complaint[]s about police misconduct—the allegations do not establish (a) that Hertman was aware of the risks associated with his failure to supervise, or that they were obvious, because Plaintiff has only alleged that Hertman was aware of one instance of misconduct, as compared to repeated complaints of civil rights violations, or (b) that there was any causal relationship between the alleged failure to supervise, the only specific instance of which occurred in March 2010 or later, and the harm alleged, which occurred, at [the] latest, in 2011.  Accordingly, Plaintiff also fails to state a *Monell* claim against Hertman." (citations and internal quotation marks omitted)).  To the extent that Plaintiff's claim is based on Hertman's failure to respond to or investigate one of Plaintiff's complaints, the claim is without merit because Hertman did conduct an investigation into Plaintiff's complaint.  (*See* Randazzo Decl. Ex. G ("Hertman Aff.") ¶ 5 ("After receiving the complaint, I immediately opened a Personnel Complaint and initially assigned Sergeant Robert McLymore to investigate.").)  As a result of the investigation, Plaintiff was provided over 100 pages of documents.  (*See id.* ¶ 6; *see also* Randazzo Decl. Ex. HH.)  After turning over the documents, the police department and Town Supervisor determined that no further action was necessary. (*See* Hertman Aff. ¶ 6.)

precluding the entry of summary judgment on Plaintiff's substantive claims. Then, in a separate

section, the Court addresses whether Defendants are entitled to qualified immunity for their

actions.

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same). "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper

Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v.

PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal

quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . . , [a

nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were

correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the

submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).

B. Materials Considered

Plaintiff has filed numerous documents in opposition to Defendants' Motion, but has not filed a Local Rule 56.1 Statement or an affidavit setting forth his version of events. Many of the filed documents are nearly incomprehensible and appear to be copied from various sources. (*See, e.g.*, Dkt. No. 291.) The Court may nonetheless treat "any verified complaint filed by . . . [P]laintiff . . . as an affidavit." *Jackson v. Onondaga County*, 549 F. Supp. 2d 204, 210 (N.D.N.Y. 2008); *see also Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied upon to oppose summary judgment."). Plaintiff's Second Amended Complaint is notarized, signed by Plaintiff, and states that Plaintiff, "being duly sworn . . . on an oath according to law," "swear[s] (or affirm[s]) that the information [he] ha[s] provided is true[ to] the best of [his] knowledge." (SAC 32; *see also id.* ("It is true facts above statements with supporting documents.").) Accordingly, the Court will treat the Second Amended Complaint as an affidavit insofar as the statements contained therein are based upon Plaintiff's personal knowledge and do not conflict with his deposition testimony. The Court will additionally consider unsworn statements made in other documents to the extent that they are based on Plaintiff's personal knowledge or are supported by other admissible evidence. *See, e.g.*, *Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *8 n.22 (N.D.N.Y. Feb. 23, 2015) ("Although the allegations are contained in [the] plaintiff's unsworn memorandum of law in

support of his opposition, courts in this circuit routinely consider such statements in connection with a motion for summary judgment where the proponent of the statements is a pro se litigant, mindful of the duty to extend special solicitude to those individuals."), *adopted by* 2015 WL 1275298 (N.D.N.Y. Mar. 18, 2015); *Hamm v. Hatcher*, No. 05-CV-503, 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (considering unsworn statements in pro se plaintiff's memorandum of law, but "only to the extent that they [were] based on personal knowledge or supported by other admissible evidence in the record").

C.  Analysis

1.  The March 30, 2010 Incident

Plaintiff contends that Dewey violated his Fourth Amendment rights because Dewey searched his bedroom and seized his pistol on March 31, 2010, the day after Plaintiff was arrested for threatening Belinda.  (*See* TAC 12.)  The Court broadly construes Plaintiff's Fourth Amendment claim to be challenging the date on which the search and seizure occurred and, regardless of the date, the constitutionality of the search and seizure.

The record easily dispels Plaintiff's first contention.  Plaintiff's belief that Dewey searched his home on March 31 is based on his interpretation of a police report drafted by Orange County Deputy Sheriff Butterfield.  (*See* Pl.'s Dep. 70–80.)  The report is dated March 31, 2010, and details the events surrounding Dewey's surrender of Plaintiff's pistol to Butterfield.  (*See* Randazzo Decl. Ex. T.)  Nothing in this report suggests that anything other than the surrender of Plaintiff's pistol occurred on March 31.  Indeed, Plaintiff did not see Dewey at his residence on March 31 because Plaintiff remained in jail, (Pl.'s Dep. 68), nor did anyone tell Plaintiff that they saw Dewey at Plaintiff's residence, (*id.* at 70).  Thus, Dewey's statements that the pistol was seized on March 30 and turned over to Butterfield on March 31 are completely

uncontested.  (*See* Dewey Aff. ¶¶ 14–15.)  The undisputed facts show that Plaintiff's pistol was seized on March 30, 2010, Plaintiff's unsupported allegations notwithstanding.  *See Wright*, 554 F.3d at 266 ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").[12]

The Court turns now to the constitutionality of the search and seizure.  Defendants contend principally that the warrantless search was constitutional because Belinda consented to the search of Plaintiff's bedroom.  (Defs.' Mem. 5–6.)[13]  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).  The Fourth Amendment's prohibition of warrantless searches is, however, subject to "'a few specifically established and well-delineated exceptions.'"  *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "One of the specifically established exceptions to the warrant requirement . . . is that a search is conducted pursuant to an occupant's consent, provided that consent is given voluntarily."  *United States v. Marchese*, 966 F. Supp. 2d 223, 226 (W.D.N.Y. 2013).  This exception extends to

---

[12] In opposition to Defendants' Motion, Plaintiff has filed another document stating that the Orange County Sheriff's Office took possession of Plaintiff's pistol on March 31, 2010.  (*See* Aff'n of Service Ex. 4, at 1.)  This document does not contradict Dewey's statement that the pistol was seized on March 30 and then transferred to Butterfield on March 31.  (*See* Dewey Aff. ¶¶ 14–15.)

[13] The Court notes that Defendants' justification for the seizure of the pistol has changed over time.  *See Ong II*, 2015 WL 5729969, at *38 ("Defendants contend, based on an exhibit to the SAC that is referenced in the TAC and FAC, that Plaintiff's firearm was seized when the officer permissibly searched Plaintiff's person and the area within his immediate control[,] . . . the area from within which he might gain possession of a weapon or destructible evidence." (internal quotation marks omitted)).

circumstances in which "officers have obtained the consent of a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990); *see also Georgia v. Randolph*, 547 U.S. 103, 109 (2006) ("To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se, one jealously and carefully drawn exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." (italics, citations, and internal quotation marks omitted)).

"[A] third party has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over that area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore v. Andreno*, 505 F.3d 203, 208–09 (2d Cir. 2007); *see also United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) ("Authority to consent to a search rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (internal quotation marks omitted)). Even if the third party lacks actual authority to consent, he or she "still may have apparent authority to consent to the search." *Moore*, 505 F.3d at 209. The existence of apparent authority "must be judged against an objective standard: would the facts available to the officer at the moment warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (alteration and internal quotation marks omitted).

Here, it is undisputed that Belinda consented to the search of the bedroom in which the pistol was located. (Defs.' 56.1 ¶¶ 18–19.) Although Defendants brush over this fact, the record establishes that Belinda was consenting to a search of *Plaintiff's* bedroom and the unlocked case

that contained the pistol, which was discovered underneath *Plaintiff's* bed. (*See* Dewey Aff. ¶ 12 ("Belinda walked me to a bedroom and told me that the pistol was in a green case underneath her *father's* bed." (emphasis added)); Pl.'s Dep. 58 ("It's in *my bedroom*, underneath, which my daughter doesn't know and my wife doesn't know." (emphasis added)).) Belinda undoubtedly had access to Plaintiff's bedroom, as she was a resident of the home, (Defs.' 56.1 ¶ 5), but the record is completely silent on whether Belinda had common authority over Plaintiff's bedroom, a substantial interest in the area, or permission to enter the bedroom, *see United States v. Turner*, 23 F. Supp. 3d 290, 304 (S.D.N.Y. 2014) ("With respect to the second prong of the . . . test, courts have considered whether the person providing consent had 'any real measure of control over' the area searched." (quoting *Moore*, 505 F.3d at 210)). On the record before it, the Court cannot conclude as a matter of law that Belinda had authority to consent to a search of her father's bedroom.

Defendants do little to rebut this conclusion. They argue merely that Belinda, "as a resident in the [house,] . . . had actual authority to consent to the search and seizure." (Defs.' Mem. 6.) And the cases cited in support of this argument are cited only for the general proposition that a third party may consent to a search so long as they possess "a sufficient relationship to the searched premises to validate the search." *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988). These cases are of little value because the record is silent on Belinda's "relationship" to Plaintiff's bedroom. In short, the Court cannot ascertain whether Belinda had "(a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore*, 505 F.3d at 209.

Even if Belinda did possess authority to search Plaintiff's bedroom, that authority would not extend to the case containing the pistol that was discovered underneath Plaintiff's bed. As

the Second Circuit has explained: "[W]hen considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in *the object* apart from his expectation of privacy in the home." *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002). Accordingly, the Court cannot conclude as a matter of law that Belinda had authority to consent to a search of the case discovered underneath Plaintiff's bed. *See Turner*, 23 F. Supp. 3d at 311 ("Here, [the third party] told the police prior to the search that the guns belonged to [the defendant] and that he kept them in his backpack. [The third party] was not asked any further questions to establish her ownership, control, or use of the backpack. Without more, even if [the third party] had apparent authority to grant consent to search the apartment, the consent could not extend to the search of a closed container known to be controlled by the defendant that was located in his closet."); *United States v. Chisholm*, No. 07-CR-795, 2009 WL 29313, at *7, *10 (E.D.N.Y. Jan. 5, 2009) (holding that a third party who had authority to consent to a general search of the defendant's bedroom did not have authority to consent to a search of a jacket and a box located in the bedroom's closet).

In the alternative, Defendants argue that even if Belinda lacked actual authority to consent to a search of Plaintiff's bedroom, "it would have been reasonable for Dewey to believe that [Belinda] had apparent authority to consent" to the search. (Defs.' Mem. 6.) Defendants rely on the following factors to support their argument:

> (1) [Belinda] was a resident of the [house] (2) asked her sister to call the police while she was being attacked by [Plaintiff] (3) met with the officers in the [house] (4) informed Dewey of the presence of the firearm (5) showed Dewey where the firearm was located (6) asked him to remove it because of her fear that [Plaintiff] would use it to harm her or her baby and (7) the container w[h]ere the firearm was stored was not locked.

(*Id.*) Factors 2, 4, and 6 are irrelevant to a determination of whether Belinda had apparent authority to consent to the search—they go more to whether the search was prudent. The

remaining factors indicate that Belinda would have authority to consent to a search of some areas

of the house, but say little about her ability to consent to a search of her father's bedroom. Other

than the fact that Belinda resided in the house, (*see* Dewey Aff. ¶ 5), at the moment before the

search, Dewey seemingly knew nothing about Belinda's access to Plaintiff's bedroom, but

Dewey did know that it was *Plaintiff's* bedroom, (*see id.* ¶ 12 ("Belinda walked me to a bedroom

and told me that the pistol was in a green case underneath her *father's* bed." (emphasis added)).

Because Dewey knew that the pistol was underneath Plaintiff's bed at the time of the search, and

the record is silent as to whether Dewey inquired about Belinda's ability to enter Plaintiff's

bedroom, *see Cullen v. Village of Pelham Manor*, No. 03-CV-2168, 2009 WL 1507686, at *14

(S.D.N.Y. May 28, 2009) ("In situations where an officer is presented with ambiguous facts

related to authority, he or she has a duty to investigate further before relying on consent."

(internal quotation marks omitted)), *aff'd*, 399 F. App'x 657 (2d Cir. 2010), the Court cannot

conclude as a matter of law that a person of "reasonable caution" would believe that Belinda had

authority to consent to a search of Plaintiff's bedroom, *Rodriguez*, 497 U.S. at 188 (internal

quotation marks omitted). The critical fact is that Dewey knew that Belinda was consenting to a

search of *Plaintiff's* bedroom, but apparently knew nothing about Belinda's common authority

over the area or whether she had permission to gain access to the area.

The same problems also persist with respect to Belinda's apparent authority to consent to

a search of the case found underneath Plaintiff's bed. Perhaps it was prudent to remove the

pistol from the residence, but nothing in the record suggests that it was reasonable for Dewey to

believe that Belinda could consent to a search of the container. *See Turner*, 23 F. Supp. 3d at

311 (holding that even if a third party had apparent authority to consent to a search of an

apartment, the apparent authority did not extent to a search of a backpack in the defendant's

closet); *Chisholm*, 2009 WL 29313, at *10 (holding that the defendant's grandmother did not have actual or apparent authority to consent to a search of certain items in the defendant's closet). Accordingly, the Court cannot conclude as a matter of law that Belinda's consent renders the search of Plaintiff's belongings constitutional.

Conspicuously absent from Defendants' papers is any discussion of whether the seizure of the pistol violated the Fourth Amendment. "In the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant, issued by a neutral magistrate after a finding of probable cause." *Harrell v. City of New York*, 138 F. Supp. 3d 479, 488 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted), *reconsideration granted*, 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015). This presumption "may be overcome in some circumstances," *Kentucky v. King*, 563 U.S. 452, 459 (2011), but Defendants have not explained why the presumption is inapplicable to the facts of this case. Perhaps Defendants intended to rely on Belinda's consent to justify the seizure of the pistol, (*see* Defs.' Mem. 6 ("[A]s a resident in the [home], Belinda Ong had actual authority to consent to the search *and seizure*." (emphasis added)), but Defendants have made no effort to explain, or cited any cases explaining, why Belinda would have authority to consent to the seizure of Plaintiff's pistol. The record establishes that Dewey did not have a warrant, that Plaintiff had a pistol permit, that the pistol was Plaintiff's, that Plaintiff did not threaten Belinda with the pistol, and that Dewey seized the pistol merely for "safe-keeping and to confirm whether the permit was valid." (Dewey Aff. ¶ 12.) On these facts, the Court cannot conclude as a matter of law that the warrantless seizure of Plaintiff's pistol was justified by Belinda's consent to search Plaintiff's bedroom.

As Defendants invoke no other exceptions to the Fourth Amendment's warrant requirement and offer no explanation why a warrant could not have been sought, Defendants are not entitled to summary judgment on this claim.

## 2. The August 20, 2010 Incident

Plaintiff asserts a series of causes of action arising from the August 20, 2010 incident. First, Plaintiff contends that he was falsely arrested and maliciously prosecuted. Second, Plaintiff contends that Farmingham assaulted him during the arrest and Kleveno failed to intervene. Finally, the Court broadly construes Plaintiff's allegations to be challenging the searches of his person, refrigerator, and laptop.

### a. False Arrest & Malicious Prosecution

To establish a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Willey v. Kirkpatrick*, 801 F.3d 51, 70–71 (2d Cir. 2015) (internal quotation marks omitted). An arrest may be "otherwise privileged" when supported by probable cause. *See Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (noting that one example of such privilege is "confinement . . . with probable cause"); *see also Morel v. Reed*, Nos. 11-CV-1808, 12-CV-5145, 2015 WL 1506132, at *4 (E.D.N.Y. Mar. 31, 2015) (defining the fourth element as "the confinement was not otherwise privileged by probable cause" (alteration and internal quotation marks omitted)), *reconsideration denied*, 2015 WL 3755976 (E.D.N.Y. June 16, 2015). To succeed on a claim for malicious prosecution, a plaintiff must show "'(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was

instituted with malice.'" *Oxman v. Downs*, 999 F. Supp. 2d 404, 412–13 (E.D.N.Y. 2014)

(quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)).  A finding of probable cause is

also enough to overcome a malicious prosecution claim.  *See Dickerson v. Napolitano*, 604 F.3d

732, 751 (2d Cir. 2010) ("Probable cause is a complete defense to any action for false arrest or

malicious prosecution in New York.").

Defendants argue that summary judgment on these claims is appropriate because

Farmingham had probable cause to arrest Plaintiff.  (*See* Defs.' Mem. 10.)  Probable cause for an

arrest (or imprisonment) exists where the arresting officer "has knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested has committed or is committing a

crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (internal quotation marks omitted).

By contrast, "[t]he standard for probable cause in the case of malicious prosecution is slightly

different—probable cause exists when the facts and circumstances 'would lead a reasonably

prudent person in like circumstances to believe [the] plaintiff [to be] guilty.'" *Thimmesch v. City

of New York*, No. 12-CV-8882, 2013 WL 1558699, at *1 n.3 (S.D.N.Y. Apr. 9, 2013) (quoting

*Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).  Either way, probable cause

exists when a law enforcement officer "receive[s] . . . information from some person, normally

the putative victim or eyewitness, unless the circumstances raise doubt as to the person's

veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted); *see also

Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a

crime by a person who claims to be the victim, and who has signed a complaint or information

charging someone with the crime, has probable cause to effect an arrest absent circumstances

that raise doubts as to the victim's veracity.").  "Probable cause may also exist where the officer

has relied on mistaken information, so long as it was reasonable for him to rely on it." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

For a false arrest claim, "[p]robable cause is evaluated based on the facts available to the officer or officers at the time of the arrest." *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 398 (E.D.N.Y. 2014). In contrast, the existence of probable cause for a malicious prosecution claim "is measured at the time of the judicial proceeding, not the time of the arrest, though if it existed at the time of the arrest it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 537 (S.D.N.Y. 2015) (internal quotation marks omitted). Additionally, while "a claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime," *Jaegly*, 439 F.3d at 150, "in the context of a malicious prosecution claim, probable cause must relate to the specific crime charged in the criminal proceeding," *Genovese v. County of Suffolk*, 128 F. Supp. 3d 661, 669 (E.D.N.Y. 2015).

Here, ample probable cause existed to justify Plaintiff's arrest and later prosecution for Endangering the Welfare of an Elderly Person in the Second Degree, Unlawful Imprisonment in the Second Degree, and Assault in the Third Degree. (Defs.' 56.1 ¶ 69; Randazzo Decl. Ex. X.)[14] Plaintiff was arrested after Farmingham spent approximately five minutes with Rana. (*See* Pl.'s Dep. 96–97.) During those five minutes, Farmingham observed that Rana had numerous bruises on her arms and legs, a black eye, and that there was a urine soaked towel on the bed.

---

[14] "A person is guilty of endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person in the second degree when, being a caregiver for a vulnerable elderly person, or an incompetent or physically disabled person . . . [h]e or she recklessly causes physical injury to such person." N.Y. Penal Law § 260.32(2). "A person is guilty of assault in the third degree when . . . [h]e recklessly causes physical injury to another person." *Id.* § 120.00(2). Finally, "[a] person is guilty of unlawful imprisonment in the second degree when he restrains another person." *Id.* § 135.05.

(Defs.' 56.1 ¶¶ 42–43.)  At the very least, these observations provided sufficient probable cause to arrest Plaintiff for Endangering the Welfare of an Elderly Person in the Second Degree. Farmingham later learned that Rana's leg was tied to the bed, (Farmingham Aff. ¶ 17), and Crain and a nurse at the hospital confirmed that the bruising on Rana's body was consistent with abuse, (*see* Defs.' 56.1 ¶¶ 65–67).  This information provided probable cause to charge Plaintiff with Unlawful Imprisonment in the Second Degree and Assault in the Third Degree.  Therefore, Plaintiff's false arrest and malicious prosecution claims have no merit; Defendants are entitled to summary judgment on these claims.[15]

### b.  Excessive Force

Plaintiff contends that Farmingham beat him during the August 20, 2010 incident and that Kleveno stood by and watched.  (*See* Pl.'s Dep. 101–13.)  "Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard."  *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (internal quotation marks omitted).  "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002).  Accordingly, "courts should examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them . . . ."  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (internal quotation marks omitted).  "Generally, the force used by

---

[15] Additionally, Plaintiff cannot maintain a malicious prosecution claim because he agreed to accept an Adjournment in Contemplation of Dismissal, (*see* Defs.' 56.1 ¶ 70), which "does not constitute a favorable termination for purposes of a malicious prosecution claim," *Smith v. City of New York*, No. 12-CV-4891, 2013 WL 5942224, at *3 (S.D.N.Y. Nov. 6, 2013); *see also Green v. Mattingly*, 585 F.3d 97, 103–04 (2d Cir. 2009) (same).

the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (italics, alteration, and internal quotation marks omitted).

Defendants argue that they are entitled to summary judgment because Farmingham and Kleveno did not use excessive force on Plaintiff. (*See* Defs.' Mem. 11–13.) Disputes of material fact, however, prevent the entry of summary judgment in Defendants' favor. According to Farmingham, the events surrounding Plaintiff's arrest unfolded as follows:

> 14. [Plaintiff] was standing in the area of the kitchen. I told him that he was under arrest. I asked [Plaintiff] to turn around and place his hands behind his back so that he could be handcuffed. [Plaintiff] turned around and Officer Kleveno assisted me as we attempted to handcuff him. [Plaintiff] struggled and moved his arms and refused to allow us to handcuff him. In order to gain control and to place handcuffs on [Plaintiff], we had to push him from behind against a closet door adjacent to the kitchen. The refrigerator was just a few feet from where [Plaintiff] was arrested and handcuffed. I do not recall which one of us handcuffed [Plaintiff].
>
> 15. At no time, either before or after [Plaintiff] was handcuffed, did I or Officer Kleveno strike or punch [Plaintiff]. We used a minimal amount of force to gain control and to handcuff him. I did not observe any injuries to [Plaintiff], and he did not complain about any injuries or that he was in pain.

(Farmingham Aff. ¶¶ 14–15.) Kleveno's version of events is similar to that of Farmingham's. (Randazzo Decl. Ex. F ¶¶ 13–14.)

Plaintiff's version of events differs substantially from that of Defendants. According to Plaintiff, Farmingham pushed Plaintiff into a doorknob, (Pl.'s Dep. 101), and then punched Plaintiff several times on the left side and grabbed Plaintiff's arm, (*id.* at 105–08). The beating lasted "somewhere" around 10 minutes. (*Id.* at 113; *see also id.* at 122 ("Q: Sir, and you testified that for about [10] minutes Officer Farmingham punched you; correct? A: Yes, beating me up."); *id.* at 138 ("Q: Sir, is it your testimony that on August 20th, a police officer beat you for

[10] minutes; is that correct? A: Approximate[ly] [10] minutes.").) While Farmingham was

beating Plaintiff, Kleveno allegedly watched and did nothing to intervene. (*Id.* at 112–13.)

Defendants argue that the Court should find Plaintiff incredible as a matter of law

because Plaintiff initially alleged that Farmingham bit him, but is now claiming that Farmingham

beat him. (*See* Defs.' Mem. 12–13.) Defendants' argument misses the mark because the cases

they cite are readily distinguishable. In two of the cases, the court viewed a video to determine

that no reasonable juror could find in favor of the plaintiff. *See McKinney v. Dzurenda*, 555 F.

App'x 110, 111–12 (2d Cir. 2014); *Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880–

81 (2d Cir. 2012). No video exists in this case. In the only other case cited—*Jeffreys v. City of

New York*, 426 F.3d 549 (2d Cir. 2005)—the Second Circuit concluded that the defendants were

entitled to summary judgment in part because the plaintiff's testimony was "unsubstantiated by

any other direct evidence" and was "so replete with inconsistencies and improbabilities that no

reasonable juror would undertake the suspension of disbelief necessary to credit the allegations

made in his complaint." *Id.* at 555 (internal quotation marks omitted). Here, Plaintiff's

testimony is corroborated by documentary evidence, (*see* Randazzo Decl. Ex. CC, at 6 (noting a

"very small" bruise on Plaintiff's abdomen and a bruise on Plaintiff's chest)), and his testimony

is not replete with inconsistencies. Indeed, Plaintiff testified that he may have mistakenly typed

"bite" in his pleadings when he meant "beat" because English is not his first language. (*See* Pl.'s

Dep. 123.) During discovery, Plaintiff consistently testified that he was beaten by Farmingham.

Thus, the Court does not find that Plaintiff's testimony is incredible as a matter of law.

Defendants contend finally that even if Farmingham and Kleveno did use excessive force

while arresting Plaintiff, Defendants are entitled to summary judgment because Plaintiff did not

sustain a cognizable injury. (*See* Defs.' Mem. 13.) The Court finds no merit in Defendants'

contention.  First, Defendants' argument overlooks evidence that supports Plaintiff's position.

Defendants argue that Plaintiff did not complain of "any physical injuries to the ambulance

crew," (*id.*), but Plaintiff specifically testified that he complained to the ambulance crew that his

arm hurt, (*see* Pl.'s Dep. 134 ("I—I just mention it, I—my arm is hurting.  I did not say I was

beaten up.")), and Plaintiff's medical records reveal that Plaintiff's doctor observed a "very

small" bruise on Plaintiff's abdomen and a second bruise on Plaintiff's chest on August 21,

2010, the day after he was allegedly beaten by Farmingham, (*see* Randazzo Decl. Ex. CC, at 6).

Second, courts in the Second Circuit have rejected Defendants' argument on several occasions.

"The slightness of injury suffered as a result of the challenged use of force . . . does not preclude

a finding that such force was objectively unreasonable."  *Adedeji v. Hoder*, 935 F. Supp. 2d 557,

567 (E.D.N.Y. 2013).  In fact, courts have allowed excessive force claims to stand where the

plaintiff suffered only minor injuries.  *See, e.g.*, *Maxwell v. City of New York*, 380 F.3d 106, 108

(2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on

allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and

threw her up against a car, causing only bruising."); *Castro v. County of Nassau*, 739 F. Supp. 2d

153, 176–77 (E.D.N.Y. 2010) (allowing excessive force claim to proceed where injury sustained

consisted of handcuff imprints, redness and soreness on wrists only); *Hamilton v. City of New*

*York*, Nos. 07-CV-3633, 07-CV-3825, 2009 WL 2226105, at *11 (E.D.N.Y. July 23, 2009)

("That [the] plaintiff did not suffer a serious injury here does not entitle [the] defendants to

summary judgment on [the] plaintiff's excessive force claim."); *Sforza v. City of New York*, No.

07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("A plaintiff need not

demonstrate serious injury to prevail in an excessive force claim; bruising and other

nonpermanent injuries are sufficient."). Accordingly, Farmingham is not entitled to summary judgment on this claim.

With respect to Kleveno, "[a] police officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'" *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 565 (S.D.N.Y. 2010) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "To establish a claim for failure to intervene, a plaintiff must show (i) the officer's failure 'permitted fellow officers to violate [the] plaintiff's clearly established statutory or constitutional rights,' and (ii) it was 'objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights.'" *Buchy v. City of White Plains*, No. 14-CV-1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (alteration omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)). Kleveno is not entitled to summary judgment on this claim because a reasonably jury could conclude that Farmingham was violating Plaintiff's clearly established right to be free from excessive force and Kleveno did not intervene, even though there allegedly was sufficient time for an intervention. *See Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) ("It is beyond dispute that the right to be free from excessive force has long been clearly established.").

### c. The Searches

Broadly construing Plaintiff's filings, Plaintiff challenges the searches of his person, laptop, and refrigerator on August 20, 2010. Defendants contend that the searches were either conducted pursuant to an exception to the warrant requirement or did not happen at all. (*See* Defs.' Mem. 14–15.)

Farmingham is entitled to summary judgment on Plaintiff's claim that Farmingham illegally searched Plaintiff's laptop because there is no admissible evidence that any such search

occurred.  Plaintiff testified that Farmingham searched his laptop, but Plaintiff's was not present during the alleged search, (*see* Borgmann Dep. 11–12), and there is no evidence to corroborate Plaintiff's assertion.  Borgmann testified only that he observed Farmingham "studying" Plaintiff's laptop, (*id.* at 15), and heard Farmingham remark that Plaintiff was worth a lot of money, (*id.* at 29), but Borgmann did not testify that he saw Farmingham open or touch the computer.  Indeed, Plaintiff admitted that his laptop was open when Farmingham and Kleveno entered the apartment.  (Pl.'s Dep. 94.)  Thus, Farmingham's statement that he did not search Plaintiff's laptop is unrebutted.  (*See* Farmingham Aff. ¶ 22.)

Defendants also are entitled to summary judgment on Plaintiff's claim that he was illegally patted down following his arrest because "[a]mong the exceptions to the warrant requirement is a search incident to lawful arrest."  *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

With respect to the search of the refrigerator, Defendants argue that the search never occurred, and even if it did, it was justified based on exigent circumstances or as a search incident to arrest.  (*See* Defs.' Mem. 14.)  Despite Farmingham's statement that he did not search Plaintiff's refrigerator, (Farmingham Aff. ¶ 22), construing the facts in the light most favorable to Plaintiff, the Court assumes that Farmingham searched the refrigerator, (*see* Pl.'s Dep. 121). Because the search of the refrigerator occurred without a warrant, to obtain summary judgment the search must fit within one of the exceptions to the Fourth Amendment's warrant requirement. *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984) ("[F]or [a warrantless] search to be valid, it must fall within one of the narrow and specifically delineated exceptions to the warrant requirement.").

"It is well-settled . . . that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act

without delay." *United States v. Moreno*, 701 F.3d 64, 72–73 (2d Cir. 2012) (internal quotation marks omitted). "The 'core question' in applying the exigent-circumstances doctrine is 'whether the facts, as they appeared [before the search], would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action.'" *United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016) (quoting *United States v. Klump*, 536 F.3d 113, 117–18 (2d Cir. 2008)), *cert. denied*, 137 S. Ct. 654 (2017). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Defendants explain that it would have been reasonable for Farmingham to believe that there was an ongoing emergency in the apartment permitting Farmingham to open the refrigerator, because he observed several bruises on Rana's skin and the apartment smelled of a foul odor. (*See* Defs.' Mem. 14.) The Court disagrees. Farmingham and Dewey were confronted with a foul odor upon entering Plaintiff's apartment, (*see* Defs.' 56.1 ¶ 33), but the search of the refrigerator did not occur until after the apartment was secured, and nothing in the record suggests that anything in the refrigerator posed a threat to any of the apartment's occupants. Therefore, the search of the refrigerator cannot be justified by reliance on exigent circumstances.

Defendants also justify the search of Plaintiff's refrigerator on the ground that it was part of a search incident to Plaintiff's arrest. Following a valid arrest, "police may conduct a search of the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (internal quotation marks omitted); *see also Davis v. United States*, 564 U.S. 229, 232 (2011) ("[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area

within his immediate control." (internal quotation marks omitted)). Plaintiff does not dispute that he was arrested before the search of the refrigerator occurred. (*See* TAC 14 (alleging that "Farmingham went to near refrigerator while Plaintiff[] was [in] handcuffs").) While Farmingham asserts that the refrigerator was located "a few feet from where [Plaintiff] was arrested and handcuffed," (Farmingham Aff. ¶ 14), the Court cannot discern whether the refrigerator was within Plaintiff's "grab area" based on this testimony, *Gandia*, 424 F.3d at 261 (internal quotation marks omitted). Farmingham's statement that the refrigerator was "a few feet away" could mean three feet away or across the room. Accordingly, material issues of fact preclude the entry of summary judgment on this issue.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim that he was illegally searched following his arrest and that Farmingham illegally searched his computer, but Defendants are not entitled to summary judgment on Plaintiff's claim that his refrigerator was illegally searched.

### 3. Qualified Immunity

Defendants argue that even if material disputes of fact preclude summary judgment in their favor, Plaintiff's claims should nonetheless be dismissed because Defendants are entitled to qualified immunity. (*See* Defs.' Mem. 18–22.) The Court has concluded that Defendants are entitled to summary judgment on Plaintiff's false arrest, malicious prosecution, and certain of Plaintiff's Fourth Amendment claims. Therefore, the focus of the Court's inquiry is on whether Dewey is entitled to qualified immunity for the search of Plaintiff's bedroom on March 30, 2010, whether Farmingham is entitled to qualified immunity for the search of Plaintiff's refrigerator on August 20, 2010, and whether Farmingham and Kleveno are entitled to qualified immunity for the alleged use of excessive force and failure to intervene that occurred on that same date.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted). Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in original) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194

34

(2001)), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he [was] doing violate[d] that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (second alteration in original) (citations and internal quotation marks omitted).  Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 2094 (citations and internal quotation marks omitted).  Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

### a.  The March 30, 2010 Search & Seizure

Defendants make two arguments with respect to the March 30, 2010 search of Plaintiff's bedroom: (1) it was reasonable for Dewey to believe that Belinda had apparent authority to consent to the search of Plaintiff's bedroom, and (2) the "law regarding third-party consent to access in a shared dwelling under the circumstances [Dewey] confronted was not clearly established at the time of the search."  (*See* Defs.' Mem. 19–20.)

Some courts have held that a defendant is entitled to qualified immunity if it was objectively reasonable for the defendant to believe that the person consenting to the search had

apparent authority to consent. *See, e.g.*, *Young v. Suffolk County*, 922 F. Supp. 2d 368, 393 n.9 (E.D.N.Y. 2013) (holding that a defendant was entitled to qualified immunity because it was reasonable for him to believe that the plaintiff had apparent authority to consent); *Krug v. County of Rennselaer*, No. 04-CV-640, 2010 WL 3937319, at *5 (N.D.N.Y. Oct. 5, 2010) (holding that a defendant was entitled to qualified immunity for "the search of [a] van because it was objectively reasonable for him [to] conclude that the search was constitutionally permitted because it had been consented to by a person having apparent authority over the vehicle"). However, the Court has already determined that it cannot conclude as a matter of law that it was objectively reasonable for Dewey to believe that Belinda had authority to consent to a search of Plaintiff's bedroom, or the case underneath Plaintiff's bed, and to then seize items found within that case. Dewey knew that Belinda was a resident of Plaintiff's home and that Belinda knew that Plaintiff kept a pistol in a case underneath his bed, (Dewey Aff. ¶¶ 5, 12), but the record is silent on whether Dewey knew anything more about Belinda's relationship to Plaintiff's bedroom or the objects in it. And, as discussed above, even if Belinda could consent to a search of Plaintiff's bedroom, Belinda's consent would not extend to a search of the case in which the pistol was located, or the pistol's seizure. *See Haqq*, 278 F.3d at 50. At the time, Dewey believed that Belinda "had the authority to consent to a search of anything in the [home]," (*id.* ¶ 15), but that is not the law, *see Turner*, 23 F. Supp. 3d at 311 (holding that even if a third party had apparent authority to consent to a search of an apartment, the apparent authority did not extent to a search of a backpack in the defendant's closet); *Chisholm*, 2009 WL 29313, at *10 (holding that the defendant's grandmother did not have actual or apparent authority to consent to a search of certain items in the defendant's closet).

Defendants' second argument—that the law on third-party consent was not clearly established—similarly is unfounded. Prior to Dewey's search of Plaintiff's bedroom, "[i]t [was] well-settled in this circuit that 'third party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access.'" *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir. 2003) (quoting *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)); *see also United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006) (same). Here, the record is completely silent on the second prong. Accordingly, Dewey is not entitled to qualified immunity with respect to his search of Plaintiff's bedroom.

The Court notes that Defendants have not presented any argument justifying the seizure of Plaintiff's pistol; their papers focus on the underlying search. (*See generally* Defs.' Mem.; *see also* Dewey Aff. ¶ 15 ("Since Belinda lived in the [home], I believed that she had the authority to consent to a *search* of anything in the [home]." (emphasis added)).) Because Dewey is not entitled to qualified immunity with respect to the search, it follows that he is not entitled to qualified immunity for the seizure of the pistol and other items found in the case underneath Plaintiff's bed. However, even if Dewey were entitled to qualified immunity on the search, Defendants' failure to make an argument concerning the seizure would preclude entry of summary judgment on that issue. Accordingly, Plaintiff's claim that Dewey unlawfully searched his bedroom and seized his pistol survives Defendants' Motion.

### b. The Search of Plaintiff's Refrigerator

Defendants devote one line of their brief to arguing that "Farmingham is entitled to qualified immunity on the unlawful search claims because there was at least arguable probable cause to search." (Defs.' Mem. 21.) "Arguable probable cause exists if either (a) it was

objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) (internal quotation marks omitted). Defendants do not explain why it was objectively reasonable for Farmingham to believe that he had probable cause to search Plaintiff's refrigerator. Indeed, they offer no explanation as to what evidence Farmingham hoped to recover from the search. The search also may be justified on the ground that the refrigerator was within Plaintiff's grab area at the time it occurred, but as discussed above, the current record precludes such a finding. Accordingly, Farmingham is not entitled to qualified immunity for the search of Plaintiff's refrigerator.

### c. The Excessive Force & Failure to Intervene Claims

Defendants argue that Farmingham and Kleveno are entitled to qualified immunity because Farmingham's conduct falls in the "sometimes hazy border between excessive and acceptable force." (Defs.' Mem. 21 (internal quotation marks omitted).) The Court disagrees. Crediting Plaintiff's version of events, Farmingham beat Plaintiff for approximately 10 minutes. Accordingly, Farmingham is not entitled to qualified immunity on this issue. *See Barcomb v. Kraeger*, No. 14-CV-1159, 2016 WL 2644885, at *7 (D. Conn. May 5, 2016) (denying summary judgment on issue of qualified immunity where the record revealed that "a reasonable jury could conclude that the officers employed unreasonable force against [the plaintiff] in violation of her clearly established constitutional right to be free from excessive force"). The Court reaches the same conclusion with respect to Kleveno, who allegedly stood by as Plaintiff was beaten by Farmingham. *See Jackson v. City of New York*, 939 F. Supp. 2d 235, 258 (E.D.N.Y. 2013) (denying summary judgment on issue of qualified immunity where two defendants failed to intervene to stop a third defendant's use of excessive force).

## III. Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Summary judgment is denied as to Plaintiff's claim that Kleveno illegally searched his bedroom on March 30, 2010, Plaintiff's claim that Farmingham illegally searched Plaintiff's refrigerator on August 20, 2010, and Plaintiff's excessive force and failure to intervene claims stemming from that same date. Defendants are entitled to summary judgment on all other claims. The Court will hold a conference on October 30, 2017 at 3:00 p.m. to set a schedule for trial.

The Clerk of Court is directed to mail a copy of this Opinion to Plaintiff, and to terminate the pending Motion. (Dkt. No. 282.)[16]

SO ORDERED.

Dated:     September 27, 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[16] The Clerk of Court is further directed to terminate the three other motions pending on the Docket, (Dkt. Nos. 293, 303, 307), as Plaintiff inappropriately labeled those documents as motions.

39